

FILED
LODGED
RECEIVED | **MAIL**

MAY 16 2013

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

1  CHRISTINA HARING-LARSON, WSBA No. 30121
   christina@slindenelson.com
2  SLINDE NELSON STANFORD
   4400 Two Union Square
3  601 Union Street
   Telephone: (206) 237-0020
4    *Of Attorneys for Plaintiffs*

5

6

7              UNITED STATES DISTRICT COURT

8            WESTERN DISTRICT OF WASHINGTON

9                      AT SEATTLE

10  DR. CHRISTOPH BÖLLING; JIMMY M.
    CONANT; BARBARA AND WILLIAM
11  DETRICK, INDIVIDUALLY AND AS
    TRUSTEES OF THE DETRICK FAMILY
12  LIVING TRUST; MICHAEL W. HENDRY;
    CAROLINE AND KENNETH HOFFMANN;
13  JOYCE M. JOHNSON, BRIAN K. JOHNSON
    AND KENNETH R. JOHNSON; DR. RUBY
14  KOCHHAR; KOCHHAR CANCER
    RESEARCH FOUNDATION; LINA CHAND-
15  MILLER AND RICHARD B. MILLER,
    INDIVIDUALLY AND AS TRUSTEES OF
16  THE MILLER FAMILY TRUST; JANET W.
    NOONE; MARGARET PALMER; JOHN R.
17  PIOTTI, AS TRUSTEE OF THE JOHN
    ROBERT PIOTTI, REVOCABLE TRUST;
18  KENNETH SAWYER; MARIO SETTE; AND
    JENNIFER TOLARBA,
19
                    Plaintiffs,
20
    v.
21
    DENDREON CORPORATION, MITCHELL
22  H. GOLD, M.D., GREGORY T. SCHIFFMAN
    and HANS E. BISHOP,
23
                    Defendants.
24

Case No. 13-cv-872 RSL

**COMPLAINT**

**JURY TRIAL DEMANDED**

13-CV-00872-CMP

25       **REDACTED VERSION PURSUANT TO LOCAL RULE 5(g)(3)**

26

SEA5637 (S/N requested)

**TABLE OF CONTENTS**

I.      NATURE AND SUMMARY OF THE ACTION .................................................. 1

II.     JURISDICTION AND VENUE ........................................................................ 3

III.    THE PARTIES .................................................................................................. 4

        A.      Plaintiffs ............................................................................................... 4

        B.      Defendants ........................................................................................... 7

IV.     CONFIDENTIAL WITNESSES CITED IN THIS COMPLAINT .................... 8

V.      DENDREON'S DEVELOPMENT AND COMMERCIALIZATION OF PROVENGE .. 9

        A.      How Provenge Works .......................................................................... 9

VI.     DEFENDANTS' FRAUDULENT SCHEME AND COURSE OF CONDUCT ............. 12

VII.    DEFENDANTS   REPEATEDLY   MISREPRESENTED   THE   DEMAND   FOR
        PROVENGE ...................................................................................................... 13

        A.      Defendants' Misrepresentations As To The Demand For Provenge ................... 13

        B.      Defendants Knew Their Representations Were False ........................................ 20

VIII.   DEFENDANTS FALSELY ASSURED SHAREHOLDERS ABOUT THE LEVEL OF
        PHYSICIAN   CONFIDENICE   IN   OBTAINING   REIMBURSEMENT   UNDER
        PROVENGE'S "BUY-AND-BILL" REIMBURSEMENT STRUCTURE ..................... 26

        A.      Defendants' Misrepresentations As To The Level Of Physician Confidence In
                Obtaining Reimbursement Under The "Buy-and-Bill" Reimbursement Structure
                ......................................................................................................... 26

        B.      Defendants Knew Their Representations Were False ........................................ 28

IX.     DEFENDANTS PROVIDED FALSE AND MISLEADING FINANCIAL GUIDANCE
        AS TO SALES FOR PROVENGE .......................................................................... 29

        A.      Defendants' Misleading Financial Guidance For Provenge ............................... 29

        B.      Defendants' Knew Their Representations Were False ........................................ 32

X.      WHILE PERPETRATING THE ABOVE FRAUDULENT SCHEME, DEFENDANTS

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

SOLD LARGE QUANTITIES OF THEIR OWN HOLDINGS OF DENDREON STOCK, FURTHER EVIDENCING THEIR SCIENTER.............................................. 34

XI.    DEFENDANTS' FRAUD IS REVEALED...................................................... 36

XII.   LOSS CAUSATION................................................................................ 39

XIII.  DENDREON CLEANS HOUSE AFTER THE REVELATION OF THE FRAUD ....... 40

XIV.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ............................................................................. 41

XV.    STATUTORY SAFE HARBOR FOR FORWARD-LOOKING STATEMENTS NOT APPLICABLE ..................................................................................... 42

XVI.   CLAIMS FOR RELIEF ........................................................................... 43

XVII.  PRAYER FOR RELIEF ........................................................................... 52

XVIII. DEMAND FOR JURY TRIAL ................................................................... 52

APPENDIX A ................................................................................................ 54

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

1   Plaintiffs, by their undersigned counsel, make the following allegations against Dendreon

2   Corporation ("Dendreon" or the "Company"), its Chairman and former Chief Executive Officer,

3   Mitchell H. Gold ("Gold"), its former Chief Operating Officer, Hans Bishop ("Bishop"), and its

4   Chief Financial Officer, Gregory T. Schiffman ("Schiffman") (collectively, "Defendants").

5   Plaintiffs' allegations are based upon personal knowledge as to themselves and their own

6   acts, and upon information and belief as to all other matters.  Plaintiffs' information and belief is

7   based upon the investigation of their counsel, which included review and analysis of annual

8   reports; publicly filed documents; press releases; news articles; analysts' statements; conference

9   call transcripts and presentations; and transcripts of speeches and remarks given by the

10  Defendants.  Plaintiffs' counsel's investigation also included interviews with former Dendreon

11  employees (identified herein as Confidential Witness ("CW __")) and the review and analysis of

12  certain internal Dendreon documents.   Plaintiffs' counsel's investigation into the factual

13  allegations contained herein is continuing, and many of the relevant facts are known only by the

14  Defendants named in this Complaint, or are exclusively within their custody or control.

15  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set

16  forth in this Complaint after a reasonable opportunity for discovery.

17  **I.      NATURE AND SUMMARY OF THE ACTION**

18       1.      This action concerns a brazen fraud perpetrated by Dendreon and its senior

19  officers Gold, Bishop and Schiffman in connection with Dendreon's one and only product,

20  Provenge.

21       2.      From April 29, 2010 through August 3, 2011 (the "Relevant Period"), Defendants

22  repeatedly touted the strong demand for Provenge, which the Company claimed was so strong

23  that it was overwhelming the Company's ability to meet the demand.  At numerous investor

24  conferences, on conference calls and in its filings with the U.S. Securities and Exchange

25  Commission ("SEC"), Defendants emphasized the "very strong demand," the "incredibly high

26  demand" and the "no shortage of end-patient demand" that existed for Provenge, which demand,

**PAGE 1 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

1   according to the Company, purportedly was "exceeding our ability to supply the market" and
2   was resulting in "completely sold out capacity" and "substantial waiting lists" for treatment with
3   Provenge.   To underscore their statements, Defendants followed up with bullish financial
4   guidance to investors, projecting revenues of $350 to $400 million from Provenge in 2011.

5         3.     As has now been revealed, these statements to investors were completely false.
6   Furthermore, Defendants knew at all times that these statements were false.  As confirmed by
7   former Dendreon employees, the Company's regional sales managers repeatedly warned
8   Defendants at weekly meetings that Defendants' statements had no basis in fact, and that the real
9   demand being observed in the field was running at a much lower rate.  Not only were these
10   warnings communicated verbally at numerous meetings, the evidence backing these warnings
11   was provided to Defendants in the form of various internal reports that were disseminated to all
12   members of senior management, including Defendants Gold, Bishop and Schiffman.

13         4.     Among other things, these reports clearly showed the many problems plaguing
14   Provenge and the negative impact these problems were having on demand.  ▮▮▮▮▮▮▮
15   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22         5.     Despite the warnings from Dendreon's sales staff, and despite the lagging demand
23   indicated by the Company's internal reports, Defendants continued to issue optimistic financial
24   guidance and statements as to Provenge's prospects.  All the while that they were disseminating
25   these false statements to unsuspecting investors, *Defendants themselves were busily offloading*
26   *their own holdings of Dendreon stock*.  During the Relevant Period, Dendreon's officers and

**PAGE 2 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

1  directors realized *over $85 million* in proceeds from insider stock sales.  Defendant Gold,

2  Dendreon's Chief Executive Officer, personally reaped over *$35 million* from the sale of

3  Dendreon stock during the Relevant Period, including millions from sales made just weeks

4  before the fraud was revealed to investors.

5      6.     On August 3, 2011, after the close of trading, Defendants were finally forced to

6  come clean and abandon their previously-issued guidance.  Defendants were forced to admit that

7  quarterly growth for Provenge would be "modest" at best, and that the demand for Provenge had

8  been negatively impacted all along by physician concerns about reimbursement.  In addition,

9  Dendreon was forced to announce a restructuring plan that slashed the Company's workforce by

10  25%.

11      7.     The revelation of the Company's fraud was devastating, erasing *$3.5 billion* from

12  Dendreon's market capitalization in a single day.  Unlike Defendants, who were able to sell

13  substantial holdings of Dendreon stock before the fraud was revealed, the Company's

14  unsuspecting shareholders suffered crippling losses.  As *TheStreet.com* put it, Gold had turned

15  out like other Chief Executive Officers who had "hone[d] the fine craft of investor

16  bamboozlement."

17  **II.    JURISDICTION AND VENUE**

18      8.     The claims asserted herein arise under and pursuant to: (i) Sections 10(b), 20(a)

19  and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b),

20  78t(a) and 78t-1, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; (ii) the

21  Washington Consumer Protection Act, RCW 19.86 *et seq.*; and (iii) Washington common law.

22      9.     This Court has original jurisdiction over Plaintiffs' claims under the Exchange

23  Act and Rule 10b-5 pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C.

24  § 78aa.

25      10.    This Court has supplemental jurisdiction over Plaintiffs' related state law claims

26  pursuant to 28 U.S.C. § 1367.

**PAGE 3 - COMPLAINT**

11.     In addition, this Court has original jurisdiction over all the claims alleged in this Complaint pursuant to 28 U.S.C. § 1332 because there exists diversity of citizenship among the parties to this action and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §§ 1391(b), (c) and (d). Many of the acts and transactions that constitute violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District. Further, Dendreon maintained its corporate headquarters and principal executive offices in this District throughout the Relevant Period.

## III.     THE PARTIES

### A.     Plaintiffs

13.     Plaintiff Dr. Christoph Bölling is a resident of Switzerland and purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

14.     Plaintiff Jimmy M. Conant is an individual residing at Keller, Texas and is a participant in and the owner of a beneficial interest in the Lockheed Martin Salaried Savings Plan. Through this plan, Plaintiff Jimmy Conant purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

15.     Plaintiffs Barbara and William Detrick are individuals residing at Cromwell, Connecticut and are the trustees of the Detrick Family Living Trust and the owners of the beneficial interest in that trust. Plaintiffs Barbara and William Detrick bring this action in their capacity as trustees and, individually, as beneficiaries of the Detrick Family Living Trust. The Detrick Family Living Trust purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

**PAGE 4 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

16.     Plaintiff Michael W. Hendry is an individual residing at Bonita Springs, Florida and purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

17.     Plaintiffs Caroline and Kenneth Hoffmann are individuals residing at The Villages, Florida, and purchased securities of Dendreon at artificially inflated prices during the Relevant Period and were damaged thereby.

18.     Plaintiffs Joyce M. Johnson and Brian K. Johnson are individuals residing at Aurora, Illinois.   Plaintiff Kenneth R. Johnson is an individual residing at Alexandria, Minnesota, and has appointed Brian K. Johnson as his attorney-in-fact.  Plaintiffs Joyce, Brian and Kenneth Johnson purchased securities of Dendreon at artificially inflated prices during the Relevant Period and were damaged thereby.

19.     Plaintiff Dr. Ruby Kochhar is an individual residing at Portsmouth, Virginia and purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

20.     Plaintiff Kochhar Cancer Research Foundation is a charitable organization organized under the laws of the State of Louisiana and 26 U.S.C. § 501(c)(3), and purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

21.     Plaintiffs Lina Chand-Miller and Richard B. Miller are individuals residing at Los Angeles, California and are the trustees of the Miller Family Trust and the owners of the beneficial interest in that trust.  Plaintiffs Lina Chand-Miller and Richard B. Miller bring this action in their capacity as trustees and, individually, as beneficiaries of the Miller Family Trust. The Miller Family Trust purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

**PAGE 5 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

22.     Plaintiff Janet W. Noone is an individual residing at Portsmouth, Virginia, and purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

23.     Plaintiff Margaret Palmer is an individual residing at Newport, Michigan, and purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

24.     Plaintiff John R. Piotti is an individual residing in Largo, Florida, and is the trustee of the John Robert Piotti, Revocable Trust, UA Dated November 17, 1998, and the owner of the beneficial interest in that trust.  Plaintiff John R. Piotti brings this action in his capacity as trustee and, individually, as sole beneficiary of the trust.  The John Robert Piotti, Revocable Trust purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

25.     Plaintiff Kenneth Sawyer is an individual residing in Lancaster, California, and is a participant in and the owner of a beneficial interest in the Baxter Healthcare Incentive Plan.  Through this plan, Plaintiff Kenneth Sawyer purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.  In addition, Kenneth Sawyer and Karen Duvall (also a resident of Lancaster, California) purchased securities of Dendreon through another, jointly-held account at artificially inflated prices during the Relevant Period and were damaged thereby.

26.     Plaintiff Mario Sette is an individual residing in Las Vegas, Nevada, and purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

27.     Plaintiff Jennifer Tolarba is an individual residing in Las Vegas, Nevada, and purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

////

**PAGE 6 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

**B.**     **Defendants**

28.     Defendant Dendreon is a Delaware corporation with its principal place of business at 1301 Second Avenue, Suite 3200, Seattle, Washington 98101. Dendreon is a biotechnology company that focuses on the development, commercialization and manufacture of therapeutics to treat cancer. Dendreon's only FDA-approved product is Provenge (sipuleucel-T), a treatment for prostate cancer. Dendreon's securities have actively traded on the NASDAQ Stock Market ("NASDAQ") since February 2002.

29.     During the Relevant Period, Defendant Gold served as President, Chief Executive Officer ("CEO"), and Chairman of Dendreon's Board of Directors (the "Board"). From 1993 to 1998, Gold was a resident physician in the Department of Urology at the University of Washington. In June 2001, Gold joined Dendreon as Vice President of Business Development. In January 2003, Gold became CEO of Dendreon. On or about January 31, 2012, Gold was terminated by the Company as President and CEO. Gold is a resident of Seattle, Washington.

30.     During the Relevant Period, Defendant Hans E. Bishop was Chief Operating Officer ("COO") and Executive Vice President of Dendreon. Bishop joined Dendreon in January of 2010. Bishop was terminated by the Company on or about September 8, 2011. Bishop is a resident of New York, New York.

31.     During the Relevant Period, Defendant Gregory T. Schiffman was Chief Financial Officer ("CFO"), Executive Vice President, and Treasurer of Dendreon. Schiffman joined Dendreon in 2006. Schiffman is a resident of Oregon City, Oregon.

32.     Defendants Gold, Bishop and Schiffman are also referred to herein as the "Individual Defendants."

33.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Dendreon's quarterly reports, press releases, and presentations to securities analysts, investment managers and institutional and individual investors, *i.e.*, the market. During the Relevant Period, the Individual Defendants

**PAGE 7 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

1   signed and certified the Company's SEC filings, including, but not limited to, Dendreon's Forms

2   10-Q and 10-K.  They were provided with copies of the Company's reports, press releases,

3   conference call scripts and presentations prior to or shortly after their issuance and had the ability

4   and opportunity to prevent their issuance or cause them to be corrected.  As alleged in this

5   Complaint, because of their positions within the Company, and their access to material non-

6   public information, the Individual Defendants knew that the adverse facts alleged in this

7   Complaint had not been disclosed to and were being concealed from the public and that the

8   representations being made were materially false and misleading.  Accordingly, the Individual

9   Defendants are liable for the false and misleading statements alleged in this Complaint.

10  IV.   **CONFIDENTIAL WITNESSES CITED IN THIS COMPLAINT**

11       34.    CW1 was the Regional Sales Manager, Northeast Region, at Dendreon from

12  January 2010 until December 2010, and then a Sales Representative until December 2011.  As

13  Regional Sales Manager for the Northeast Region of the United States, CW1 was responsible for

14  more than five states and numerous sales representatives.  CW1's job responsibilities included,

15  among other things, overseeing the sales of Provenge to accounts located in the Northeast

16  Region, developing a regional business plan, and reporting to Defendants about the level of

17  demand for Provenge.  CW1 regularly received and reviewed plant "Capacity Reports",

18  "Apheresis Reports", "Prescriptions vs. Infusion Reports", and internal Dendreon market

19  research reports.  CW1 had several conversations with Defendant Bishop and other senior

20  executives concerning revenue guidance and sales of Provenge.  CW1 has over 20 years of

21  industry experience, including 12 years of experience with the oncology and urology market.

22       35.    CW2 was the Director of Sales Operations at Dendreon from November 2009

23  until December 2011.  CW2 created the Company's plant Capacity Reports for the first three

24  months of Provenge's launch, and sent them to Gold, Bishop, and other senior members of

25  Dendreon management.  After CW2 ceased preparing the Capacity Reports, CW2 continued to

26  receive the Capacity Reports, and reviewed and forwarded them to the sales management team.

**PAGE 8 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

1  In addition, CW2's department created the Prescription vs. Infusion reports.  CW2 also received

2  and reviewed "Provenge Weekly Performance Reports" and market research reports.  CW2

3  attended about a dozen "Commercial Team" meetings, which were held each Monday by

4  Defendant Bishop and other high-level management at the Company's headquarters.  In these

5  meetings, the prior week's performance was discussed, including how many Provenge treatments

6  were scheduled, how many treatments were performed, and where the Company stood in terms

7  of its capacity.

8  **V.    DENDREON'S    DEVELOPMENT    AND    COMMERCIALIZATION    OF**

9  **PROVENGE**

10     **A.    How Provenge Works**

11        36.    Founded in 1992, Dendreon is a biotechnology company focused on the

12  discovery, development and commercialization of therapies to treat various cancers.  Since its

13  inception, however, the Company has received FDA approval for only one drug, Provenge

14  (sipuleucel-T), a therapeutic vaccine for the treatment of advanced prostate cancer.  Although the

15  Company has other "potential product candidates" under development, none are beyond Phase I

16  FDA testing.

17        37.    Provenge is a form of "autologous cellular immunotherapy", under which cells

18  from a patient's own immune system are taken from the patient's body, cultured and processed

19  to activate them until their resistance to cancer is strengthened, and then replaced in the patient's

20  body.  In effect, Provenge trains a patient's immune system to fight the prostate cancer.

21        38.    Dendreon developed Provenge over fifteen years at a cost of over $1 billion.  In

22  2000, Dendreon began clinical testing of Provenge.  In 2006, Dendreon conducted a Phase III

23  trial.  Clinical studies showed that Provenge increased the median survival time of patients by

24  four months compared with a placebo, and posed fewer side effects than chemotherapy.  In April

25  2010, Provenge was approved by the FDA for men whose prostate cancer has spread into their

26

**PAGE 9 - COMPLAINT**

1  bodies, who have either no or minimal symptoms from the disease, and who will not respond to

2  hormone blocking drugs.

3       39.     There are three steps involved in the treatment of a patient using Provenge.  First,

4  a patient's blood is collected at an approved "apheresis" site and immediately shipped to a

5  Dendreon manufacturing plant for processing.   The patient's blood must be received by

6  processing within 18 hours of removal from the patient's body.  Second, once received at the

7  manufacturing plant, the patient's blood is turned into Provenge at individual workstations, by

8  incubating the patient's white blood cells with a proprietary "antigen" similar to the one found in

9  prostate cancer cells.  (An antigen is a substance that causes the body to react with an immune

10  response.)  Third, once the immune cells are "primed" or "activated", which takes about 36 to 44

11  hours to complete, the Provenge is immediately shipped to an approved center for infusion into

12  the patient.  Once infused, Provenge uses a patient's immune system to activate T-cells that in

13  turn fight the prostate cancer cells.   The Provenge must be infused within 18 hours after

14  shipment, or else the cells die and the drug is ineffective.

15       40.     Each Provenge infusion costs $31,000.  A full treatment of Provenge requires

16  three infusions over a one-month period, for a total cost of $93,000.  The cost of Provenge is

17  charged to the patient's physician or healthcare provider, who then must seek reimbursement

18  from Medicare or the patient's private health insurer.

19       41.     Before launching Provenge, Dendreon was also required to obtain FDA validation

20  and approval of its workstations for manufacturing Provenge.  In 2006, the FDA approved 12

21  workstations in the Company's Morris Plains, New Jersey plant to conduct Phase III testing.

22  Dendreon used these 12 workstations exclusively to manufacture Provenge from the time of its

23  launch in April 2010 until March 10, 2011, when the Company obtained FDA approval to

24  manufacture Provenge at an additional 36 workstations at the New Jersey facility.  On June 29,

25  2011, Dendreon received FDA approval to manufacture Provenge at an additional 36

26  workstations located at a facility in Seal Beach, California (referred to internally as the "Los

**PAGE 10 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

1   Angeles" plant).   On August 26, 2011, Dendreon received FDA approval to manufacture

2   Provenge at an additional 36 workstations located at a third facility in Atlanta, Georgia.

3       42.   Since the launch of Provenge in May 2010, Provenge has accounted for virtually

4   all of Dendreon's revenue.  Accordingly, during the Relevant Period, the demand for Provenge

5   was of critical importance to investors in assessing Dendreon's value and business prospects.

6       **B.**    **The Individual Defendants' Close Involvement In The Development And**

7       **Commercialization Of Provenge**

8       43.   Each of the Individual Defendants played a significant role in the launch and

9   commercialization of Provenge.  According to Dendreon's 2010 Annual Report, Defendant Gold

10   and the Company's other executive officers were "involved in a broad range of critical activities"

11   related to the commercialization of Provenge, "including providing strategic and operational

12   guidance."

13       44.   As part of their "critical" role in the commercialization of Provenge, the

14   Individual Defendants were provided with regular reports that tracked key metrics concerning

15   the demand for Provenge, including the Plant Capacity Reports, Prescription vs. Infusion

16   Reports, Provenge Weekly Performance Reports, and Reimbursement Confidence Reports.

17       45.   In addition, as part of their "critical" role in the commercialization of Provenge,

18   the Individual Defendants conducted regular meetings with other members of Dendreon's

19   management.  For example, every Monday, Defendant Bishop and other high-level management

20   held "Commercial Team" meetings at the Company's headquarters, at which the prior week's

21   performance was discussed, including how many Provenge treatments were scheduled, how

22   many treatments were performed, and where the Company stood in terms of capacity.   In

23   addition, every Tuesday, the Individual Defendants held Executive Committee meetings with the

24   Company's Senior Vice President of Operations to discuss the status of the Provenge launch,

25   including all the details from the previous week and any hot topics from the week.   At the

26

**PAGE 11 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

1  weekly Executive Committee meetings, the participants also discussed the plant Capacity

2  Reports, sales trends and forecasts.

3       46.     Based on the information derived from their close involvement described above,

4  the Individual Defendants also updated Dendreon's Board with presentations concerning the

5  progress of Provenge's launch and commercialization.

6  **VI.    DEFENDANTS' FRAUDULENT SCHEME AND COURSE OF CONDUCT**

7       47.     From the outset, Defendants were aware that, despite the promise of Provenge, its

8  commercialization confronted several significant challenges.

9       48.     One challenge was the cost of Provenge, and the effect this had on demand.

10  Before its launch in April 2010, Wall Street analysts had projected a cost ranging from $40,000

11  to $75,000 for a full course of treatment per patient, with an average of $62,000.   When it

12  launched Provenge, Dendreon announced that the price for a single, one-month treatment would

13  be $93,000, making Provenge one of the most expensive cancer treatments on the market.   As

14  *Forbes.com* reported in April 2010, this was "far higher than Wall Street expected."

15  Accordingly, from the start, a critical question was the effect the price of Provenge would have

16  on demand.

17       49.     A second, and related, challenge was the effect on demand of Provenge's "buy-

18  and-bill" reimbursement structure, under which treating physicians were required to advance the

19  entire $93,000 cost of treatment upfront, before seeking reimbursement from the patient's private

20  insurer or Medicare.

21       50.     A third, and significant, challenge was navigating the logistical hurdles in getting

22  a patient's blood from an apheresis center, using the patient's blood to manufacture Provenge,

23  and then shipping the Provenge for infusion at an approved center – all within a tight window of

24  three days, or else the treatment became ineffective.

25       51.     Because of their close involvement in the launch and commercialization of

26  Provenge, Defendants were aware of each of these serious problems from the outset.   However,

**PAGE 12 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

1  instead of coming clean with investors, Defendants did the *exact opposite*. As set forth in greater

2  detail below, during the Relevant Period, in quarter after quarter, Defendants engaged in a

3  fraudulent scheme and course of conduct under which they deliberately and repeatedly misled

4  Dendreon's shareholders by: (a) misrepresenting the demand for Provenge; (b) falsely assuring

5  investors about the level of physician confidence in obtaining reimbursement under Provenge's

6  "buy-and-bill" reimbursement payment structure; and (c) providing grossly inflated forecasts for

7  sales of Provenge.

8       52.    At the same time that they were perpetrating this fraud, the Individual Defendants

9  were busily off-loading their own holdings of Dendreon Stock. As set forth below, during the

10  Relevant Period, and while they were perpetrating their fraudulent scheme, the Individual

11  Defendants collectively sold 842,812 shares of Dendreon stock, reaping a total of nearly $41

12  million. Other senior Company executives and directors collectively sold another 966,259

13  shares, generating another nearly $45 million in proceeds.

14  **VII.**  **DEFENDANTS REPEATEDLY MISREPRESENTED THE DEMAND FOR**

15  **PROVENGE**

16      **A.**    **Defendants' Misrepresentations As To The Demand For Provenge**

17       53.    Commencing on April 29, 2010, immediately after the FDA approved the use of

18  Provenge for the treatment of advanced prostate cancer in certain patients, Defendants embarked

19  on a public relations blitz emphasizing to investors the "incredible" demand that existed for

20  Provenge. At more than 25 shareholder and investor conferences, and in numerous press

21  releases and other public statements during the Relevant Period, Defendants repeatedly claimed

22  that demand for Provenge was so great that it exceeded the Company's ability to deliver the

23  drug. Specifically, Defendants represented that the Company had the capacity to serve 2,000

24  patient prescriptions in the first 12 months, or the equivalent of 6,000 infusions, and that demand

25  was greater than this capacity. Defendants' specific misrepresentations are set forth in detail in

26  Appendix A to this Complaint, and are also described below.

**PAGE 13 - COMPLAINT**

54.     On April 29, 2010, Defendants hosted a conference call for investors and analysts to announce the FDA's approval of Provenge.  During the conference call, Defendant Gold described Provenge as the "Holy Grail of Oncology", and Defendant Bishop boasted that "demand for Provenge will exceed our initial ability to supply it for the first 12 months."  Gold represented that, initially, the Company would be operating with just the twelve workstations, which capacity would allow the Company to treat 2,000 patients: "Over the next 12 months, we'll provide Provenge to approximately 2,000 patients. ... We will be launching Provenge from only 25% of our New Jersey facility."  Gold stated that "the capacity for Provenge initially will be 25% of the New Jersey facility.  We expect that the demand for this product early on will exceed our ability to supply it in the marketplace."  In response to a question from Citi Investment Research "to clarify [whether] you plan to treat 2,000 patients over the remaining of this year or over the next 12 months?", Gold responded "Over the next 12 months."

55.     Defendant Bishop further explained that the theoretical maximum capacity of the twelve New Jersey workstations was greater than the capacity figure of 2,000 patients provided by the Company.  As Bishop explained, the 2,000 patient capacity figure was a conservative number offered by the Company based on the assumption that, initially, as Dendreon ramped up production, the Company would not be able to operate the twelve New Jersey workstations at full capacity.  Thus, in response to a direct question from Citi Investment Research whether, "assuming that 25% of the facility is online, [one] can [ ] assume the New Jersey facility will be able, eventually, to take care of 8,000 patients per year?", Bishop responded unequivocally: "[D]on't extrapolate those patient numbers I shared to broader capacity assumptions.  And the reason for that is that we're not actually operating New Jersey at 100% of that 25% initially."

56.     Following the call, Dendreon's stock price spiked nearly $14.49, or 36.1% during intraday trading.

57.     On May 3, 2010, Defendant Gold released a letter in which he reiterated that the demand for Provenge was so great that it would "exceed [Dendreon's] ability to manufacture it,

**PAGE 14 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

1  at first."  The letter was republished by several major media outlets, including *The New York*

2  *Times*, *Washington Post*, and *Los Angeles Times*.

3       58.  At the Deutsche Bank Health Care Conference on the same day, in response to a

4  specific question from an investor "what gives [him] confidence in that 2,000 patient number

5  over the next 12 months", Gold responded that "The other component of that is the capacity.

6  We've already given guidance that the New Jersey facility can support somewhere between 1.2

7  and \$2.5 billion in annual revenue. If you break that down into just the 25% capacity that's

8  currently available, it's 125 to 250, which translates into roughly *1,800 to 2,600 patients*. So we

9  have the capacity to be able to supply this into the marketplace. … We tend to be very

10  conservative in the type of guidance we give in terms of utilization of the plants. But even *on*

11  *that low-end, you're in the range of meeting the 2,000 patients*."  In other words, Gold

12  indicated that the capacity of the New Jersey plant could even be higher than 2,000 patients per

13  year.

14       59.  Continuing in the 2010 second quarter, at over six investor conferences, including

15  conferences sponsored by Bank of America, Goldman Sachs and Wells Fargo, Defendants

16  assured investors that "there is a very high demand for PROVENGE out there", "the demand for

17  this product is incredibly high", and there was "no shortage of end-patient demand." Defendants

18  further stated that "the vast majority of [Dendreon's] infusion centers have substantial waiting

19  lists for PROVENGE and they're waiting for us to bring additional capacity online."

20       60.  Defendants' representations were in turn incorporated into the bullish reports of

21  numerous securities analysts who followed Dendreon and who encouraged investors to buy

22  Dendreon's stock.  For example, on June 7, 2010, Cowen & Company rated Dendreon an

23  "Outperform" and stated that, based on "[d]iscussions with management at this year's ASCO

24  meeting", "[w]e expect initial demand for Provenge to outstrip supply."  On June 23, 2010,

25  Brean Murray Carret & Co. issued a report that gave Dendreon a "Buy" rating, referred to the

26

**PAGE 15 - COMPLAINT**

1   "substantial patient waiting lists" for Provenge and concluded with this exhortation: "Make no

2   mistake – demand is high."

3       61.     On August 3, 2010, after the close of trading, Dendreon announced its financial

4   results for the second quarter of 2010.  Dendreon reported that sales of Provenge were only $2.8

5   million, approximately $1.6 million or 57% less than consensus analyst expectations of $4.4

6   million.   On a conference call held later that day to discuss the Company's financial

7   performance, Defendant Bishop reassured investors by emphasizing that "we see strong demand"

8   for Provenge and attributed the weak quarterly sales to a lack of manufacturing capacity.  Bishop

9   assured investors that "the majority of our centers tell us that they have waiting lists."

10      62.     In addition, in response to a direct question as to whether the patient prescriptions

11  reported by the Company in the second quarter of 2010 "translated into a single infusion and

12  then how many went all the way to the three [infusions]", Defendant Bishop responded "Yeah,

13  the majority of our prescriptions result in three infusions."

14      63.     Needham & Company directly sought clarification from Defendants, asking "One

15  quick question, a very concrete, when you say a prescription, is the prescription for one infusion

16  or is it for three infusions?"  Defendant Bishop responded unequivocally:

17          It is for three. So, it's when the doctor orders the treatment it's a
            single order that will cover the three infusions to that particular
18          patient, so it's specific prescription that covers three infusions for
            an individual patient.
19

20  Defendant Gold emphasized that "It's a prescription [ ], just to be clear for a complete course of

21  treatment."  Later on the conference call, Gold again explained "Yeah, so just to be clear, …

22  [p]atients don't receive prescriptions.  The doctor writes a prescription for PROVENGE, and it's

23  for a full course of treatment."

24      64.     In response to a direct question from Cowen & Company as to whether, operating

25  with just 12 workstations, the capacity of the New Jersey manufacturing plant was to treat 100 to

26  150 patients per quarter, Defendant Bishop responded "I would reiterate [ ] that we said, at the

**PAGE 16 - COMPLAINT**

1  time of the launch we expect to treat about 2,000 patients over the first 12 months[.] [W]e're on

2  track with that."

3      65.    In response to a further question from Deutsche Bank about the Company's

4  capacity, Defendant Bishop explained that the capacity amounted to 2,000 patient prescriptions

5  in the first twelve months: "What I'm going to say that [ ] is we're reiterating our guidance that

6  we're going to treat 2,000 patients over the first 12 months of our launch. The next step-up in our

7  capacity is associated with a successful approval of the New Jersey expansion, which we've said

8  will be early in 2011. ... The most important event in terms of additional capacity will come if

9  we're successful with our New Jersey expansion early next year."

10      66.    Unsurprisingly, analysts understood Defendants' statements above to mean that

11  the existing capacity of the New Jersey plant was to treat 2,000 patients in the first 12 months.

12  This is evidenced by a follow-up question from Deutsche Bank, which interpreted Defendant

13  Bishop's statements to mean that, when the expansion of the New Jersey plant was complete,

14  this would increase the number of workstations by five times, resulting in an increase in capacity

15  from the New Jersey plant to "treat [ ] 10,000 patients ... from that facility."

16      67.    Again, analysts and investors reacted positively to Defendant's representations

17  during the August 3, 2010 conference call. On August 4, 2010, Cowen & Company issued a

18  report that reaffirmed its "Outperform" rating for Dendreon, explaining that, while Dendreon's

19  quarterly sales numbers were below expectations, "[m]ore importantly the company provided

20  highly encouraging updates on ... demand for Provenge." JP Morgan similarly "increased [its]

21  conviction" for Dendreon, reiterating its "Overweight" rating, and explaining that Dendreon's

22  earnings miss "shouldn't be a focus" in light of the "encouraging update" from Defendants.

23  Likewise, Roth Capital reiterated its "Buy" rating for Dendreon, explaining that it was

24  "encouraged" by Defendants' presentation at the conference and concluded, based on

25  Defendants' presentation, that, "though sales came in lighter than expected, we believe the

26

**PAGE 17 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

1    demand for Provenge is clear." On the same day, Dendreon's stock price rose by $5.95 to close

2    at $39.78, an increase of 17.6% from the prior day's close.

3         68.     Throughout the third quarter of 2010, Defendants continued to misrepresent the

4    level of demand for Provenge. At no less than five investor conferences held during the third

5    quarter of 2010, Defendants repeated their claim that demand for Provenge was outstripping the

6    Company's capacity to supply the product. For example, at a Morgan Stanley conference in

7    mid-September 2010, Defendant Gold reiterated that there was "good, strong demand for the

8    product" and "as we anticipated, the demand for this product is currently exceeding our ability to

9    supply it." Two days later, at a Baird & Co. conference, Defendant Bishop again assured

10   investors that "we are supply constrained."

11        69.     On November 3, 2010, Dendreon announced its third quarter financial results.

12   The Company again reported weak Provenge sales of $20.2 million, which was $3.8 million or

13   16% less than the consensus analyst estimates of $24 million. Again, Defendants attributed the

14   weak sales to temporary supply constraints. On a conference call held the same day as the

15   Company's earnings announcement, Defendant Gold asserted that "clearly the demand out there

16   is exceeding our ability to supply the market" – a problem that Gold assured would be "resolved

17   once additional capacity comes online" in early 2011.

18        70.     Bishop further stated:

19             [N]o we're are not at all worried about demand. ... We're seeing
               very solid demand this year ... and we'll be ramping up our sales
20             and marketing initiatives including, by the way, the number people
               we have in the field so we're confident that demand will stay
21             strong throughout next year.

22        71.     In response to a question from an analyst, Gold defined the capacity of Dendreon

23   to supply the market as its ability to serve 2,000 patients in the first 12 months:

24             The 2,000 patient guidance that we gave during the first 12 months
               of launch [ ] was designed to really let the patient and physician
25             community know that we were in a *capacity constrained
               environment and giving a sense of how many patients we can
26             treat*. (emphasis added)

**PAGE 18 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

72.     Later during the conference call, an analyst asked "whether you still expect to treat 2,000 patients, which calculates up to 6,000 doses, by the end of April 2011 as per your original guidance." In response, Defendant Gold reiterated that this "guidance was principally given as you know to get patients educated on the capacity constraints that we'll be facing at the time of approval."

73.     As with the Defendants' prior explanations, analysts reacted positively following Defendants' reassurances. Following the November 3 investor conference call, analysts reaffirmed their favorable ratings on Dendreon's stock. For example, Cowen & Company reiterated its "Overweight" rating for Dendreon, stating that "everything we know about Provenge ... suggests demand is not the issue." RBC Capital also affirmed its "Outperform" rating on Dendreon shares, stating that it was encouraged by management's assertion that "there are wait lists and a patient queue at the majority of US sites, contrary to the bear thesis that demand was already slowing."

74.     Defendants continued to tout the high demand for Provenge during the remainder of 2010. At a November 11, 2010 Credit Suisse conference call, Defendant Gold stated that the capacity available at the New Jersey facility was "[not] enough capacity to supply the demand that's out there in the market" and emphasized repeatedly that "we are in a capacity-constrained environment for this year." At a December 15, 2010 Deutsche Bank conference call, Defendant Schiffman reiterated that "the vast majority of all sites that we talk with do have a good site queue of patients they want to get in and be able to write scripts and they are waiting." Schiffman stated that Dendreon was "not aware of any [sites] that don't have any queue."

75.     On January 7, 2011, Dendreon hosted a conference call at which it pre-announced its expected financial results for the 2010 fourth quarter. The Company reported anticipated sales for Provenge of only $25 million, which was lower than consensus estimates by $3.9 million, and an overall loss of $91.8 million. In his opening remarks at the conference call, Defendant Gold reassured investors that "demand for PROVENGE is robust", and that sales for

**PAGE 19 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

1    Provenge remained low only because "we're still in this capacity constrained environment."

2    Following Defendants' statements on January 7, 2011, the price of Dendreon's shares climbed

3    nearly $2.78 for the day, or 7.9%.

4         76.    Nearly two months later, on March 1, 2011, Dendreon reported its actual fourth-

5    quarter results, which confirmed sales of just $25 million.  Nevertheless, Defendant Gold boasted

6    that, "[i]n Q4, we sold out our capacity in most geographic areas" and that the disappointing

7    sales resulted from the Company being "capacity constrained."  Taking their direction from these

8    assurances, a number of analysts published reports that same day affirming their positive outlook

9    for Dendreon.    For example, RBC Capital affirmed its "Outperform" rating based on

10   management's "confidence in patient demand", including Gold's representation "that all regions

11   of US sold out in Q4, except NYC."  Canaccord also affirmed its "Buy" rating for Dendreon,

12   noting that "management indicated strong demand for Provenge."

13        77.    For the remainder of the first half of 2011, Defendants continued to tout the

14   strong demand for Provenge, including at investor conferences hosted by Needham, Leerink and

15   Roth Capital.  For example, at the Leerink conference in early April 2011, Schiffman assured

16   investors that there is "large demand" for Provenge and "we've been completely sold out in

17   capacity."

18        78.    On May 2, 2011, Dendreon reported its financial results for the first quarter of

19   2011.  Although sales of Provenge were a disappointing $28.1 million, once again Defendant

20   Gold reassured investors that demand for Provenge remained strong, and that the poor sales were

21   attributable to a supposed lack of manufacturing capacity.  Gold stated that at "a majority of the

22   sites across the country there's still some sites that have waiting lists associated with them."

23       **B.**    **Defendants Knew Their Representations Were False**

24        79.    Unbeknownst to investors, the real picture as to demand for Provenge was starkly

25   different.  Contrary to Defendants' repeated assurances and explanations that the Company's

26   financial performance was attributable to the Company's inability to meet demand due to

**PAGE 20 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

1  capacity constraints, demand was objectively weak and, in fact, *far below* the Company's

2  manufacturing capacity, which Defendants defined as the ability to serve 2,000 patients (*i.e.*

3  supply 6,000 infusions) in the first 12 months.  Significantly, at all relevant times, the Individual

4  Defendants not only knew that demand for Provenge was poor, but also *why* the demand was so

5  poor.

6       80.  ████████████████████████████████████████████

7  ████████████████████████████████████████████████████

8  ██████████████████████████████  ████████████████████████

9  ████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████

12 ██████████████████  ██████████████████████████████████

13 ████████████████████████████████████████████████████

14 ████████████████████████████████████████████████

15      81.  ████████████████████████████████████████████

16 ████████████████████████████████████████████████████

17 ████████████  ██████████████████████████████████████████

18 ██████████████████████  ████████████████████████████████

19 ████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████

25 ████████████████████████████████████████████

26

**PAGE 21 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

82.



83.

**PAGE 22 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020



84.

85.

86.    Not only did Defendants know from these internal reports that demand was much less than capacity, Defendants also knew the precise reasons why.

**PAGE 23 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020



**PAGE 24 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

90.     According to CW2, the real demand picture caused by these different factors was frequently discussed by the Individual Defendants and other senior executives.  Every Monday, the Individual Defendants and Dendreon's senior executives attended a so-called "Commercial Team" meeting at the Company's headquarters during which they discussed the Company's performance.  CW2 attended approximately twelve such meetings.

91.     According to CW2, the reasons for Provenge's poor performance were openly discussed at the Commercial Team meetings.  ██████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████

92.     ██████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
███████████████████████████

93.     ██████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████

**PAGE 25 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

94.

**VIII. DEFENDANTS FALSELY ASSURED SHAREHOLDERS ABOUT THE LEVEL OF PHYSICIAN CONFIDENICE IN OBTAINING REIMBURSEMENT UNDER PROVENGE'S "BUY-AND-BILL" REIMBURSEMENT STRUCTURE**

**A.    Defendants' Misrepresentations As To The Level Of Physician Confidence In Obtaining Reimbursement Under The "Buy-and-Bill" Reimbursement Structure**

95.    Under traditional cancer treatments, patients directly incur the expense of the treatment. Provenge is marketed differently, however, using a "buy-and-bill" reimbursement model. Under this model, the treating physician or health care provider makes an up-front payment for Provenge and then seeks reimbursement from the patient's private insurer or Medicare. Accordingly, the physician or healthcare provider bears all the risk. If the patient's insurer ultimately refuses reimbursement, the entire cost of the treatment falls on the physician.

96.    Initially, investors expressed some skepticism about Dendreon's "buy-and-bill" payment model. Specifically, investors were concerned that physicians would be unwilling to carry large accounts receivables with the possibility that they would receive delayed or even no reimbursement. In April 2010, investor concerns were heightened further when the Company announced that a single, one-month treatment for Provenge would cost $93,000.

97.    In response to these early investor concerns, Defendants embarked on the second part of their fraudulent scheme, that is, repeatedly reassuring investors during the Relevant

**PAGE 26 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

1   Period that physicians were comfortable with the Company's reimbursement structure for
2   Provenge.   Defendants' many misrepresentations and omissions concerning physicians'
3   confidence in the reimbursement structure for Provenge are set forth in detail in Appendix A, and
4   are also described below.

5       98.   On June 23, 2010, at the NASDAQ OMX Investor Program, Defendant Gold
6   represented to investors that "the reimbursement coverage has been going just as we had planned
7   [a]nd so we are seeing no hurdles in terms of reimbursement for providing coverage for
8   PROVENGE."

9       99.   On September 13, 2010, at the Morgan Stanley Global Healthcare Unplugged
10   Conference, Gold again reiterated that "we're seeing smooth reimbursement coming through
11   from both the private and public sector."

12       100.   On April 7, 2011, at a Leerink Swan Cancer Roundtable, Defendant Schiffman
13   represented that "we're not aware of any situations at all where physicians are not believing that
14   they're going to be paid for a product that has been prescribed on label."

15       101.   On May 10, 2011, at a Bank of America conference, Defendant Schiffman
16   responded as follows to a specific question about reimbursement from biotech research analyst
17   Rachel L. McMinn:

18           I think today people are very comfortable, the product is being paid
        ... And so I think the reimbursement concerns, people want to
19           make sure they're processing the paperwork correctly, but I don't
        think they have a strong concern on reimbursement.
20

21       102.   As a result of these assurances, the market believed that reimbursement concerns
22   for Provenge were a "non-issue", as Cowen & Company concluded in an August 4, 2010 analyst
23   report. RBC Capital Markets similarly concluded in a November 4, 2010 report that Defendants'
24   "positive outlook" should quiet the "bear thesis" that "reimbursement logistics are a barrier" to
25   Provenge's success.

26   ////

**PAGE 27 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

**B.      Defendants Knew Their Representations Were False**

103.    Unbeknownst to investors, the true story was quite different.   Contrary to Defendants' repeated misrepresentations throughout the Relevant Period, Defendants knew or were deliberately reckless in not knowing that physicians expressed substantial concerns about Dendreon's reimbursement model, and had encountered significant difficulties in obtaining reimbursement for the drug.   Combined with doubts physicians had about the efficacy of the treatment, this was significantly and negatively impacting Provenge sales.

104.    ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████

105.    ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████

106.    Ultimately, Defendants were forced to reveal to investors on August 3, 2011 that physicians' reimbursement concerns were a major factor contributing to weak demand for

**PAGE 28 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

1    Provenge, a problem which Defendants had known all along.  Reflecting the extent by which

2    Defendants had managed to conceal physicians' concerns about reimbursement, analysts reacted

3    uniformly with surprise to Defendants' revelations.   On the Company's August 3, 2011

4    conference call, the very first question directed to Defendants was from JPMorgan Chase, who

5    asked "it's still kind of bizarre to me that the reimbursement issues are just surfacing now … .

6    So, I'm wondering what changed those suddenly because it doesn't seem like capacity

7    constraints would hide [the] reimbursement issue from your field reps, and it seemed like this is

8    something that was being positively talked about from a coverage standpoint as recently as [ ]

9    early June."   In an analyst report on August 4, 2011, JPMorgan expressed "*shock*" that

10   physicians held significant reimbursement concerns, which investors had been led to believe was

11   an issue "*in the rear-view mirror.*"

12   **IX.    DEFENDANTS   PROVIDED   FALSE   AND   MISLEADING   FINANCIAL**

13         **GUIDANCE AS TO SALES FOR PROVENGE**

14         **A.    Defendants' Misleading Financial Guidance For Provenge**

15         107.    As a third part of their fraudulent scheme, Defendants repeatedly assuaged

16   investor concerns by buttressing their optimistic statements with financial "guidance" to

17   investors that were utterly bogus and had absolutely no basis in fact.  Specifically, on numerous

18   conference calls and in press releases, interviews and other public statements throughout the

19   Relevant Period, Dendreon issued wildly optimistic guidance about the number of patients the

20   Company would treat and the revenues it would generate during 2011.   Again and again,

21   Defendants assured investors that the Company was currently "on track" to achieve (and even

22   exceed) this purported "guidance."   Defendant's numerous misrepresentations and omissions

23   concerning the Company's "guidance" are set forth in detail in Appendix A, and are also

24   described below.

25         108.    On April 29, 2010, at an investor conference held immediately after the FDA

26   approved Provenge, Dendreon promised that "[o]ver the next 12 months, we'll provide Provenge

**PAGE 29 - COMPLAINT**

1   to approximately 2,000 patients." Between April 29, 2010 and August 3, 2011, at no less than

2   sixteen investor conferences, Defendants repeated this same commitment of "2,000 patients

3   within the first 12 months." For example, on May 2, 2010, in a letter released by Dendreon and

4   reprinted in *The New York Times* and other major news outlets, Defendants represented that they

5   would "provide PROVENGE to approximately 2,000 patients ... within the first 12 months." At

6   a June 23, 2010 NASDAQ conference, Defendants described this guidance as "very

7   conservative."

8        109.   In addition, Defendants made it clear that this 2,000 patients was the equivalent of

9   6,000 infusions because, as Defendant Bishop made clear during the Company's August 3, 2010

10  conference call, "the majority of our prescriptions result in three infusions." Accordingly,

11  analysts understood the 2,000 patients to mean 6,000 patients, as evidenced by a question from

12  an analyst during the Company's November 3, 2010 conference call whether "you still expect to

13  treat 2,000 patients, which calculates up to 6,000 doses, by the end of April 2011 as per your

14  original guidance."

15       110.   Contrary to its repeated assurances, Dendreon did not come close to meeting its

16  guidance of 2,000 patients within the first 12 months of its launch. When the twelve-month

17  milestone in fact neared, Defendants were forced to modify their previous guidance.

18  Specifically, during the November 2010 third quarter conference call, Defendant Gold stated

19  that, by "2,000 patients in the next 12 months", Dendreon meant that it would treat 2,000 patients

20  by "mid-year 2011." Gold explained that investors should "think of [the 2,000] number kind of

21  more mid-year [2011]", which he later defined as July 2011.

22       111.   To assuage any concerns caused by the modification to the 2,000 patient

23  guidance, Defendants provided further, ambitious (and equally false) guidance. Specifically,

24  Defendants now told investors that, in addition to serving 2,000 patients by sometime in July

25  2011, the Company would also record revenues of $350 to $400 million for Provenge in 2011.

26

**PAGE 30 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

112.     To achieve this newly stated guidance of $350 to $400 million in 2011 revenues, Dendreon would have needed to treat approximately 3,760 to 4,300 patients in 2011 (assuming each patient obtained a full course of three infusions at a cost of $93,000).  This would have represented an approximate *fourfold* increase in annual Provenge sales.  Nevertheless, in their press releases and at investor conferences, Defendants justified these outsized revenue predictions based on the purported "incredible demand" for Provenge that outstripped existing capacity.  According to Defendants, once the Company moved beyond its "capacity constraints" in 2011, the Company's revenues would immediately skyrocket to $350 to $400 million.

113.     During the remainder of the Relevant Period, Defendants repeatedly touted the guidance of $350 to $400 million in 2011 revenues.  Specifically, Defendants repeated this guidance in their November 3, 2010 and May 2, 2011 press releases and at over twelve investor conferences, including conferences hosted by Credit Suisse, RBC Capital Markets and Bank of America.  Defendants represented to investors that the Company was currently "on track" or "in sync with all internal metrics" to meet or exceed its guidance of 2,000 patients and $350 to $400 million in 2011 revenues, including during at least eight conference calls held between June 8, 2010 and June 21, 2011.

114.     In turn, analysts responded by incorporating Defendants' bullish representations into the analysts' research reports.  For example, on November 2, 2010, RBC Capital Markets reported that Dendreon appears "on track to meet guidance."  In a research update published several days later, Rodman & Renshaw also concluded, based on management's statements during the third quarter conference call, that Dendreon was "on track to reach $350-400 MM in 2011."  On May 2, 2011, Deutsche Bank reported that "[e]verything looks on track to meet '11 sales guidance of $350-400M in Provenge sales."  On the same day, research analysts at Collins Stewart also reported that "DNDN is on-track to meet its FY11 revenue guidance of $350M-$400M."

////

**PAGE 31 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

1     **B.     Defendants' Knew Their Representations Were False**

2     115.    Unbeknownst to analysts and investors, Dendreon's guidance never had any basis

3     in fact, and Dendreon was never in a position to even come close to meeting its ambitious

4     guidance.  During the entire Relevant Period, Defendants knew that Dendreon was never "on

5     track" to meet any of these often-touted benchmarks.  More importantly, as set forth above,

6     Defendants knew at all relevant times why that was the case.

7     116.   █████████████████████████████████████

8     ████████████████████████████████████████████

9     ████████████████████████████████████████████

10    ████████████████████████████████████████████

11    ████████████████████████████████████████████

12    ████████████████████████████████████████  █

13    ████████████████████████████████████████████

14    ████████████████████████████████████████████

15    ███████████████████████████████████

16    117.   █████████████████████████████████████

17    ████████████████████████████████████████████

18    ████████████████████████████████████████████

19    ████████████████████████████████████████████

20    ██████████████████

21    118.   █████████████████████████████████████

22    ████████████████████████████████████████████

23    ███████████  █████████████████████████████████

24    ████████████████████████████████████████████

25    ████████████████████████████████████████████

26    ████████████████████████████████████████████

**PAGE 32 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020



1
2
3
4
5
6  119.
7
8
9
10
11
12
13
14
15
16
17  120.
18
19
20
21
22
23  121.
24
25
26

**PAGE 33 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020



122.   Ultimately, confirming the falsity of Defendants' statements, Defendants missed (i) their guidance of "2,000 patients within the first twelve months" by *over 50%*; (ii) their modified guidance of "2,000 patients by mid-2011" by *over 20%*; and (iii) their guidance of "$350-400 million in 2011 revenues" by approximately *35% to 43%*.  On January 5, 2012, Dendreon announced full-year sales of Provenge in 2011 of just $228 million, significantly below the Company's Class Period guidance of $350 to $400 million.

## X.   WHILE PERPETRATING THE ABOVE FRAUDULENT SCHEME, DEFENDANTS SOLD LARGE QUANTITIES OF THEIR OWN HOLDINGS OF DENDREON STOCK, FURTHER EVIDENCING THEIR SCIENTER

123.   During the Relevant Period, while Defendants were perpetrating the above-described fraudulent scheme and course of conduct, Individual Defendants Gold and Schiffman, as well as numerous other Dendreon officers and directors, were actively disposing of their personal holdings of Dendreon stock.   Taking advantage of the opportunity presented by Dendreon's fraudulently-inflated stock price, Dendreon's officers and directors collectively disposed of *over $85 million* of Dendreon stock between April 29, 2010 and August 3, 2011, led by Individual Defendant and CEO Gold (who sold over $35 million of stock); General Counsel, Richard F. Hamm (over $19 million); Chief Science Officer David L. Urdal (over $10 million); and Individual Defendant and CFO Schiffman (over $5 million).  These insider sales were highly suspicious both as to their size and their timing.

**PAGE 34 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

124.   The insider sales during the Relevant Period were extraordinarily large both in absolute and percentage terms, as reflected in the table below.  For example, Defendant Gold sold over 720,000 shares at an average price of over $40.00 per share, representing nearly 60% of the total shares he held, and generating proceeds of $35 million.  Hamm, Dendreon's General Counsel and Executive Vice President of Corporate Development, sold over $19 million of his stock, representing more than 70% of his total holdings.  Likewise, Defendant Schiffman sold nearly 30% of his total holdings, for proceeds of more than $5.7 million.

| Insider | Date of Sales | Shares Disposed | Proceeds | Percent of Holdings |
|---------|---------------|-----------------|----------|---------------------|
| Gold | 04/29/10 – 07/25/11 | 721,825 | $35,095,429 | 59.0% |
| Schiffman | 04/29/10 – 07/21/11 | 120,987 | $5,733,516 | 27.6% |
| Hamm | 04/29/10 – 5/23/11 | 382,527 | $19,331,093 | 70.4% |
| Urdal | 04/30/10 – 7/21/11 | 255,666 | $10,332,356 | 42.0% |
| Frohlich | 04/30/10 – 07/21/11 | 100,790 | $4,563,127 | 38.6% |
| Dziurzynski | 05/24/10 – 03/11/11 | 79,250 | $3,051,488 | 79.7% |
| Bayh | 04/29/10 – 04/29/10 | 56,550 | $2,997,207 | 47.5% |
| Watson | 04/30/10 – 04/30/10 | 36,171 | $2,045,998 | 78.3% |
| Cox | 05/03/10 – 07/21/11 | 25,605 | $1,363,084 | 74.1% |
| Clark | 05/03/10 – 08/20/10 | 16,244 | $758,477 | 100.0% |
| Canet | 05/26/10 – 06/03/11 | 13,456 | $542,913 | 100.0% |
| | **TOTAL** | 1,809,071 | $85,814,687 | 53.6% |

125.   In addition to being substantial in absolute and percentage terms, the insider selling was highly unusual when the timing of the sales is compared to prior selling activity.  For example, during the 15 months of the Relevant Period, the number of shares sold by Defendant Gold (721,825) reflected an increase of *over 159%* compared to the number of shares he sold (279,207) during the entire five year period immediately preceding the Relevant Period (beginning on April 29, 2005, and ending on April 28, 2010, and excluding sales on April 29, 2009[1]).  Also, the proceeds of Gold's sales during the Relevant Period ($35,095,429) reflected an

---

[1] To ensure a meaningful comparison, all trades on April 29, 2009 are excluded because these trades occurred on the day after Dendreon's stock price plummeted 69% in 75 seconds and then dramatically rebounded to its original price, which caused of a flurry of irregular trading and was the subject of a NASDAQ investigation.

**PAGE 35 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

increase of more than *786%* compared with the proceeds of all sales he made during the preceding five year period ($3,956,911).  To underscore just how suspicious was the timing of his sales, Defendant Gold sold 19,000 shares on July 25, 2011, just one week approximately before Dendreon's fraud was finally revealed on August 3, 2011, as described below.

126.    Similarly Schiffman's sales during the Relevant Period stood in stark contrast to his sales during the preceding five-year period – reflecting an approximately *650%* increase in the number of shares sold (120,987 compared to 16,190) and an increase of over 1000% in terms of sale proceeds ($5,733,516 compared to $511,794).

127.    *Significantly, none of the Individual Defendants – including Gold and Schiffman – purchased a single share of Dendreon stock on the open market during the Relevant Period.*

128.    In this sense, the highly unusual insider trading described above reflects the Individual Defendants' attempts to profit from their own fraud at the expense of Dendreon's shareholders.  While Defendants were misleading shareholders concerning the level of demand for Provenge, the appeal of Dendreon's buy-and-bill reimbursement model and Dendreon's projected revenues, the Individual Defendants were busily disposing of their own stock at inflated prices, thereby underscoring Defendants' scienter.

129.    The seemingly fortuitous timing and amounts of Defendants' insider selling has sparked public outrage.  As *CBS Moneywatch* reported on August 3, 2011, Dendreon has been "bedeviled" by insider transactions and "a general lack of transparency from CEO Mitchell Gold. … *Retail investors are already asking how long Gold has known he could not meet his revenue targets*" given that the August 3, 2011 conference call was scheduled back on July 8, 2011 and "*Gold sold roughly $1 million in DNDN stock between the scheduling and today's retraction.*" (emphasis added).

////

XI.    **DEFENDANTS' FRAUD IS REVEALED**

PAGE 36 - COMPLAINT

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

130.   On August 3, 2011, after the market closed, Dendreon halted trading in its securities and issued an announcement that for the first time revealed the full extent of Defendants' fraud.   Specifically, the Company announced that: (i) notwithstanding the Company's additional manufacturing capacity in the second quarter of 2011, the Company's quarterly sales totaled only $49.6 million, which was well below the market's estimates of approximately $58 million; (ii) the Company was abandoning its previous revenue guidance of $350-$400 million for 2011 and now expected only "modest quarter over quarter revenue growth for the remainder of the year"; and (iii) the Company would be reducing its workforce and other expenses to align with its "manufacturing requirements" for Provenge.   In the accompanying press release, Defendant Gold attributed the disappointing results to physician concern over reimbursement for Provenge, which Gold now stated would result in a "gradual" adoption of Provenge.

131.   In a conference call held later that evening to discuss the announcements, Defendants made several additional revelations.   Defendant Gold disclosed that July 2011 sales of Provenge were only $19 million, which was "below [the Company's] anticipated growth." Dendreon's second quarter revenues and July sales totals together revealed that the Company had completely missed its "revised" guidance of treating 2,000 patients with Provenge by the end of July.   The Company's cumulative revenue reflected, and the Company's Prescription vs. Infusion Reports confirmed, a total of only 1,577 patients treated with Provenge through the end of July 2011 – approximately 22% less than the 2,000 patients Defendants had repeatedly assured investors that the Company was "on track" to accomplish.   Finally, Defendant Gold also revealed that Dendreon's customer accounts were generating Provenge sales of only 0.8 patients per month, which was substantially less than the 1 to 2 patients that Defendants had previously represented to investors.

132.   Defendants' August 3, 2011 disclosures were particularly significant because the second quarter marked the first time when the Company's core New Jersey plant ran at full

**PAGE 37 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

1 capacity for the entire quarter.  Accordingly, the August 3, 2011 disclosures revealed that the

2 demand for Provenge was *not* hampered by "capacity constraints", as Defendants had repeatedly

3 and falsely claimed throughout the Relevant Period, but that demand was simply weak.

4   133. The market's reaction to the August 3, 2011 revelations was swift and severe.  In

5 after-hours trading on August 3, 2011, Dendreon's stock price plummeted by $23.11, or 64.5%.

6 On the first regular trading day after these announcements, August 4, 2011, the price of

7 Dendreon stock plummeted to close at just $11.69, a drop of *$24* from the prior day's close of

8 $35.84, a staggering one-day decline of *67%* that *erased over $3.5 billion* in market

9 capitalization.  As *Bloomberg* reported, this was "the biggest single day decline since the

10 company's initial public offering in June 2000."

11   134. Within twenty four hours of the August 3, 2011 revelations, Dendreon was

12 downgraded by at least eight major research analysts, including Bank of America, Robert W.

13 Baird, RBC Capital Markets, and Cowen & Company, all of whom reacted with dismay and

14 anger in response to the Company's revelations.  As research analysts at BioHealth Investor put

15 it, "[t]o say that Dendreon caught most of the market off balance would be a severe

16 understatement."  In an August 4, 2011 note to clients, Cory Kasimov of JP Morgan wrote: "This

17 was obviously a crushing blow to our overweight thesis and one that we certainly did not see

18 coming.  We don't think anyone did."  Another analyst at Robert W. Baird wrote in a note to

19 investors that Defendants' August 3, 2011 disclosures were "a shocking about-face."

20   135. The severe reaction to Defendants' August 3, 2011 disclosures was a direct result

21 of the revelation of each of the facets of Defendants' extensive fraud.  In particular, the August 3,

22 2011 disclosures revealed to the market, and the market understood for the first time, that: (i)

23 there was startlingly weak demand for Provenge; (ii) the weak demand for Provenge was not

24 caused by any manufacturing constraints, but was a permanent issue; (iii) physicians had serious

25 concerns about Dendreon's "buy-and-bill" reimbursement model that negatively impacted the

26

**PAGE 38 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

1    demand for, and sales of, Provenge; (iv) the Company was never "on track" to achieve its

2    guidance regarding Provenge; and (v) the Company's guidance regarding Provenge was false.

3        136.    For example, in an August 4, 2011 report downgrading Dendreon, analysts at

4    Cowen & Company stated:

> [W]e are *tired of making excuses* for what has been a disappointing
> commercial trajectory *since day one* of launch. In our view, the
> simplest explanation for the drug's poor commercial performance
> is that *demand is lower than we had predicted* . ... [A]dditional
> capacity came on line in March 2011, and demand has *not*
> materialized as quickly as we expected.

       137.    Similarly, in an August 4, 2011 article entitled "Dendreon's Provenge Sales

Surprise Raises Questions About Reasons," *Dow Jones* described how analysts have "questioned

whether the company's explanation [for its lackluster sales] *told the whole story*", pointing out

that "a company expecting a short-term problem likely wouldn't take the drastic step of cutting

jobs, often the move of a company adjusting to the new realities of a business model." The

article further quoted Goldman Sachs analyst, Sapna Srivastava, who explained that "there are

many reasons to believe this at least in part also *a permanent demand issue.*"

       138.    The reaction of the financial press also reflected their discovery of Defendants'

fraud for the first time. For example, in an article published on August 4, 2011, *Forbes* stated

that, "[n]ow when the veil was supposed to lift and give everyone a real glimpse of Provenge

demand, Provenge has run into a new problem .... The fact that earnings missed could mean there

is *simply less demand* for Provenge than anyone thought." On the same day, *The Wall Street

Journal* reported that Dendreon's "scaling back [of] recently scaled-up manufacturing capacity"

was because of a lack of demand for Provenge, and that the Company's workforce reductions

would stay in place "*pending evidence that demand for Provenge is coming back.*"

## XII.    LOSS CAUSATION

       139.    As discussed above, Dendreon's August 3, 2011 revelations caused an immediate

and direct decline in the Company's stock price. When trading resumed after the Company's

**PAGE 39 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

1    stunning August 3, 2011 disclosures, the price of the Company's stock immediately collapsed,

2    falling by $23.11, or 64.5% in after-hours trading on August 3, 2011.  At the close of regular

3    market trading on August 4, 2011, the price of Dendreon shares had fallen to only $11.69, down

4    by more than $24 from the prior day's close of $35.84, a staggering decline of 67% that erased

5    over $3.5 billion in market capitalization.

6         140.    The swift and sudden decline in the Company's stock reflected a materialization

7    of the risks concealed by Defendants' ongoing fraud.  As set forth above, prior to the August 3,

8    2011 revelations, and throughout the Relevant Period, Defendants improperly inflated the price

9    of the Company's securities during conference calls with investors and analysts, and through

10   press releases, SEC filings, letters to and advertisements in the mainstream media, and television

11   interviews.  Defendants presented a misleading image of Dendreon's business and future growth

12   prospects by, among other things, falsely and improperly: (i) representing that there was

13   incredibly high demand for Provenge; (ii) representing that the demand for Provenge exceeded

14   the Company's capacity to manufacture the drug; (iii) representing that physicians were

15   comfortable with Provenge's "buy-and-bill" reimbursement model and had expressed no

16   concerns; (iv) providing guidance to the market concerning the number of patients the Company

17   would treat and the revenues it would achieve; and (v) representing that the Company was "on

18   track" to meet Defendants' guidance and business plans.

19        141.    When Defendants' misrepresentations and fraudulent conduct were finally

20   exposed to investors on August 3, 2011, the price of Dendreon's securities plummeted and the

21   prior artificial inflation in the price of Dendreon's securities was erased.  As a result of their

22   purchases of Dendreon securities during the Relevant Period, Plaintiffs suffered economic losses.

23   **XIII.   DENDREON CLEANS HOUSE AFTER THE REVELATION OF THE FRAUD**

24        142.    On September 8, 2011, in the immediate aftermath of the August 3, 2011

25   revelations, Dendreon issued a press release announcing the departure of Defendant Bishop, the

26   Company's chief operating officer.

**PAGE 40 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

143.    On February 1, 2012, Dendreon announced that the Company's Board had voted to remove Defendant Gold from his position as President and CEO.  The Company further announced that Gold would no longer serve as Chairman of the Board, effective June 30, 2012. As reported by *Pharmalot.com* that day, Gold's termination was the latest in the "chain of events follow[ing] increasing complaints from some investors that Dendreon was repeatedly missing forecasts, failing to disclose important info" and "that Dendreon management had sold big chunks of stock just weeks before the bad news was announced."

144.    On May 7, 2012, Dendreon filed a Form 10-Q with the SEC in which the Company disclosed that it had "become aware that the Securities and Exchange Commission ("SEC") has commenced a formal investigation" into the events underlying the August 3, 2011 events.

145.    Dendreon's stock price still has not recovered from the August 3, 2011 revelations.  As of May 14, 2013, Dendreon's stock price traded at just $4.17 per share, or approximately *92% below* the Relevant Period high of $55.43.

## XIV.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

146.    Plaintiffs are entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine, for the following reasons:

(a)    The Defendants made public misrepresentations or failed to disclose material facts during the Relevant Period;

(b)    The misrepresentations and omissions were material;

(c)    Dendreon's common stock traded in an efficient market;

(d)    The misrepresentations and omissions alleged would induce a reasonable investor to misjudge the value of Dendreon's common stock; and

(e)    Plaintiffs purchased Dendreon securities between the time Defendants misrepresented or failed to disclose material facts and the time the true

**PAGE 41 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

1        facts were disclosed, without knowledge of the misrepresented or omitted

2        facts.

3        147.    At all relevant times, the market for Dendreon's publicly traded common stock

4        was efficient for the following reasons:

5                (a)     Dendreon's stock was listed and actively traded on the NASDAQ;

6                (b)     As a regulated issuer, Dendreon filed periodic public reports with the

7                        SEC;

8                (c)     Dendreon's securities volume was substantial during the Relevant Period;

9                (d)     Dendreon was followed by numerous analysts who published research

10                       reports that were distributed and entered the public market; and

11               (e)     Dendreon regularly communicated with public investors via established

12                       market  communication  mechanisms,  including  through  regular

13                       dissemination of annual and quarterly reports and press releases that were

14                       carried by the media, newswires and on the Internet, as well as through

15                       presentations to investors and analysts, and conference calls with analysts.

16       148.    Accordingly, the market for Dendreon's publicly traded common stock promptly

17       digested current information with respect to the Company from publicly available sources and

18       reflected such information in the price of Dendreon common stock. Each of Plaintiffs relied on

19       the integrity of the market price for the Company's stock and is entitled to a presumption of

20       reliance with respect to Defendants' misstatements and omissions alleged in this Complaint.

21  **XV.  STATUTORY SAFE HARBOR FOR FORWARD-LOOKING STATEMENTS**

22       **NOT APPLICABLE**

23       149.    The statutory safe harbor applicable to certain forward-looking statements does

24       not apply to any of the false statements alleged in this Complaint. The statements alleged to be

25       false or misleading herein relate to then-existing facts and conditions from which the truth or

26       falsity of the statements could be determined at the time spoken, or were statements about the

**PAGE 42 - COMPLAINT**

1  future that also function as communications of current expectations and were therefore not

2  "forward-looking statements" when made.

3        150.   To the extent certain of the statements alleged to be false or misleading may be

4  characterized as forward-looking, they were not identified by Defendants as forward-looking or

5  accompanied by meaningful cautionary statements identifying important factors that could cause

6  actual results to differ materially from those in the purportedly forward-looking statements.

7        151.   Furthermore, if any of Defendants' statements alleged herein to be false or

8  misleading may be characterized as forward-looking, Defendants had actual knowledge at the

9  time they made the statements that the particular forward looking statement was false or

10  misleading, and/or the forward-looking statement was authorized and/or approved by an

11  executive officer of Dendreon who knew that those statements were false or misleading when

12  made.

13  **XVI.   <u>CLAIMS FOR RELIEF</u>**

14  <b>COUNT I</b>

15  <b>For Violations of Section 10(b) Of The</b>

16  <b>Exchange Act And Rule 10b-5 Promulgated Thereunder</b>

17  <b>(Against All Defendants)</b>

18        152.   Plaintiffs repeat and re-allege each and every allegation above as if fully set forth

19  herein.

20        153.   This Count is brought pursuant to Section 10(b) of the Exchange Act and Rule

21  10b-5 promulgated thereunder against Defendants Dendreon, Gold, Schiffman and Bishop.

22        154.   Throughout the Relevant Period, Dendreon and Defendants Gold, Schiffman and

23  Bishop, individually and in concert, directly and indirectly, by the use and means of

24  instrumentalities of interstate commerce and/or of the United States mail, engaged and

25  participated in a continuous course of conduct to conceal adverse material information about

26  Dendreon, its business operations and future prospects, as set forth in this Complaint. This plan,

**PAGE 43 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

scheme and course of conduct was intended to and, throughout the Relevant Period, did: (a) deceive the investing public, including Plaintiffs; (b) artificially inflate the market price of Dendreon securities; and (c) cause Plaintiffs to purchase Dendreon securities at artificially inflated prices.

155.    In furtherance of this unlawful scheme, plan and course of conduct, Defendants, individually and jointly, took the actions set forth in this Complaint.  While in possession of material, adverse non-public information, these Defendants (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; (c) sold shares while in possession of material, adverse non-public information; and (d) engaged in acts, practices and a course of conduct which operated as a fraud and deceit upon all purchasers of the Company's common stock.  Defendants' misconduct was designed to create and maintain artificially high market prices for Dendreon's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.   Each of Defendants was a direct, necessary and substantial participant in the common course of conduct alleged herein.

156.    Defendants acted with scienter throughout the Relevant Period in that they knew or, but for their deliberate recklessness, should have known, that their statements concerning the Company's business operations and future prospects, as disseminated to the investing public during the Relevant Period, were materially false.  Further, Defendants knew of existing adverse facts which directly contradicted their representations about Dendreon's existing business operations and prospects during the Relevant Period.  The Individual Defendants were among the senior management of the Company and were therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public through press releases, news reports and filings with the SEC.

157.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Dendreon common

**PAGE 44 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

1  stock was artificially inflated during the Relevant Period.  During the Relevant Period, Plaintiffs

2  were ignorant of the fact that market prices of Dendreon's securities, including its publicly

3  traded common stock, were artificially inflated.  Plaintiffs relied directly or indirectly on the

4  false and misleading statements made by Defendants, the absence of material adverse

5  information that was concealed by Defendants during the Relevant Period, and/or upon the

6  integrity of the market in which Dendreon's securities trade.

7      158.   As a result, Plaintiffs acquired Dendreon securities during the Relevant Period at

8  artificially high prices and were damaged thereby.  Defendants' conduct was a direct and

9  proximate cause of Plaintiffs' damages.

10     159.   Had Plaintiffs known of the material adverse information not disclosed by

11  Dendreon and the Individual Defendants, or been aware of the truth behind these Defendants'

12  material misstatements, they would not have purchased or otherwise acquired Dendreon

13  securities at artificially inflated prices, or at all.

14     160.   By virtue of the foregoing, Defendants have violated Section 10(b) of the

15  Exchange Act, and Rule 10b-5 promulgated thereunder.

16                          **COUNT II**

17         **For Violations Of Section 20(a) Of The Exchange Act**

18                  **(Against The Individual Defendants)**

19     161.   Plaintiffs repeat and re-allege each and every allegation above as if fully set forth

20  herein.

21     162.   This Count is asserted against the Individual Defendants Gold, Bishop and

22  Schiffman.

23     163.   The Individual Defendants acted as controlling persons of Dendreon within the

24  meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions within

25  Dendreon, their ownership and contractual rights, participation in and awareness of the

26  Company's operations, and intimate knowledge of the Company's actual performance, the

**PAGE 45 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

1   Individual Defendants had the power to influence and control, and did influence and control,

2   directly or indirectly, the decision-making of the Company, including the content and the

3   dissemination of the various false and misleading statements set forth in this Complaint.

4        164.   The Individual Defendants were provided with and had unlimited access to,

5   copies of the Company's reports, press releases, public filings and other statements alleged in

6   this Complaint to be misleading prior to and shortly after these statements were issued, and had

7   the ability to prevent the issuance of the false statements and material omissions or cause such

8   misleading statements and omissions to be corrected.

9        165.   In addition, each of these Individual Defendants had direct and supervisory

10   involvement in the day-to-day operations of the Company and, therefore, is presumed to have

11   had the power to control or influence the particular transactions giving rise to the securities

12   violations as alleged herein, and exercised the same. For example, the Individual Defendants

13   were able to and did control the content of various SEC filings, press releases, investor

14   presentations, and other public statements pertaining to the Company during the Relevant Period.

15   The Individual Defendants had access to the adverse undisclosed information about Dendreon's

16   business, operations, products, trends, financial statements, markets, and present and future

17   business prospects via access to internal documents (including but not limited to plant Capacity

18   Reports, Prescriptions vs. Infusion Reports, Provenge Weekly Performance Reports,

19   Reimbursement Confidence Reports, Apheresis reports and internal Dendreon market research

20   reports); conversations and connections with other corporate officers, employees, and borrowers;

21   participation at management and Board meetings and committees thereof; and reports and other

22   information provided to them in connection with these meetings.

23        166.   The Individual Defendants each participated in the drafting, preparation and/or

24   approval of the various public shareholder and investor reports and presentations, as well as

25   other communications alleged herein.

26

**PAGE 46 - COMPLAINT**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

1    167.   As set forth above, Dendreon and the Individual Defendants each violated Section

2    10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their

3    positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the

4    Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct,

5    Plaintiffs suffered damages in connection with their purchases of Dendreon securities during the

6    Relevant Period.

7                                           **COUNT III**

8                     **For Violations Of Section 20A Of The Exchange Act**

9                        **(Against Defendants Gold and Schiffman)**

10    168.   Plaintiffs repeat and re-allege each and every allegation above as if fully set forth

11   herein.

12    169.   This Count is asserted pursuant to Section 20A of the Exchange Act against

13   Defendants Gold and Schiffman on behalf of any Plaintiff who purchased Dendreon common

14   stock contemporaneously with the sale of Dendreon common stock by either Gold or Schiffman

15   during the Relevant Period, and who was damaged thereby.

16    170.   During the Relevant Period, Gold and Schiffman occupied positions within

17   Dendreon that made them privy to confidential information about Dendreon, as well as the true

18   state of Dendreon's operations, finances, financial condition and future business prospects.

19    171.   During the Relevant Period, Gold and Schiffman had a duty to refrain from

20   trading in Dendreon common stock unless they disclosed the foregoing material adverse facts.

21   In violation of their fiduciary duties to Dendreon's shareholders, including Plaintiffs, during the

22   Relevant Period, Gold and Schiffman sold their Dendreon common stock contemporaneously

23   with Plaintiffs' purchases of Dendreon common stock.

24    172.   Gold and Schiffman sold their shares of Dendreon common stock on, among

25   other dates, June 18, 2010, October 15-18, 2010, November 19, 2010, December 18, 2010, May

26   25, 2011, July 21, 2011 and July 25, 2011 and, as alleged above, at market prices artificially

**PAGE 47 - COMPLAINT**

1   inflated by the non-disclosure of material adverse non-public facts, misrepresentations of fact,

2   and the public statements released during the Relevant Period.

3       173.    Gold and Schiffman knew that they were in possession of material adverse

4   information that was not known to the investing public, including Plaintiffs. Before selling their

5   stock to the public, Gold and Schiffman were obligated to disclose the material non-public

6   adverse information to Plaintiffs.

7       174.    By reason of the foregoing, Gold and Schiffman, directly and indirectly, by use

8   and means of instrumentalities of interstate commerce, electronic communications mailing, and

9   the facilities of a national securities exchange, employed devices, schemes, and artifices to

10  defraud, and engaged in acts and transactions and a course of business which operated as a fraud

11  or deceit upon members of the investing public who purchased Dendreon common stock

12  contemporaneously with the sale of such stock by Gold or Schiffman.

13      175.    Plaintiffs who purchased Dendreon common stock contemporaneously with sales

14  by Gold or Schiffman (i) have suffered damages because, in reliance on the integrity of the

15  market, they paid artificially inflated prices as a result of the violations of Section 10(b) and

16  20(a) of the Exchange Act as alleged herein; and (ii) would not have purchased the securities at

17  the prices they paid, or at all, if they had been aware that the market prices had been artificially

18  inflated by the Defendants' false and misleading statements and concealment. At the time of the

19  purchases of the securities by Plaintiffs, the fair and true market value of the securities was

20  substantially less than the price paid by Plaintiffs.

21                              **COUNT IV**

22      **Violation Of The Washington Consumer Protection Act, RCW 19.86 *et seq.***

23                          **(Against All Defendants)**

24      176.    Plaintiffs repeat and re-allege each and every allegation above as if fully set forth

25  herein.

26

**PAGE 48 - COMPLAINT**

177.    The Consumer Protection Act ("CPA") is codified at Rev. Code Wash. 19.86.020 *et seq.*, and prohibits unfair and deceptive acts and practices that occur in trade or commerce.

178.    Throughout the Relevant Period, Dendreon and Defendants Gold, Schiffman and Bishop, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse material information about Dendreon, its business operations and future prospects, as set forth in this Complaint. This plan, scheme and course of conduct was intended to and, throughout the Relevant Period, did: (a) deceive the investing public, including Plaintiffs; (b) artificially inflate the market price of Dendreon securities; and (c) cause Plaintiffs to purchase Dendreon securities at artificially inflated prices.

179.    In furtherance of this unlawful scheme, plan and course of conduct, Defendants individually and jointly made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading.

180.    Defendants' misrepresentations and omissions as alleged herein constituted unfair and deceptive acts and practices for purposes of RCW 19.86.020 in that the misrepresentations and omissions had the capacity to deceive, were intended to deceive and did in fact deceive a substantial portion of the public.

181.    Defendants' misrepresentations and omissions occurred in the conduct of trade or commerce for purposes of RCW 19.86.020.

182.    Defendants' misrepresentations and omissions were injurious to the public interest because they in fact injured each of the Plaintiffs and other Dendreon shareholders, and had the capacity to injure Plaintiffs and other Dendreon shareholders, as set forth in RCW 19.86.093(3). As alleged in this Complaint, Defendants' misrepresentations and omissions were undertaken as part of a generalized course of conduct, pattern and practice affecting numerous Dendreon shareholders in Washington and elsewhere.

183.    As alleged in this Complaint, when the truth was revealed concerning Defendants' misrepresentations and omissions, each of Plaintiffs suffered significant losses on their holdings

**PAGE 49 - COMPLAINT**

1  of Dendreon securities.  Therefore, as a direct and proximate result of Defendants' violations of

2  RCW 19.86.020, Plaintiffs were injured in their property for purposes of RCW 19.86.090.

3      184.    Plaintiffs have been damaged and are entitled to all of the damages, remedies,

4  fees and costs available under the CPA, including attorneys' fees, costs and treble statutory

5  damages. *See* RCW 19.86.090.

**COUNT V**

**Common Law Fraud**

**(Against All Defendants)**

9      185.    Plaintiffs repeat and re-allege each and every allegation above as if fully set forth

10  herein.

11      186.    Throughout the Relevant Period, Dendreon and Defendants Gold, Schiffman and

12  Bishop, individually and in concert, directly and indirectly, engaged and participated in a

13  continuous course of conduct to conceal adverse material information about Dendreon, its

14  business operations and future prospects, as set forth in this Complaint.

15      187.    In furtherance of this unlawful scheme, plan and course of conduct, Defendants,

16  individually and jointly, made untrue statements of material fact and/or omitted to state material

17  facts necessary to make the statements made not misleading.

18      188.    As alleged in this Complaint, Defendants knew that their statements were false,

19  and/or that material facts were necessary to make the statements not misleading.

20      189.    Defendants intended that their statements would be relied upon by Plaintiffs and

21  other Dendreon shareholders.

22      190.    Plaintiffs did not know and did not have the ability to know of the falsity of

23  Defendants' statements, or that Defendants had omitted material facts necessary to make

24  Defendants' statements not misleading.

25      191.    Plaintiffs justifiably and reasonably relied on Defendants' misstatements and

26  omissions.

**PAGE 50 - COMPLAINT**

1   192.   As a direct and proximate result of Defendants' fraudulent misrepresentations and

2   omissions, Plaintiffs have suffered and continue to suffer substantial harm and are entitled to

3   recover from Defendants damages in amount to be proven at trial.

4                                    **COUNT V**

5                      **Common Law Negligent Misrepresentation**

6                              **(Against All Defendants)**

7   193.   Plaintiffs repeat and re-allege each and every allegation above as if fully set forth

8   herein.

9   194.   Plaintiffs bring this cause of action in the alternative to the other causes of action.

10   195.   During the Relevant Period, in numerous SEC filings, press releases, conference

11   calls, analyst presentations and other publicly disseminated statements, Defendants: (i)

12   represented that there was incredibly high demand for Provenge; (ii) represented that the demand

13   for Provenge exceeded the Company's capacity to manufacture the drug; (iii) represented that

14   physicians were comfortable with Provenge's "buy-and-bill" reimbursement model and had not

15   expressed any concerns; (iv) provided guidance to the market concerning the number of patients

16   the Company would treat and the revenues it would achieve; and (v) represented that the

17   Company was "on track" to meet Defendants' guidance and business plans.

18   196.   At the time that Defendants made these representations, Defendants knew that the

19   representations would be relied upon by Dendreon's shareholders, including Plaintiffs, for

20   assessing and determining Dendreon's financial condition and business prospects.

21   197.   At the time that Defendants made the above material representations, Defendants

22   knew or should have known that the above material representations were false, and/or

23   Defendants negligently disregarded whether these representations were true or false. Defendants

24   nevertheless made these negligent material representations with full knowledge and intention

25   that they would be relied upon by Dendreon's shareholders, including Plaintiffs.

26

**PAGE 51 - COMPLAINT**

198.    At all relevant times, Plaintiffs justifiably relied on Defendants' material misstatements in determining and assessing, among other things, Dendreon's financial condition and business prospects.

199.    As a direct and proximate result of Defendants' negligent misrepresentations and omissions, Plaintiffs have suffered and continue to suffer substantial harm and are entitled to recover from Defendants damages in amount to be proven at trial.

## XVII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

A.    Awarding Plaintiffs compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.    Ordering Defendants Gold and Schiffman to disgorge the profits of their insider sales of Dendreon stock during the Relevant Period;

C.    Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## XVIII. DEMAND FOR JURY TRIAL

Lead Plaintiff demands a trial by jury.

DATED: May 15, 2013.

SLINDE NELSON STANFORD

By:  /s/ Christina Haring-Larson
Christina Haring-Larson, WSBA No. 30121
*Of Attorneys for Plaintiffs, Local Counsel*

**PAGE 52 - COMPLAINT**

HUNG G. TA, ESQ. PLLC


By: _/s/ Hung G. Ta_____
    Hung G. Ta, NYSBA No. 3972544
    250 Park Avenue, Seventh Floor
    New York, NY 10177
      *Of Attorneys for Plaintiffs*


KYROS LAW OFFICES


By: _/s/ K. William Kryos_____
    K. William Kryos, MASBA No. 634442
    17 Miles Road
    Hingham, MA 02043
      *Of Attorneys for Plaintiffs*

**PAGE 53 - COMPLAINT**

**APPENDIX A**

| Date/Event | Misleading Statement/Omission[2] |
|---|---|
| April 29, 2010 - FDA Approval Conference Call | At a presentation to investors and analysts to announce the FDA's approval of Provenge, Bishop stated that "[o]ver the next 12 months, we'll provide Provenge to approximately *2,000 patients*", and *"[w]e recognize that demand for Provenge will exceed our initial ability to supply it for the first 12 months."* <br><br> Gold similarly stated that "[s]o as we've said all along, the capacity for Provenge initially will be 25% of the New Jersey facility. *We expect that the demand for this product early on will exceed our ability to supply it in the marketplace."* |
| May 3, 2010 – Letter To Investors | In a letter to investors authored by Gold and published in *The New York Times, Washington Post,* and *Los Angeles Times,* Gold reiterated to investors: <br><br>     We are proud to be able to provide PROVENGE to *approximately 2,000 patients* with asymptomatic or minimally symptomatic metastatic castrate resistant prostate cancer (mCRPC) *within the first 12 months.* (See Indication and Important Safety Information Below) This is an important step towards realizing our mission of transforming the lives of patients with cancer, but it is not enough. <br><br>     We recognize that we have a unique challenge. Given the personalized approach we discovered with autologous cellular immunotherapy, coupled with the number of patients with mCRPC, *we expect that the demand for PROVENGE will exceed our ability to manufacture it, at first.* That's why we are completing the buildout of our three manufacturing facilities in New Jersey, Los Angeles, and Atlanta by the middle of next year so that we may offer more patients a new treatment option that extends survival. |
| May 3, 2010 – 2010 Deutsche Bank Health Care Conference | At a presentation to analysts and investors at the Deutsche Bank Health Care Conference, Schiffman stated: "We indicated, we will be commercializing it from the 25% of New Jersey, which has been built out and has been operating as our clinical facility for the past several years. *And as we look over the first 12-months, we believe that we will be able to provide PROVENGE to approximately 2,000 patients."* <br><br> Schiffman also stated that "*we do expect to see the demand for* |

---

[2]     Emphasis added to all quoted statements unless otherwise specified.

**PAGE 54 – APPENDIX A**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

| | | |
|---|---|---|
| 1 | | *PROVENGE in the first year as we're building out the rest of the capacity to be greater than our ability to supply the product.*" |
| 2 | May 11, 2010 – Bank Of America Merrill Lynch Healthcare Conference | At a presentation to analysts and investors, Gold again stated: |
| 3 | | So I'm sure most of you have heard the strategy already, but *there is a very high demand for PROVENGE out there.* ... We're currently making PROVENGE available through approximately 50 sites throughout the United States. That availability is going to be supported from the 25% of our New Jersey manufacturing facility that was licensed by the FDA. And *we've said during the first 12 months, we'll be able to supply PROVENGE to approximately 2,000 men with late stage prostate cancer.* But we know that's not enough. |
| 8 | June 7, 2010 – CNBC Interview | During an interview on CNBC, Gold stated that *"what we're seeing is strong demand for Provenge out there."* He further indicated that the gap between "demand exceeding supply" would be bridged only once Dendreon substantially increased its capacity. |
| 11 | June 8, 2010 – Jefferies Global Life Sciences Conference | At a presentation to investors and analysts, Schiffman stated: "We build our capacity in 2006 in New Jersey. Its 25% of the potential for that site. That has gone through the licensing inspection and been approved and we're actively building out the rest of New Jersey, so that we can bring it on board and we expect it in the first half of next year. *Given the capacity that we have we are capacity constrained and we believe that in the first 12 months we will be able to provide PROVENGE to approximately 2,000 patients.*" |
| 15 | | Schiffman also stated that *"We're on track for the 2,000 patients and everything is consistent with what we've had as expectations for a ramp and a launch."* |
| 17 | June 9, 2010 – Needham & Company Healthcare Conference | During a presentation to investors and analysts, Schiffman stated: "We expect to be able to service approximately *2000 patients with the capacity we will have in place for the first 12 months. We do expect to see those patients back-loaded somewhat next year given that early next year we will have the rest of the capacity* of New Jersey coming on line, increasing that capacity by a factor of three, so we have four times the capacity early next year as we have today." |
| 21 | | With respect to potential concerns about physician reimbursement, Schiffman assured investors at the Needham Conference that "[w]e've got coverages, processes underway and *we're on-track with all of our expectations with regards to reimbursement activities.*" |
| 24 | June 16, 2010 – Goldman Sachs Healthcare Conference | At a presentation to investors and analysts, Schiffman stated: |
| 25 | | We've only built out 25% of that facility, and so we are launching from the 25% that was built out. It is a limited launch, that's why we've limited the physicians and our expectation is *we'll have* |

**PAGE 55 – APPENDIX A**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

| | | |
|---|---|---|
| 1<br>2 | | *about 2000 patients processed in the first 12 months*. ... We are pleased to say that we've made tremendous progress and *we're on track* with our launch at this point in time. *All the internal metrics that we established have been hit.* |
| 3<br>4<br>5<br>6<br>7 | June 23, 2010 –<br>NASDAQ      OMX<br>Investor Program | At a presentation to investors and analysts, Gold stated that:<br><br>And we said that through these 50 centers and *over the first year of launch, we can provide PROVENGE to about 2,000 patients during the first 12 months* of the commercialization of the product. *And we expect more patients to be part of that in 2011 as oppose to 2010, as we bring up additional capacity* from our New Jersey plant, okay? So the New Jersey facility at launch is build out at 25% of its capacity. |

We already initiated a build-out and completed a build-out of that plant. It's now going through validation and we expect that the remaining capacity, the remaining 75% of our New Jersey plant will come online early next year. And when that additional capacity comes online, we will be able to provide additional capacity for treating patients. *So there is a tail to the 2,000 patients that we are treating during the first 12 months and it's weighted heavily into when the New Jersey facility comes online early in 2011.*

That being said, *we know that the demand for this product is incredibly high.* We are seeing very strong demand for this product in our initial infusion centers. In fact, *the vast majority of these infusion centers have substantial waiting lists for PROVENGE* and they're waiting for us to bring additional capacity online. We've allocated each of these sites, by the way, these initial infusion sites, about two to three patients a month, okay and the demand is exceeding that.

We knew that was going to be the case and so we initiated a build-out of two additional facilities in the United States even prior to getting approval for the product. As I said, one is Atlanta, Georgia, just outside of Atlanta and the other is just outside of L.A. *And those three facilities in total can support somewhere between 1.2 and 2.5 billion in annual revenue in the United States. So we're very confident that once these three facilities online, that we'll be able to meet the strong demand that we're seeing at the physician sites today.*

* * *

So within 60 days of launch, we've been able to get the vast majority of these centers up and going, *so that's going very, very well, and those centers are experiencing high demand for the product.*

In response to a specific question from an investor "what gives [him]

**PAGE 56 – APPENDIX A**

SLINDE NELSON STANFORD<br>4400 Two Union Square<br>601 Union Street<br>Seattle, WA 98101<br>p. 206.237.0020

confidence in that 2,000 patient number over the next 12 months", Gold responded as follows:

> So the question is, what gives us the confidence that we can meet this 2,000 patient number that we've said that we could supply over the first 12 months of launch. A couple of things. One, *the demand is clearly there at the physician's offices*. So the 50 initial infusion sites that are up and going are seeing waiting lists for the product. *And in fact, even though centers that aren't on our current infusion list, but want to get access to PROVENGE once more capacity is available, already have patients coming into them saying, when can I get treated at your facility with PROVENGE? So the patient demand is there*.

> The other component of that is the capacity. We've already given guidance that the *New Jersey facility can support somewhere between 1.2 and $2.5 billion in annual revenue*. If you break that down into just the 25% capacity that's currently available, it's 125 to 250, which translates into roughly 1,800 to 2,600 patients. So we have the capacity to be able to supply this into the marketplace.

> And lastly, *the reimbursement coverage has been going just as we had planned*. And so *we are seeing no hurdles in terms of reimbursement* for providing coverage for PROVENGE.

In addition, Gold stated to investors that "We tend to be very conservative in the type of guidance we give in terms of utilization of the plants. But even *on that low-end, you're in the range of meeting the 2,000 patients*."

| June 24, 2010 – Wells Fargo Securities Healthcare Conference | At a presentation to a group of investors and analysts, Schiffman stated: |

> Given that we have a limited launch in terms of the amount of capacity we have available, *we expect to be able to deliver PROVENGE to about 2,000 patients over the first 12 months*. That certainly is going to be back-end loaded in the 2011 because early 2011, the rest of New Jersey comes on board, we will have an incremental 3X, what we have today, so 4X the amount of capacity we're launching with. … *We see no shortage of end-patient demand and actually on the physician side, we've seen great support there* as we've had the call center, have a lot of physicians contact us wanting to have a sales rep come out, which is unusual in this industry to educate him on PROVENGE and talk about potentially how we are going to expand the ramp.

When asked by Wells Fargo research analyst, Aaron Reames, whether Dendreon was "on tracks [or] slightly ahead of internal projections," Schiffman responded:

> I guess if you look at the launch and the components of it, I feel

**PAGE 57 – APPENDIX A**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

| | | |
|---|---|---|
| 1<br>2 | | *we're on track in terms of actual bringing patients in, it's in line with our model, it's in line with our projection for the 2,000 patients.* |
| 3<br>4<br>5<br>6<br>7<br>8<br>9 | | I actually feel *we're ahead of where our internal projections were* if we look at reimbursement coverage and what we've already seen in guidelines and pieces coming out. And say in general, I'd say we're completely on track. *We're in sync with all the internal it's facility build out, reimbursement or signing up with physicians and patients.* And you know excited to be where we are, I know we've seen a little bit of pressure over the last little bit with some uncertainty there, and I'm not sure we are generated because we look from our standpoint, like I say, to have over 80% of the sites already prescribed it within two months of launch, when a lot of these are centers that have two-month internal processes that they have to go through before they can even prescribe a product, we think we're doing really well. |
| 10<br>11<br>12 | August 3, 2010 – Second Quarter Results Press Release | In a press release announcing its second-quarter 2010 financial results, Defendants stated that "Dendreon is *on track to provide PROVENGE to approximately 2,000 patients over the first 12 months of the launch* and to date has already received prescriptions from more than 500 patients." |
| 13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 | August 3, 2010 – Second Quarter Earnings Conference Call | During the Company's second quarter conference call to discuss Dendreon's quarterly results, Gold assured investors that Dendreon was "*on track.*" Gold also stated: "We are reiterating our guidance for treating approximately *2,000 patients over the first 12 months*. As Hans [Bishop] indicated previously, the revenue will be back-end loaded to 2011 as we expect to have all of our New Jersey capacity approved early in 2011." Gold told investors that "we're also seeing *large waiting lists at a number of our facilities,* as well."<br><br>During his presentation on the second quarter conference call, Defendant Bishop stated that "[w]hat I can tell you is that *the majority of our centers tell us that they have waiting lists.*" During the call, Bishop noted that "*I would like to reiterate our guidance of increasing approximately 2,000 patients over the first 12 months of launch.*"<br><br>When JPMorgan asked whether the approximately 500 prescriptions recorded by the Company for the 2010 second quarter "translated into a single infusion and then how many went all the way to the three [infusions]?", Defendant Bishop responded "Yeah, *the majority of our prescriptions result in three infusions.*"<br><br>When Cowen and Company research analyst, Eric Schmidt, questioned Bishop about Dendreon's guidance, Bishop again stated: "I would reiterate, Eric, we said at that time of launch *we expect to treat about 2,000 patients over the first 12 months. We're on track with that.* So we're progressing towards that goal as we planned." |
| 26 | | |

**PAGE 58 – APPENDIX A**

SLINDE NELSON STANFORD<br>4400 Two Union Square<br>601 Union Street<br>Seattle, WA 98101<br>p. 206.237.0020

When questioned by Needham & Company analyst, Mark Monane, about how Dendreon evaluates itself, Bishop responded:

> *We're really pleased about the acceptance we're getting in the clinical community about the importance of our data*. So that's number one.
>
> The second thing you clearly look for is that you are getting good uptake in the clinics where you're selling, and I can tell you *we see strong demand* in the clinics where we're currently providing Provenge, so that's important, and a really important baseline as we think forward for 2011.
>
> And then, finally, reimbursement. And I would like to reiterate what both Mitch and I have said. Our original expectations were that it would take about six to nine months for the majority of payers to publish their policies. *And here we are just at three months, and the majority of MACs have already published in one form or another, and we're seeing really good traction on the private payer side, too*. That's really important when we think about the ramp of--growth as we enter into 2011 to after good reimbursement environment. So I think there are important things, and that's why we're pretty pleased with where we are today.

When asked at the conference, "geographically with the launch right now, where are the majority of the shipments occurring now?" Bishop responded "*[a]ctually, it's very evenly spread across the country*" and that shipping Provenge from the New Jersey facility to the west coast "has worked fine."

| | |
|---|---|
| August 10, 2010 – Canaccord Adams Global Growth Conference | At a presentation to research analysts and investors, Schiffman stated: "We think that we can provide this to approximately *2,000 patients over the first 12 months*. And we have guided that that will be *backend loaded*, because early next year the rest of New Jersey will come onboard and we'll have four times the capacity that we have today."<br><br>With regard to issues of reimbursement, Bishop represented that "*as we look at where we're at from a reimbursement standpoint, we're probably ahead of where we thought we would be at this point in time*." |
| September 13, 2010 – Morgan Stanley Global Healthcare Unplugged Conference | At a presentation to investors and research analysts, Gold stated that "[w]e reported our first quarter revenues last quarter and *we've had a good, strong demand for the product* since then." When asked by Morgan Stanley's research analyst, Sara Slifka, whether the launch was meeting his expectations, Gold responded:<br><br>So the concept of prolonging survival with minimal toxicity was very appealing to both the physician and to the patient. *So as we anticipated the demand for this product is currently exceeding our ability to supply it in the marketplace*. First off the facility that was licensed in New Jersey has a capacity of 48 hoods or |

**PAGE 59 – APPENDIX A**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

workstations, and 12 of those workstations were licensed initially as part of our license application with the FDA. And so *at full capacity the New Jersey plant has the capability of supplying somewhere between 500 million and $1 billion in annual revenue into the marketplace, and we're only at 25% of that potential capacity now*.

We're very pleased with the way the launch is going from several perspectives. One is we're seeing *excellent demand out there in the physician community*. There's an incredible amount of awareness of this product in the patient community, and *we're seeing smooth reimbursement* coming through from both the private and public sector.

| | |
|---|---|
| September 15, 2010 – Robert W. Baird & Co., Inc. Health Care Conference | At a presentation to investors and research analysts, Bishop stated:<br><br>And we've guided that *we'll be able to supply about 2,000 patients over the first 12 months* of our launch period. I'll point out that a significant number of those 2,000 patients will be treated in 2011 and that estimate relies on us bringing online, the expanded New Jersey facility early in 2011. I talked about this already, but I just want to give you a bit of a sense about the importance of these new facilities and give you some guidance around their capacity.<br><br>So New Jersey will triple in size. So, it goes from the 12 workstations that are currently approved in supplying our market today to 48 workstation early in '11 and that plant will be able to support sales between 500 million and 1 billion. Then both of the plants in Atlanta, and they're a little smaller, 36 workstations each and the same math, they'll be able to support - each of them will be able to support 375 to 750 million in sales. Those come online around the middle of 2011.<br><br>In addition, Bishop assured investors that "*right now, until next year we are supply constrained.*" |
| September 16, 2010 – Bank Of America Merrill Lynch Global Health Care Conference | At a presentation to investors and research analysts, Schiffman stated:<br><br>And given that we have limited capacity at launch we launch with approximately 50 physicians, they were all prior clinical trials, trial sites. They are familiar with the product and over the first 12 months *we think we're going to be able to provide PROVENGE to approximately 2,000 patients*. With more of that happening in 2011 because in early 2011 the rest of New Jersey comes online, and we have four times the capacity that we launched with early in 2011.<br><br>We're rapidly expanding those manufacturing facilities. I indicated early 2011, the rest of New Jersey comes online. We'll have 48 workstation, at a low end of our revenue and I think |

**PAGE 60 – APPENDIX A**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

| | |
|---|---|
| | something that we showed we can get to in our July manufacturing. *We'd be able to generate 500 million in annual sales out the facility*. There are efficiencies in others that we are projecting at the upper end, *it could move to about a $1 billion* and so that's sort of the range in annual sales as we get multiple facilities up, we'll be able to narrow that down and give a better estimate. |
| | Atlanta and LA, will both be coming on in the middle of next year. They've got a total of 36 workstations, when we're done, we will have a 120. So, 10 times the capacity that we launched with available, at the end of next year. *At that point, we think we're in a good position to be able to service the market and at a low end, we have ability to be able to do 1.2 billion to about 2.5 billion in annual revenues from those facilities.* |
| | When questioned by Bank of America Merrill Lynch research analyst, Rachel McMinn, about issues of reimbursement, Schiffman responded: |
| | *We've seen reimbursement happen to the physicians for both private pay and public pay*. It's not a lot of percentage of the patients because we are 4.5 months into the launch and typically it's about 90 days for the first reimbursement. And so at about a month and half where you're hitting that window, in our first month and half was not a large portion of our revenue. And so from that standpoint it's getting - *I would expect over the next month and month and half to get more in a steady state and get everybody comfortable, all the reimbursement processes are working over the next probably three months.* |
| October 21, 2010 – BioBusiness.TV and MD Becker Partners Conference | During his presentation at a conference hosted by BioBusiness.TV and MD Becker Partners, Dendreon's Chief Scientific Officer David L. Urdal represented that Dendreon was "[a]ble to provide PROVENGE to approximately *2,000 patients*," with "more patients expected in 2011 than 2010 *due to increased capacity from NJ*." |
| November 3, 2010 – Third Quarter Results Press Release | In a press release issued announcing the Company's third-quarter results, under the "Highlights" section, Dendreon stated: "Dendreon's revenue guidance for full year 2010 is approximately $46-47 million and for *2011 is expected to be in the range of $350-400 million, with approximately half of that expected to be generated in Q4, based on a standard FDA review period and approval of the new manufacturing facilities.*" |
| November 3, 2010 – Third Quarter Conference Call | During Dendreon's third quarter conference call, Gold stated that "*We expect 2011 revenue to be approximately $350 million to $400 million.*" |
| | When asked by the research analyst for RBC Capital Markets, Michael Yee, for "more color" to this guidance, Gold stated: |
| | In terms of more granular guidance in a quarter by quarter basis, we're not going to get into that, but my comments and Greg's |

**PAGE 61 – APPENDIX A**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

prepared comments, we've given you guidance for the year which is *$350 million to $400 million* and Greg reiterated that *half of that will occur in the fourth quarter of 2011 and that's a direct correlation to when our additional capacity comes online.*

When asked by research analyst Mark Monane whether "the variable will change as you expand next year," Gold responded:

> I'm sorry Hans clearly wants to chime in here, but clearly once we have additional capacity online, the variables will change. I think if you look at it today, *clearly the demand out there is exceeding our ability to supply the market* and so what that creates is a multitude of factors either patients with late-stage prostate cancer needing to go on other forms of treatment or physicians don't want to keep their patients in the queue for an extended period of time so it changes the decision-making process and how they do that. We expect that to really be resolved once additional capacity comes online from New Jersey, Atlanta and LA next [year].

When questioned by Biotech Stock Research analyst, David Miller, about Dendreon's guidance of 2,000 patients in the first year, Gold responded:

> As I said ... , that guidance was principally given, as you know, to get patients educated on the capacity constraints we be facing at the time of approval. We knew that there was *a lot of pent-up demand and really anxiety for patients to get access to Provenge*. As I said to Robyn, May was principally a start-up month for us so *we expect that number to be hit some time mid year*.

During the third quarter conference call, Bishop delivered prepared remarks in which he made the following assurances:

> Thank you, Mitch. Good afternoon, everyone. Today I'll give you an update on the commercial and operational progress we've made since launching Provenge in May. *We continue to see strong demand across the majority of the country, with most sites having waiting lists*. Year-to-date, we've received over 1,000 prescriptions. As a reminder, not every prescription converts into a treatment with Provenge, and one of the main reasons is because of *long waiting lists in many parts of the country due to our limited capacity*.
>
> * * *
>
> To update you on our manufacturing performance, I'm pleased to report that *all aspects of manufacturing and distribution continue to perform as expected*, and are consistent with our clinical trial experience.

In response to a question posed by a research analyst from Cowen and

**PAGE 62 – APPENDIX A**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

Company, Eric Schmidt, concerning the demand for Provenge, Bishop responded:

> Eric, *no were are not at all worried about demand*. So I want to talk about the plant plan in a moment. *We're seeing very solid demand this year* evidenced in the numbers that we just shared with you and we'll be ramping up our sales and marketing initiatives including, by the way, the number people we have in the field so *we're confident that demand will stay strong throughout next year*.

In response to a question from Deutsche Bank research analyst, Robyn Karnauskas, regarding the demand for Provenge, Bishop again responded:

> Yes, Robyn, this is Hans. Well, I think the first point to reinforce is that *we have got queues across the majority of the country* and that's consistent with what Mitch shared in his prepared remarks that last month's sales were $9.5 million, and actually our average maximum monthly capacity is between $9 million and $10 million, *so we're selling our capacity*. There are a small number of tenants in the northeast which often take a little bit longer to get going where there are not queues but *the majority of the country there are waiting lists. We are looking forward, by the way, having additional capacity so that is a problem that is behind us*.

During the third quarter conference call, Schiffman also delivered prepared remarks in which he stated:

> The first area of focus [for Dendreon] has been on establishing a revenue forecast consistent with our projected year end patient demand by geography. This will enable us to maximize the efficiency of our manufacturing and logistics supply chain entering 2012. Assuming the successful approval of our manufacturing facilities, and an expanded apheresis network, *our 2011 guidance is projected to be between $350 million and $400 million, with approximately 0.5 of the total revenue for the year expected to come in the fourth quarter*.

| | |
|---|---|
| November 11, 2010 – Credit Suisse Healthcare Conference | During a presentation to investors and analysts, Gold stated: <br><br> So we've completed the buildout of the remaining 75% of the New Jersey facility. In fact, yesterday we announced that we filed an sBLA for licensure of the remaining 36 hoods in New Jersey. That will give us a total of 48 workstations in that plant, and those 48 workstations are capable of supporting approximately *$500 million to $1 billion in revenue, just off of the New Jersey facility*. That in and of itself is - *we don't believe it's enough capacity to supply the demand that's out there in the market* so we've completed construction on two additional plants. |

**PAGE 63 – APPENDIX A**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

* * *

In terms of our financial position, the company is in a strong financial position. We ended the third quarter with just under $400 million of cash on our balance sheet. We did give guidance for the remainder of this year, that revenues would be in the $46 million to $47 million range, keeping in mind that *we are in a capacity-constrained environment for this year* and we will be for the first part of next year as we bring up the remainder of New Jersey.

Next year, *we gave revenue guidance for $350 million to $400 million*. And specifically, we said that approximately half of that revenue would occur in Q4 of next year, so $175 million to $200 million occurring in the fourth quarter. And that's because *we'll be bringing plant capacity online,* not only from New Jersey, but from the LA and Atlanta facilities coming online in the middle of the year.

| December 15, 2010 – Deutsche Bank Securities, Inc. BioFEST Conference | During a presentation to investors and analysts, when asked about patient demand for Provenge, Schiffman responded that *"the vast majority of all sites that we talk with do have a good site queue of patients* they want to get in and be able to write scripts and they are waiting" and that he was *"not aware of any [sites] that don't have any queue."* |

| January 7, 2011 – Shareholder Update Conference Call | At a shareholder update conference call for investors and research analysts, Gold emphasized in his opening remarks that *"[t]he demand for PROVENGE is robust"* and further stated:

As you know, *we are in a capacity constrained environment in 2010,* so in 2011, we will turn the volume up on our awareness efforts to ensure we are maximizing our available capacity.

* * *

As our reminder, our revenue capacity remains unchanged for the first quarter of this year at around $9 million to $10 million per month while *we're still in this capacity constrained environment.*

In addition, Gold told investors that "[w]e are reiterating our 2011 revenue guidance to be approximately *$350 million to $400 million,* with approximately half of that occurring in the fourth quarter."

During his presentation, Schiffman stated, "As we look to 2011, we are reiterating our previous revenue guidance of between *$350 million to $400 million in annual revenues* with approximately half of the revenue expected to come in the fourth quarter."

When questioned by Wedbush Securities analyst, Katherine Xu, about Dendreon's guidance of 2,000 patients within the first year of launch, Gold responded that *"the 2,000 patient number on our last call would be* |

**PAGE 64 – APPENDIX A**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

| | | |
|---|---|---|
| | | *middle of the year*; and just to be specific, middle of the year for us is sometime in July." |
| | March 1, 2011 – Form 10-K | In Dendreon's Form 10-K, which was signed by Gold and Schiffman, Defendants assured investors that *"We are presently not at capacity sufficient to manufacture PROVENGE in quantities sufficient to fulfill patient demand. We have experienced . .. in the near future constraints in our ability to manufacture PROVENGE in sufficient quantities to satisfy market demand."* |
| | March 1, 2011 – Fourth Quarter Shareholder Conference Call | During Dendreon's conference call to discuss its 2010 fourth quarter results, Gold assured investors that *"[i]n Q4, we sold out our capacity in most geographic areas."* Gold stated that Dendreon's guidance *"is $350 million to $400 million for the year*, of which we expect approximately half of that will occur in the fourth quarter of this year." Gold assured investors that Dendreon was *"well-positioned to execute on our plans this year, to achieve our year-end revenue guidance"* of $350-400 million in revenues. Gold stated that Dendreon was *"still in a capacity-constrained environment"* entering 2011. |
| | | During his opening remarks, Bishop stated: "On average, we expect that this year these sites will prescribe PROVENGE to about *one to two patients per month* at first" and *"[w]e are on track with providing PROVENGE to approximately 2,000 patients by the end of July."* Bishop likewise stated that Dendreon was *"still in the same supply constrained environment."* |
| | | When asked about the demand for Provenge, Bishop responded: "And in fact, I've just come back from pretty much two weeks with many of our new sales representatives. And *we're seeing a lot of enthusiasm from customers* about the product profile, so *I don't expect we're going to get pushbacks there."* |
| | March 3, 2011 – RBC Capital Markets Healthcare Conference | At a presentation to investors and analysts at the RBC Capital Markets Healthcare Conference, Schiffman stated: |
| | | As we look at where our guidance has us, we finished the year in a position that should be seeing very strong sales, somewhere around 50% of our revenues expected. And that's - *our guidance is somewhere between $350 million to $400 million in revenue*. And so, you've finished the year in a strong position with your facilities on board. |
| | March 8, 2011 – Cowen and Company Health Care Conference | At a presentation to investors and analysts Schiffman made the following opening remarks: |
| | | *Our guidance for revenue this year is about between $350 million to $400 million. The first quarter, we are limited in our capacity consistent with what we've had for the past several months.* And we said that we can do about $9 million to $10 million a month with that capacity, so you will be looking at $27 |

**PAGE 65 – APPENDIX A**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

| | | |
|---|---|---|
| | | million to $30 million for the first quarter. |
| | | We do expect about half of that revenue approximately should happen in the fourth quarter and that's really geared to our manufacturing facilities coming on line. As I indicated, New Jersey, we would expect to see news on that this week. Revenues would really start to ramp beginning of Q2 because at that point physicians have time to start prescribing with patients. |
| | | On the issue of reimbursement, Schiffman reassured investors and analysts "[w]e increased the size of the reimbursement team. We recognize that reimbursement is extremely important for our product. *I think it's an area that we've been very successful.*" |
| | | When asked at the conference about issues of demand, Schiffman responded that "*[w]e do not perceive that there are any issues there at all.* We hear a lot of positive feedback." |
| April 6, 2011 – Needham and Company Healthcare Conference | | During a presentation to investors and analysts, Schiffman stated: |
| | | *We've given revenue guidance for this year of between $350 million to $400 million. Given the low amount of capacity that we had a launch, it is back-end loaded.* This capacity coming on throughout the year and we expect approximately 50% of that revenue to occur in the fourth quarter, with a very strong exit rate as we enter into 2012. |
| | | During the question and answer session, Schiffman was asked about Dendreon's guidance for Provenge. In response, he stated that "*with L.A. or Atlanta on board, either of those facilities, we would be able to hit our fourth quarter guidance.*" |
| April 7, 2011 – Leerink Swann Cancer Roundtable | | During a presentation to investors and analysts, Schiffman was asked to provide a sense of where Dendreon was tracking against its goals for the number of patient accounts, and responded as follows: |
| | | You bet. So- and actually, I think these goals or metrics, this is probably where we're tracking closest inside the organization as the real key this year is we've got the capacity, we see it coming online. And now, you're really working to stimulate the market demand and fill those facilities. |
| | | *And I think we have the revenue guidance out there where we're looking for $350 million to $400 million, but approximately half of that in the fourth quarter just tied to how our facilities are coming online.* |
| | | And so to hit those numbers, what we're tracking and monitoring is bringing accounts onboard. |
| | | * * * |

**PAGE 66 – APPENDIX A**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

| | |
|---|---|
| | In terms of accounts that have started to order, those are the ones that we'll provide updates as we move throughout the year and certainly give data and – but I think that is what the investors really should be focusing on is, are we consistently bringing new accounts on board and those accounts then starting to order the product. *And what we're looking for is essentially, on average, one to two accounts, and one or two patients a month per account. And we're hitting our guidance.* |
| | When asked about the demand for Provenge, Schiffman assured investors the following: |
| | We've seen a lot of interest from physicians as we're looking to bring them on board and [ph] fair commitment of their time. And as we look at what we saw on the launch with just the first 50 sites, *we've been completely sold out in capacity, with many sites having patients that they're not able to get on, simply because of our capacity limitations.* And so as we look at that and we look at sort of the dynamics there and we look at bringing new accounts on board, *we would expect to see similar dynamics with a lot of those new accounts.* |
| | *And so, we feel comfortable with the guidance we've given, with the fact that there is a large demand.* |
| | On the issue of reimbursement, Schiffman stated that *"we're not aware of any situations at all where physicians are not believing that they're going to be paid for a product that has been prescribed on label."* |
| May 2, 2011 – Dendreon Press Release | In a press release announcing its 2011 first quarter financial results, Dendreon again stated to investors: "Dendreon continues to expect revenue this year of between *$350-400 million* with approximately half of that anticipated in the fourth quarter." |
| May 2, 2011 – First Quarter Conference Call | During the Company's 2011 first quarter conference call for investors and analysts, Gold stated that "[w]e continue to expect revenue this year of between *$350 million and $400 million*, with approximately half of that expected in the fourth quarter. To put this year's anticipated revenues in perspective, it will rank among the top product launches in oncology history."<br><br>With regard to demand, Gold also stated that "in terms of the backlog, et cetera, as Hans had mentioned, *there was substantial waiting list* at a number of facilities we've worked through. From *a majority* of the sites across the country *there's still some sites that have waiting lists* associated with them."<br><br>When asked by Morgan Joseph & Co., Inc. research analyst, Shiv Kapoor, where geographically Dendreon's revenues were coming from, Gold responded: |

**PAGE 67 – APPENDIX A**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

In terms of revenue and where *it's coming geographically across the country*, I think it's fair to say that we're seeing *broad momentum across the country*, both as a result of the increased capacity that we're bringing online, plus the marketing initiatives that we set forth this year that we didn't have in place last year. So the growth is broad *across the entire country*.

During his opening remarks at the first quarter conference call, Bishop told investors:

I'd like to start my update with an overview of our performance in acquiring new accounts. *We follow closely the number of new accounts* we add, as it represents a good early indication of demand for PROVENGE. As a reminder, we're targeting approximately 500 active infusion accounts by the end of the year, with *an expectation that these accounts will treat 1 to 2 patients per month*.

\* \* \*

We believe we have carefully budgeted our capacity to meet *our revenue guidance for 2011 of $350 to $400 million*. In addition, *we're on track to provide PROVENGE to approximately 2,000 patients by the end of July*.

| | |
|---|---|
| May 4, 2011 – Deutsche Bank Health Care Conference | During a presentation to investors and analysts, Schiffman reiterated, "[w]e've guided that our revenues will be *$350 million to $400 million*. They'll be ramping through the year as our capacity ramps up. We'd expect to have about half of those revenues in the fourth quarter." <br><br> Schiffman also assured investors that Provenge was launched "*in a very limited and constrained environment*." |
| May 10, 2011 – Bank Of America Merrill Lynch Health Care Conference | During a presentation to investors and analysts, Schiffman stated: "And we are looking to achieve revenues of between *$350 million to $400 million for the year*, which we think puts this in one of the top launches of any novel oncology product." <br><br> During the question-and-answer session, in response to a question from research analyst Rachel McMinn whether physicians had reimbursement concerns, Schiffman stated: <br><br> And so I would say to me upfront reimbursement was certainly probably one of the larger concerns. <br><br> I think *today people are very comfortable*, the product is being paid.... And so I think the reimbursement concerns, people want to make sure they're processing the paperwork correctly, but *I don't think they have a strong concern on reimbursement*. |
| June 7, 2011 – | During his presentation, in the question-and-answer session, Schiffman |

**PAGE 68 – APPENDIX A**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020

| | | |
|---|---|---|
| 1 2 3 | Goldman Sachs Global Health Care Conference | was asked by Goldman Sachs research analyst, Sapna Srivastava: "The one question I really want to make sure we touch on is 2011 guidance. I mean there is a lot of focus on - or a lot of nervousness I should rather say that whether you will hit that or not. So assure us why will you hit that guidance, and how do you get there, the guidance update?"   In response, Schiffman stated: |
| 4 5 6 7 8 9 10 | | A. Sure. So as we look at the guidance, I think we looked at it several different ways. But in the end, the critical metrics for us to hit our guidance and I think what we're sharing - and thus far if we looked at the data we've released *I think we were on track* – it's getting accounts signed up.<br><br>* * *<br><br>*The early metrics are in line that it seems like we're hitting what we need to achieve it.* It's not – I'm not going to downplay that Hans has a heck of a job ahead of him and it's keeping him very busy because it is a substantial growth of the substantial launch, but one that thus far *seems to be going well.* |
| 11 12 13 14 | June 21, 2011 – NASDAQ OMX Investor Program | During a presentation to investors and analysts, Schiffman stated: "We're guiding revenue guidance this year again at *$350 million to $400 million*, with about half of that in the fourth quarter, and *that's just a logical progression* as you think about the launch of the products starting from such a low base. ... We're dramatically increasing our capacity, *we should be on track*. ... And as I indicated, *we're looking to achieve revenues $350 million to $400 million.*" |

**PAGE 69 – APPENDIX A**

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
p. 206.237.0020