1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10    CHRISTOPH BOLLING, et al.,                    CASE NO. C13-0872JLR

11                    Plaintiff,                    ORDER GRANTING IN PART
                                                    AND DENYING IN PART
12          v.                                      MOTION TO DISMISS

13    DENDREON CORPORATION, et al.,

14                    Defendant.

15                              **I. INTRODUCTION**

16          Before the court is a motion to dismiss this securities fraud case pursuant to

17    Federal Rule of Civil Procedure 12(b)(6).  (Mot. (Dkt. # 38).)  The motion is brought by

18    Defendants Dendreon Corporation ("Dendreon" or "Company") and several of its

19    corporate officers, Mitchell H. Gold, Gregory T. Schiffman, and Hans E. Bishop

20    (collectively "Defendants").  (*See id.*)  Dendreon is a Seattle-based biotechnology firm

21    that makes a prostate cancer treatment called Provenge.  (*See* Am. Compl. (Dkt. # 32)

22

ORDER- 1

¶ 35.)  Plaintiffs are roughly 30 Dendreon investors who claim to have been harmed by an extensive fraud related to Provenge.  (*See generally* Am. Compl.)

Plaintiffs' complaint alleges widespread securities fraud by Dendreon and its corporate officers.  (*See id.*)  Plaintiffs claim that Defendants issued "wildly optimistic" revenue projections, exaggerated the level of demand for Provenge, and concealed concerns about Provenge's potential for commercial success.  (*Id.* ¶¶ 1-4, 114.)  Plaintiffs claim that Defendants did this in order to fraudulently elevate Dendreon's stock price so that individual Defendants could realize substantial profits by offloading their Dendreon holdings.  (*Id.* ¶ 5.)  Plaintiffs also allege that Defendants' fraud was ultimately revealed and, as a result, Dendreon's stock price dropped sharply, shedding $3.5 billion in market capitalization in a single day.  (*Id.* ¶ 6-7.)  Multiple class action lawsuits alleging securities fraud soon followed, but Defendants settled all of those lawsuits.  (*See Frias, et al. v. Dendreon, et al.*, No. C11-1291JLR, 4/24/13 Stip. (Dkt. # 97).)  Plaintiffs filed this complaint after opting out of the class action settlements in the prior cases.

In this motion, Defendants argue that all of Plaintiffs' claims should be dismissed.  (*See* Mot.)  Defendants' arguments are complex and multi-faceted, but the overall themes are that Plaintiffs have not sufficiently demonstrated fraud and, for a variety of reasons, Plaintiffs' claims are barred by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4.  (*See id.*)  The court has examined the complaint and the record in this case and concludes that Defendants are correct with respect to Plaintiffs' federal securities fraud claims, but incorrect with respect to certain related state law claims.  Accordingly, the court GRANTS in part and DENIES in part the motion to dismiss.

# I.   FACTUAL BACKGROUND

Plaintiffs are 30 investors who purchased or otherwise acquired Dendreon's publicly-traded securities between April 29, 2010, and August 3, 2011 ("the relevant period"). (Am. Compl. ¶¶ 13-32.)  Plaintiffs assert claims against Dendreon, its Chairman and former Chief Executive Officer Mr. Gold, its former Chief Operating Officer, Mr. Bishop, and its Chief Financial Officer, Mr. Schiffman, for violations of Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934, violations of the Washington Consumer Protection Act, and common law fraud and negligent misrepresentation.  (*See id.* ¶¶ 159-206.)

Dendreon is a biotechnology company that makes one product:  Provenge.  (*Id.* ¶ 43.)  Provenge is a treatment for advanced prostate cancer.  (*Id.*)  Dendreon developed Provenge over a fifteen year period at a cost of over $1 billion.  (*Id.* ¶ 45.)  On April 29, 2010, after 15 years of research, Dendreon announced that the company had secured Food and Drug Administration ("FDA") approval for Provenge.  (*See id.* ¶ 45.)

Provenge is a unique product.  It is a first-in-class immunotherapy that, in effect, trains a patient's immune system to fight prostate cancer.  (*Id.* ¶ 44.)  During treatment, cells from a patient's immune system are taken from the patient's body, cultured and processed to strengthen their resistance to cancer, then put back in the patient's body. (*Id.*)  No other prostate cancer treatment works in this way.  Even the manufacturing process is unique:  First, doctors collect the patient's cells by drawing blood at an approved "apheresis" site and immediately ship the cells to a Dendreon manufacturing facility for processing.  (*Id.* ¶ 46.)  Processing must begin within 18 hours of collection or

1  the cells will no longer be viable.  (*Id.*)  After Dendreon has completed production of a

2  dose of Provenge, the company must again contend with strict deadlines; if the medicine

3  is not infused into the patient within 18 hours, the cells will die.  (*Id.*)

4        Notably, Dendreon sells Provenge through a "buy-and-bill" reimbursement model.

5  (*Id.* ¶ 47, 102.)  Under this model, the treating physician makes an up-front payment for

6  Provenge then later seeks reimbursement from the patient's private insurer or from

7  Medicare.  (*Id.*)  As a result, the physician could be responsible for the entire cost of the

8  treatment if the patient's insurer ultimately refuses to provide reimbursement for

9  Provenge.  (*Id.*)  Each Provenge infusion costs $31,000.00.  (*Id.* ¶ 47.)  A full treatment

10  consists of three infusions over a one-month period for a total cost of $93,000.00.  (*Id.*)

11        Dendreon announced on April 29, 2010, that Provenge had been approved by the

12  FDA and would soon be commercially available.  (*See id.* ¶ 45.)  In the same

13  announcement, however, Dendreon emphasized that it would launch the drug only

14  gradually.  (*Id.*)  During the first phase of the drug's launch, Provenge would be made

15  available at only the 50 institutions and physician groups that had participated in the

16  clinical trials for the drug.  (Wechkin Decl. (Dkt. # 39) Ex. 1 at 5.)  The reason for this

17  was Dendreon's complex manufacturing process, and the reality that Provenge could be

18  produced at only a limited number of Dendreon processing facilities, each of which had

19  to be approved by the FDA before use.  (*See id.*)  For this reason, the company told the

20  public and investors that demand for Provenge would exceed Dendreon's ability to

21  supply it for the first 12 months after the product was introduced into the market.  (Am.

22  Compl. ¶¶ 60-64.)  Nevertheless, Dendreon claimed that it expected to have capacity to

ORDER- 4

1    treat, and was "on track" to treat, 2,000 patients over the 12 months following FDA

2    approval.  (Wechkin Decl. Ex. 1 at 5, 9.)  In the announcement, Mr. Gold, who was

3    President of Dendreon at that time, described Provenge as "the Holy Grail of Oncology."

4    (*Id.* Ex. 1 at 2; *see* Am. Compl. ¶ 61.)  Dendreon's shares rose 36.1 % following the

5    announcement.  (Am. Compl. ¶ 63.)

6         Dendreon began selling Provenge in May 2010.  Over the next six months,

7    Dendreon reported revenue of $350,000.00 in May, $2.45 million in June, $5.2 million in

8    July, $7.2 million in August, $7.8 million in September, and $9.5 million in October

9    2010.  (Wechkin Decl. Ex. 2 at 3-4, Ex. 16.)

10        Initially, sales did not meet expectations, but investors' hopes for Provenge

11   remained high.  On August 3, 2010, Dendreon announced second quarter sales of $2.8

12   million, of which $2.45 million was generated in June 2010.  (*Id.* Ex. 2 at 3; Am. Compl.

13   ¶ 68.)  Plaintiffs allege that this figure was 57 % less than Wall Street's expectation of

14   $4.4 million.  (Am. Compl. ¶ 68.)  Dendreon stated that it was seeing "strong demand in

15   the clinics . . . currently providing Provenge," and that "the majority of our centers tell us

16   that they have waiting lists."  (Wechkin Decl. Ex. 2 at 10-11, 15-16, 18.)  Dendreon also

17   stated that "certain sites . . . have very active and . . . very long waiting lists and

18   others . . . are perhaps in a different situation."  (*Id.* Ex. 2 at 16-17.)  Dendreon also

19   reiterated its guidance "for treating approximately 2,000 patients over the first 12 months.

20   (*Id.* at 4-5; *see also id.* at 10 ("[W]e expect to treat about 2,000 patients over the first 12

21   months, we're on track with that.").)

22

In addition, on August 3, 2010, Dendreon advised the market about a new regulatory development.  On June 30, 2010, the Centers for Medicare and Medicaid Services announced that they were undertaking a National Coverage Analysis ("NCA") for Provenge.  (*Id.* Ex. 2 at 4.)  The outcome of that process would be a National Coverage Determination ("NCD"), which all local Medicare contractors would be obliged to follow.  (*Id.*)  Until the NCA was complete, however, coverage decisions had to be made individually by each of the country's 15 regional Medicare administrators.  (*See id.* at 4-5.)  Dendreon reported its progress with these administrators over the next months, and securities analysts closely tracked the issue.  (*Id.* Ex. 2 at 4; *id.* Ex. 3 at 4-5.)

On November 3, 2010, Dendreon provided revenue guidance for the first time and reiterated that demand for Provenge was strong.  (*See id.* Ex. 3.)  Dendreon projected 2010 revenues of approximately $46-$47 million, with $23-$24 million occurring in the fourth quarter of 2010.  (*Id.* Ex. 3 at 2.)  In addition, Dendreon projected 2011 revenue of $350-$400 million, with half of those revenues occurring in the fourth quarter of 2011. (*Id.* Ex. 3 at 3, 7.)  Dendreon also stated that it "continue[d] to see strong demand across the majority of the country with most sites having waiting lists."[1]  (*Id.* Ex. 3 at 3-4.)  The company reminded investors of its "limited capacity," but stated that it was "on track with the expansion of [the] New Jersey facility as well as the completion of facilities in

---

[1] Dendreon reiterated its confidence about demand several times, stating:  "We are not at all worried about demand," "[w]e're seeing very solid demand this year," "we're confident that demand will stay strong throughout next year," and "clearly the demand out there is exceeding our ability to supply the market."  (Wechkin Decl. Ex. 3 at 8, 10.)

1  Atlanta and L[os] A[ngeles], for which construction is substantially complete . . . ." (*Id.*

2  Ex. 3 at 4.)  Although demand was "exceeding [its] ability to supply the market,"

3  Dendreon explained that it expected this issue to "be resolved, once additional capacity

4  comes online from New Jersey, Atlanta, and L[os] A[ngeles] next year" and that

5  revenues would increase accordingly.  (*Id.* at 11-12.)

6  　　　In early 2011, Dendreon appeared to be on track to meet its revenue guidance, and

7  continued to tout strong demand for Provenge.  On January 7, 2011, Dendreon announced

8  anticipated sales of $25 million for the fourth quarter of 2010.  (Am. Compl. ¶ 82.)  Mr.

9  Gold stated that "demand for Provenge is robust," and maintained that sales for Provenge

10  remained low only because "we're still in this capacity constrained environment." (*Id.*)

11  On March 1, 2011, Dendreon reported 2010 revenue of approximately $48 million, of

12  which $25 million occurred in the fourth quarter.  (*Id.* ¶ 83; Wechkin Decl. Ex. 5 at 3.)

13  These results were consistent with the company's public revenue guidance.  Dendreon

14  reiterated its $350-$400 million revenue guidance for 2011 and shared the model behind

15  the guidance.  (*Id.*)  The projected revenue figure could be derived by multiplying the

16  number of medical practices expected to be enrolled by the number of patients each

17  practice was expected to generate.  (*Id.* Ex. 5 at 4.)

18  　　　Meanwhile, Dendreon was busily completing additional workstations.  Dendreon

19  announced on March 1, 2011, that it had completed construction of its expanded

20  production capacity in New Jersey and that the FDA was expected to decide whether to

21  approve the new space shortly.  (*Id.*)  Ten days later, the FDA approved the 36 new

22  workstations in Dendreon's New Jersey plant.  (*Id.* Ex. 6 at 3.)

ORDER- 7

1    Dendreon remained on track through the first quarter of 2011.  On May 2, 2011,

2    Dendreon announced revenues of $28 million for the first quarter of 2011, which were

3    consistent with its original capacity estimate of $9-$10 million per month for that quarter.

4    (*Id.* Ex. 6 at 3, 6.)  Dendreon also announced April 2011 revenues of $15 million and

5    addressed concerns about demand.  (*Id.* Ex. 6 at 3.)  Mr. Gold stated that although there

6    were parts of the country where waiting lists still existed, since Dendreon had brought on

7    new capacity "it's a much less significant problem than it was during the first part of

8    [Dendreon's] launch."  (*Id.* Ex. 6 at 13.)

9        Other positive developments followed.  In June 2011, the FDA approved the

10   company's second plant in Los Angeles, which included 36 additional workstations.  (*Id.*

11   Ex. 12.)  In addition, one year after initiating the NCA, the Centers for Medicare and

12   Medicaid Services announced a favorable NCD.  (*Id.*)  The effect of the NCD was to

13   standardize Medicare and Medicaid reimbursement processes across the country.  (*Id.*)

14   Provenge was issued a "Q-code," which allows physicians to submit claims

15   electronically, accelerating the time to payment.  (*Id.*)

16       Despite this run of positive news, there was trouble ahead for Dendreon.  On

17   August 3, 2011, Dendreon announced second quarter revenue of approximately $51

18   million and July sales of approximately $19 million.  (Wechkin Decl. Ex. 7 at 3.)  These

19   figures represented large gains over previous revenue totals, but they still fell short of

20   expectations.  Specifically, they fell short of the trajectory needed to meet Dendreon's

21   revenue guidance.  (*Id.*)  It seemed Provenge was not catching on as fast as Dendreon had

22   anticipated and, as a result, Dendreon withdrew its revenue guidance.  (*Id.*)

1    Dendreon explained the cause of the problem.  It explained that physicians were

2  not prescribing Provenge at the rate Dendreon had anticipated.  (*Id.* Ex. 7 at 3-7, 11-12.)

3  Worse, Dendreon executives believed the problem would persist in the near-term.  (*Id.*)

4  Dendreon further explained that the model that supported its revenue guidance—number

5  of in-serviced sites multiplied by number of patients expected per site—had been

6  partially inaccurate.  Although the number of in-serviced sites was higher than expected,[2]

7  the sites had not generated the expected one to two prescriptions per month.  (*Id.* Ex. 7 at

8  3-4.)  Instead, they were generating only 0.8 prescriptions per month.  (*Id.*)  Dendreon

9  explained that it believed that some physicians were reluctant to have multiple patients on

10  Provenge at the same time because of the drug's up-front cost of $93,000.00 for the

11  three-infusion course of treatment.  (*Id.* at 4.)  On the brighter side, Dendreon predicted

12  that with a favorable NCD and Q-code now on the books, improvement would soon

13  follow.  (*See id.*)  This small patch of bright news was not enough.

14    Dendreon's stock price dropped steeply following the August 3, 2011,

15  announcement.  (*See* Am. Compl. ¶ 140.)  On the first full day of trading after the

16  announcement, the price of Dendreon's stock fell 67 %, from $35.84 to $11.69.  (*Id.*)

17  This represented a loss of over $3.5 billion in market capitalization and "the biggest

18  single day decline since the company's initial public offering in June 2000."  (*Id.*)

19

20  _____

21    [2] Dendreon had forecast 225 sites at the end of the second quarter, but there were in fact
    255 sites at that point and 300 at the end of July.  (Wechkin Decl. Ex. 6 at 2.)

22

ORDER- 9

1      Following the drop in Dendreon's stock price on August 3, 2011, numerous class

2  action complaints alleging securities fraud against Dendreon and its various officers were

3  filed in this court.  (*See Frias, et al. v. Dendreon, et al.*, No. C11-1291JLR.)  The

4  plaintiffs in those actions asserted that Defendants made false and misleading statements

5  and omissions during the relevant period that deceptively reassured investors that

6  Dendreon remained a good investment.  The court consolidated the actions and scheduled

7  oral argument on a motion to dismiss.  (*See id.*, 12/19/11 Order (Dkt. # 50); *id.* Dkt.

8  ## 93-94.)  However, before the court could rule on the motion, the parties settled the

9  case.  (*See id.* 4/24/13 Stip. (Dkt. # 97).)

10      Plaintiffs in this case are individuals who opted out of the class action settlement

11  in the prior case.  They now bring claims based on factual allegations that are materially

12  similar to those made in the original class action complaint.  (*Compare id.* Compl. (Dkt.

13  # 1) *with* Am. Compl.)  In particular, Plaintiffs allege that Defendants made false and

14  misleading statements or omissions concerning (1) the high level of demand for

15  Provenge, (2) Dendreon's capacity constraints with respect to the production of Provenge

16  (*see* Am. Compl. ¶¶ 60-101), (3) the lack of physician concern about the Company's

17  "buy-and-bill" reimbursement structure (*see id.* ¶¶ 102-13), (4) Dendreon's market

18  guidance that it would treat 2,000 patients in the first 12 months after launch and (5)

19  Dendreon's 2011 revenue guidance (*see id.* ¶¶ 114-29).

20      Just under a month after Plaintiffs filed their amended complaint, Defendants filed

21  this motion to dismiss.  (*See* Mot.)

22

ORDER- 10

## II.   ANALYSIS

### A.   Standard on a Motion to Dismiss in a Securities Fraud Case

A motion to dismiss in a securities fraud case is subject to three layers of analysis. First, the court must examine the pleadings under ordinary Rule 12(b)(6) standards: "courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  However, as is ordinarily the case, the court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

Second, the court must examine the pleadings for compliance with the particularized pleading requirement found in Federal Rule of Civil Procedure 9(b). *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).  The Ninth Circuit has long applied the heightened pleading standard of Rule 9(b) to securities fraud complaints, *see id.* (citing *Semegen v. Weidner*, 780 F.2d 727, 729, 734-35 (9th Cir. 1985)), and therefore requires the element of falsity, or "a material misrepresentation or omission of fact," to be pled with particularity,  *see id.* (citing *Ronconi v. Larkin*, 253 F.3d 423, 429 n.6 (9th Cir. 2001)).

Last, the court must examine the pleadings under the PSLRA.  Since 1995, courts have been required to scrutinize securities fraud complaints under the more exacting standards of the PSLRA.  The PSLRA amended the Securities Exchange Act to require

1    that a securities fraud complaint "plead with particularity both falsity and scienter."

2    *Zucco*, 552 F.3d at 990 (quoting *Ronconi*, 253 F.3d at 429).  To properly allege falsity, a

3    securities fraud complaint must now "specify each statement alleged to have been

4    misleading, [and] the reason or reasons why the statement is misleading."  15 U.S.C. §

5    78u-4(b)(1).  To the extent that an allegation regarding a statement or omission is made

6    on information and belief, "the complaint shall state with particularity all facts on which

7    that belief is formed."  *Id.*  In doing so, the plaintiff must "reveal 'the sources of [his]

8    information.'"  *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1015 (9th Cir. 2005).

9         The PSLRA has even more exacting requirements for alleging scienter.  To

10   properly allege scienter, the plaintiff must "state with particularity facts giving rise to a

11   strong inference that the defendant acted with the required state of mind."  15 U.S.C.

12   § 78u–4(b)(2).  In other words, the plaintiff must plead with particularity the facts

13   evidencing "the defendant's intention 'to deceive, manipulate, or defraud.'"  *Tellabs*, 551

14   U.S. at 313 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976)).  To satisfy

15   the PLSRA's rigorous pleading standards, the complaint's scienter allegations must give

16   rise not just to a plausible inference of scienter, but to an inference that is "cogent and at

17   least as compelling as any opposing inference of nonfraudulent intent."  *Id.* at 314; *see*

18   *also id.* at 324.

19        This last part is very different from the ordinary Rule 12(b)(6) standard.  On an

20   ordinary Rule 12(b)(6) motion, the court indulges all reasonable inferences in the

21   plaintiff's favor.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic*

22   *Corp v. Twombly*, 550 U.S. 544, 570 (2007)).  Under the PSLRA, the court must weigh

competing inferences and "only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing inference." *Zucco*, 552 F.3d at 991. Thus, a "Rule 10b-5 claim does not receive the traditional deference a court affords a complaint in resolving a motion to dismiss for failure to state a claim." *In re Watchguard Sec. Litig.*, No. C05-0678JLR, 2006 WL 2038656, at *3 (W.D. Wash. Apr. 21, 2006).

**B.     Materials the Court Considers**

In deciding this motion, the court is not strictly limited to the confines of the complaint. The court can also consider documents that are attached to the complaint or that are judicially noticeable. *Tellabs*, 551 U.S. at 322. This is important here. In support of its motion, Dendreon submits a variety of documents that Plaintiffs either quoted or cited in their complaint (Wechkin Decl. Exs. 1-9, 15-24) or that are on file with the SEC (*id.* Exs. 10-14). When ruling on a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must consider the complaint in its entirety, including "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322. Where a plaintiff fails to attach to the complaint the documents upon which the complaint is premised, a defendant may attach such documents in order to show that they do not support the plaintiff's claim. *E.g.*, *In re Pac. Gateway Exch., Inc.*, 169 F. Supp. 2d 1160, 1164 (N.D. Cal. 2001). The court may also take judicial notice of public filings, such as those made with the SEC. *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (stating that the court "may consider documents referred to in the complaint or any matter subject to judicial notice, such as

1    SEC filings.") (citing *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir.

2    1986)).  For purposes of this order, the court takes judicial notice of the foregoing

3    referenced exhibits.

4    **C.      Securities Fraud Claims Under Section 10(b)**

5            Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for "any

6    person . . . [t]o use or employ, in connection with the purchase or sale of any security

7    registered on a national securities exchange . . . any manipulative or deceptive device or

8    contrivance in contravention of such rules and regulations as the Commission may

9    prescribe as necessary or appropriate in the public interest or for the protection of

10   investors."  15 U.S.C. § 78j(b).  One such rule promulgated under the Act is SEC Rule

11   10b–5, which provides, inter alia, that "[i]t shall be unlawful for any person . . . [t]o

12   engage in any act, practice, or course of business which operates or would operate as a

13   fraud or deceit upon any person, in connection with the purchase or sale of any security."

14   17 C.F.R. § 240.10b–5(c).  To prevail on a Rule 10b-5 claim, a securities fraud plaintiff

15   must prove five elements:  "'(1) a material misrepresentation or omission of fact, (2)

16   scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss

17   causation, and (5) economic loss.'"  *Zucco*, 552 F.3d at 990 (quoting *In re Daou*, 411

18   F.3d at 1014).

19   **D.      Plaintiffs Plead Multiple Different Theories of Securities Fraud Under Rule
             10b-5**

20           Plaintiffs have formulated several distinct theories of how and why Defendants

21   violated the securities laws.  Indeed, under the PSLRA, Plaintiffs are required to "specify

22

1 each statement alleged to have been misleading, [and] the reason or reasons why the

2 statement is misleading." 15 U.S.C. § 78u-4(b)(1).  Plaintiffs have done so.  (*See*

3 *generally* Am. Compl.; *see id.* Appendix A.)  Plaintiffs allege five separate theories of

4 securities fraud.  (*See* Am. Compl.)  Each theory warrants different treatment under the

5 law, so the court will consider each in its turn.

6 **E.   Fraud Theories Based on Forward-Looking Revenue Guidance and Patient-Treatment Prediction**

7         Plaintiffs' first two theories of securities fraud relate to certain forecasts made by

8 Dendreon in 2010 and 2011.  (*See, e.g.*, Am. Compl. ¶¶ 60-62, 65, 114-29.)  Plaintiffs

9 claim that Defendants issued (1) revenue guidance and (2) a patient-treatment prediction,

10 both of which they knew were false.  (*See id.*)  The revenue guidance in question is

11 Dendreon's forecast that it would generate $350-$400 million in revenue in 2011.  (*Id.*

12 ¶¶ 114-29.)  Dendreon missed this target.  Plaintiffs allege that Defendants knew all

13 along that they would miss this target and therefore violated Rule 10b-5 by issuing the

14 revenue guidance and claiming they were on track to meet it.  (*Id.* ¶¶ 117-22.)  The

15 patient-treatment prediction theory involves Dendreon's forecast that it would treat 2,000

16 patients by April 29, 2011, which Dendreon later adjusted to July, 2011.  (*See id.*; *see*

17 *also id.* at 60-62, 65.)  Again, Plaintiffs assert that Defendants knew all along that they

18 would not meet this forecast.  (*Id.* ¶ 122.)  Under Plaintiffs' theory, Defendants only

19 issued these forecasts to mislead investors and fraudulently inflate Dendreon's stock

20 price.  (*See id.* at 130-36.)

21

22

1       Both of these theories are coherent and pleaded with particularity but, under the

2  PSLRA, neither of them is actionable.  Both theories fall under a liability shield

3  contained within the PSLRA that protects securities defendants from claims related to

4  forecasts and predictions.  This liability shield is known as the PSLRA "safe harbor" for

5  forward-looking statements accompanied by meaningful cautionary language.  *See In re*

6  *Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).  If applicable, the PLSRA safe-

7  harbor serves as a "barrier at the pleading stage" to claims based on forecasts,

8  predictions, and other forward-looking statements.  *Id.*  To assert the safe harbor, a

9  securities defendant must show that certain conditions are met.  The safe harbor

10  immunizes forward-looking statements that are (1) identified as such and (2)

11  "accompanied by meaningful cautionary statements identifying important factors that

12  could cause actual results to differ materially from those in the forward-looking

13  statement."  15 U.S.C. § 78u-5(c)(1)(A)(i).  Defendants contend that both the revenue

14  guidance and the patient-treatment forecast are protected by this liability shield.  (*See*

15  Mot. at 17-22.)  For the reasons explained below, the court agrees.

16       As an initial matter, both the revenue guidance and the patient-treatment forecast

17  qualify as "forward-looking statements."  Revenue projections are by definition a type of

18  forward-looking statement.  *See* 15 U.S.C. § 78u-5(i)(1)(A) ("The term 'forward-looking

19  statement' means . . . a statement containing a projection of revenues . . . .").  *City of*

20  *Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1062 (N.D. Cal.

21  2012); *In re Leapfrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1047 (N.D. Cal.

22  2007).  The patient-treatment forecast likewise qualifies.  The safe harbor extends to any

1    "statement of the plans and objectives of management for future operations, including

2    plans or objectives relating to the product or services of the issuer."  15 U.S.C. § 78u-

3    5(i)(1)(B).  The patient-treatment forecast involves plans and objectives relating to

4    Dendreon's product, Provenge, and therefore easily falls within this definition and

5    qualifies as a forward-looking statement.  *See id.*; *see also Royal Oak*, 880 F. Supp. 2d at

6    1062; *Leapfrog*, 527 F. Supp. 2d at 1046.

7         Requirement (1) of the safe harbor is also met.  Dendreon properly identified the

8    relevant statements as "forward-looking."  *See* 15 U.S.C. § 78u-5(c)(1)(A)(i) (requiring

9    forward-looking statements to be identified as such).  Indeed, Dendreon routinely began

10   and ended analyst conference calls by notifying audiences that its presentations contained

11   forward-looking statements.  (*See* Wechkin Decl. Exs. 1 at 2, 2 at 2, 3 at 2-3, 4 at 2, 5 at

12   2, 6 at 2-3, 7 at 3, 18 at 2, 19 at 2, 21 at 2.)  Dendreon also routinely notified investors

13   and analysts during these calls that risks and uncertainties could cause actual results to

14   differ from predicted results, and that a full discussion of those risks and uncertainties

15   could be found in Dendreon's SEC filings.  (*See id.*)  Thus, the safe harbor's requirement

16   (1) is met.  *See* 15 U.S.C. § 78u-5(c)(1)(A)(i).

17        Requirement (2) is met as well.  The relevant statements were accompanied by

18   "meaningful cautionary statements."  *See* 15 U.S.C. § 78u-5(c)(1)(A)(i) (requiring

19   meaningful cautionary statements).  In the Ninth Circuit, courts regularly interpret the

20   phrase "meaningful cautionary statements" to include statements that warn of the very

21   risks on which a securities plaintiff bases his claims.  *See, e.g.*, *Police Ret. Sys. v.*

22   *Intuitive Surgical, Inc.*, No. 10-CV-03451-LHK, 2012 WL 1868874, at *11-12 (N.D. Cal.

May 22, 2012) (dismissing claims against medical device company that warned of risks such as failure to achieve market acceptance, slow adoption, and physician difficulty with reimbursement when claims were based on the same); *Royal Oak*, 880 F. Supp. 2d at 1062 (dismissing claims where warnings in SEC filings covered risks that ultimately materialized and formed the basis of the plaintiffs' claims); *Leapfrog*, 527 F. Supp. 2d at 1047 (dismissing claim where company's risk disclosures "explain[ed] the risks associated with the subject matter of plaintiffs' claims"). That is precisely the situation here. Plaintiffs' claims are based on the materialization of risks such as slow adoption by physicians, difficulty in obtaining reimbursement, and other risks associated with market penetration for a first-in-class therapy like Provenge. (*See, e.g.*, Am. Compl. ¶¶ 1-5, 102-09.)

Dendreon's SEC filings warned of these risks.[3]  For example, Dendreon stated in its filings that:

> Prior to the launch of PROVENGE in May 2010, we had never sold or marketed our own pharmaceutical product . . . . Our ability to maintain or increase our revenues for PROVENGE will depend on, and may be limited by, a number of factors, including the following:

---

[3] Under controlling Ninth Circuit law, Dendreon's citation to SEC filings in oral statements had the effect of incorporating by reference the risk disclosures contained in those filings. *Emp'rs Teamsters Local Nos. 174 and 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1133 (9th Cir. 2004) ("[T]he PSLRA does not require that the cautions physically accompany oral statements . . . ."); *In re Coinstar, Inc.*, No. C11–133 MJP, 2011 WL 4712206, at *5 (W.D. Wash. Oct. 6, 2011) ("Under the PSLRA, oral forward-looking statements are protected as long as accompanied by an oral statement referring people to 'a readily available written document' that contains cautionary language and risk factors.") (citing 15 U .S.C. § 78u–5(c)(2)).  "Documents filed with the SEC are "readily available" for purposes of the PSLRA." *Id.* (citing 15 U.S.C. § 78u–5(c)(3)).

- acceptance of and ongoing satisfaction with PROVENGE as a first-in-class medicine . . . by the medical community, patients receiving therapy and third party payers . . . .

- whether physicians are willing to adopt PROVENGE as part of the treatment paradigm for men with metastatic castrate resistant prostate cancer.

**********

***Adoption of PROVENGE for the treatment of patients with advanced prostate cancer may be slow or limited for a variety of reasons including competing therapies, perceived difficulties in the treatment process and access to reimbursement. If PROVENGE is not successful in broad acceptance as a treatment option for advanced prostate cancer, our business would be harmed.***

The rate of adoption of PROVENGE for advanced prostate cancer and ultimate market size will be dependent on several factors including educating physicians on the patient treatment process with PROVENGE and immunotherapies generally. As a first in class therapy, PROVENGE utilizes a unique treatment approach which can have associated challenges in the treating physician learning curve. A significant portion of the prospective patient base for treatment with PROVENGE may be under the care of urologists who are less experienced with infusion treatments. Acceptance by urologists of PROVENGE as a treatment option may be measurably slower than adoption by oncologists of PROVENGE as a therapy and may require more educational effort by us. In addition, the tight manufacturing an infusion timelines required for treatment with PROVENGE will require treating physicians to adjust practice mechanics which may result in delay in market adoption of PROVENGE as a preferred therapy.

**********

***The availability and amount of reimbursement for our product candidates and the manner in which government and private payers may reimburse for our potential products is uncertain.***
. . . .We expect that many of the patients who seek treatment with PROVENGE . . . will be eligible for Medicare benefits. . . . The Medicare program is administered by the Centers for Medicare & Medicaid Services ("CMS"), and coverage and reimbursement for products and services under Medicare are determined pursuant to regulations promulgated by CMS and

1         pursuant to CMS's subregulatory coverage and reimbursement
2         determinations. It is difficult to predict how CMS may apply those
          regulations and subregulatory determinations to newly approved products,
3         especially novel products such as ours, and those regulations and
          interpretive determinations are subject to change.

4    (Wechkin Decl. Ex. 7 at 31-32, 39-40 (emphasis in original).) These precise risks

5    materialized and now form the basis of Plaintiffs' claims. (*See, e.g.*, Am. Compl. ¶¶ 1-5,

6    102-09.) Thus, under settled principles of security law, the statements qualify as

7    "meaningful cautionary statements." *See, e.g.*, *In re Coinstar, Inc.*, No. C11–133 MJP,

8    2011 WL 4712206, at *4-5 (W.D. Wash. Oct. 6, 2011) (dismissing claims challenging

9    revenue guidance where risk disclosures "mirror what Plaintiff alleges Defendants failed

10   to disclose to the public"); *City of Marysville Gen'l Employees Ret. Sys. v. Nighthawk*

11   *Radiology Holdings, Inc.*, No. 2:09-cv-00659-EJL-CWD, 2011 WL 4584778, at *18 (D.

12   Idaho Sept. 12, 2011). Dendreon alerted the market in its SEC filings to the very risks

13   underlying Plaintiffs' claims and, accordingly, the challenged statements fall within the

14   cautionary statements portion of the PSLRA safe-harbor.[4]

15

16   _____

17       [4] Plaintiffs make a cursory argument that four of the relevant statements were made
     without any cautionary statements at all—in other words, before making them, Defendants did
18   not make reference to Dendreon's SEC filings. (Resp. at 41.) This may be true of those
     statements. However, the statements in question either do not relate to forward-looking guidance
19   at all and so are not relevant here, or else merely make reference to Dendreon's revenue
     guidance in a general way. (*See id.*; Am. Compl. (Appendix) at 64, 66, 67, 69.) None of them
     are substantive statements upon which a securities fraud claim could be based. (*See id.* at 67, 68,
20   69, 71.) Instead, they merely refer to a state of facts that was indeed reality at that time. (*See,
     e.g.*, *id.* at 69 ("[O]ur guidance is somewhere between $350 million to $400 million in
21   revenue.").) This is an accurate description of facts that would not form the basis of a securities
     fraud claim, unlike the revenue guidance itself, which was issued with cautionary statements.
     Even if this were not true, however, the court would reject Plaintiffs' cursory argument under the
22   so-called "bespeaks caution" doctrine. *See, e.g.*, *Grossman v. Novell, Inc.*, 120 F.3d 1112 (10th

1      Plaintiffs make one additional argument with respect to these theories that the

2  court also rejects.  Plaintiffs assert that the risk disclosures were not "meaningful"

3  because Dendreon allegedly knew that the risks identified had already transpired or were

4  certainties.  (*See* Resp. at 21-22, 38-39.)  The Ninth Circuit has already rebuffed this

5  argument, finding that the speaker's state of mind is irrelevant under the cautionary

6  statements inquiry:

7          Under subsection (A)(i), . . . if a forward-looking statement is identified as
           such and accompanied by meaningful cautionary statements, then the state
8          of mind of the individual making the statement is irrelevant, and the
           statement is not actionable regardless of the plaintiff's showing of scienter.

9  *Cutera*, 610 F.3d at 1112.  *See also NightHawk*, 2011 WL 4584778, at *11 ("By arguing

10  that the cautionary statements were not meaningful because the warned of risks had

11  already come to pass, Plaintiff necessarily implies that Defendants knew of the falsity of

12  the assumptions upon which the earnings statements were based," [but] "the same

13  argument was rejected in *Cutera*."); *see also Intuitive Surgical*, 2012 WL 1868874, at

14  *11-12 (rejecting plaintiff's argument that, among other things, an identified risk was

15  "already impacting" the company because it improperly conflated two portions of

16  PSLRA safe-harbor provision).

17      Having rejected this final argument, the court GRANTS Defendants' motion to

18  dismiss Plaintiffs' federal securities claims to the extent the claims are based on forward-

19  looking revenue guidance and patient-treatment predictions.

20

21  _____

22  Cir. 1997); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir. 1994), *cert denied*,
516 U.S. 868 (1995).

1  **F.      Fraud Theories Based On Demand and Reimbursement**

2         Plaintiffs plead three additional theories of fraud, all of which suffer from a

3  common underlying defect.  The first two theories are related:  Plaintiffs allege that

4  Defendants (1) made specific false claims that demand for Provenge was higher than

5  Dendreon's initial capacity to produce it; and (2) made false claims more generally about

6  the level of demand for Provenge in the marketplace.  (Am. Compl. ¶¶ 60-101.)  In

7  addition, Plaintiffs allege that Defendants (3) fraudulently downplayed physician

8  concerns about obtaining reimbursement for Provenge.  (*Id.* ¶¶ 102-13.)  For the reasons

9  described below, the court concludes that Plaintiffs' fraud allegations are insufficient to

10  pass muster under the PSLRA.  Under the PSLRA, Plaintiff s must "state with

11  particularity facts giving rise to a strong inference that the defendant acted with the

12  required state of mind."  15 U.S.C. § 78u-4(b)(2).  Plaintiffs have not done that.

13         The PSLRA requires the court to undertake a uniquely stringent scienter analysis

14  at the pleading stage.  To satisfy the PSLRA's rigorous pleading standards, the plaintiff

15  must allege facts that give rise to a "strong inference" of scienter—that is, an inference

16  that is "cogent and at least as compelling as any opposing inference of nonfraudulent

17  intent."  *Tellabs*, 551 U.S. at 314, 324 (quoting *Ernst*, 425 U.S. at 194).  To perform this

18  analysis, the court must weigh all competing inferences that may be drawn from the facts

19  and can "only allow the complaint to survive a motion to dismiss if the malicious

20  inference is at least as compelling as any opposing inference."  *Zucco*, 552 F.3d at 991.

21  Under this standard, a "Rule 10b-5 claim does not receive the traditional deference a

22

1  court affords a complaint in resolving a motion to dismiss for failure to state a claim."

2  *Watchguard*, 2006 WL 2038656, at *3.

3        Plaintiffs' complaint does not meet this high standard.  The court finds that

4  Plaintiffs' pleaded facts, even assumed true, establish a stronger benign inference than a

5  malicious one.  In short, the inference of innocence is simply more compelling than the

6  inference of bad motive.

7        There are two inferences that can reasonably be drawn from the available facts.[5]

8  The first is Defendants' version of events.  Defendants contend that they never

9  misrepresented the level of demand for Provenge or the level of concern about

10  reimbursement and that, instead, they simply misjudged these things.  (*See* Mot. at 8-10.)

11  Defendants assert that, as Provenge was released on a larger scale, they learned that

12  physicians were prescribing Provenge at a slower rate than expected and that growth

13  would consequently be "more gradual" than initially projected.  (*Id.* at 8-9; Wechkin

14  Decl. Ex. 7 at 3-6, 11-12.)  Accordingly, demand for Provenge turned out to be less than

15  they projected it to be, much to their surprise and displeasure.  This misjudgment did not

16  become apparent until after the new workstations came on line because, prior to that time,

17  Provenge could only be prescribed by a handful of physicians who had participated in

18  clinical trials.  Thus, Defendants claim they misread the level of demand for Provenge in

19  the market as a whole.  Defendants also claim they never misled investors about the level

20

21       [5] As explained above, the available facts include facts alleged in the complaint as well as

22  facts included in the documents referenced therein and in Defendants' judicially noticeable submissions.  *See Tellabs*, 551 U.S. at 322.

1   of physician concern over reimbursement, and that they were just as surprised as

2   everyone else that physicians had major concerns about Provenge's reimbursement

3   model.  (Mot. at 35-38.)  Under Defendants' version of events there was no fraud, just

4   mistakes.

5          Plaintiffs offer a different version of events.  They allege that Defendants

6   orchestrated a "brazen fraud" on the market in order to inflate Dendreon's stock price for

7   personal gain.  (Am. Compl. ¶¶ 1-7.)  Plaintiffs allege that Defendants exaggerated the

8   level of demand for Provenge despite knowing all along that demand was lower than they

9   said it was.  (*Id.* ¶¶ 60-101.)  Plaintiffs also allege that, as part of this plan, Defendants

10  concealed physicians' concerns about reimbursement for Provenge from investors to

11  make Dendreon appear to be a more attractive investment than it actually was.  (*Id.*

12  ¶¶ 102-13.)  According to Plaintiffs, Dendreon's key decision-makers were busily

13  offloading stock at artificially elevated prices, all the while knowing that it was only a

14  matter of time before their fraud was revealed and the stock price dropped.  (*Id.* ¶¶ 130-

15  36.)  They claim the result was a massive loss for Dendreon stockholders—over $3.5

16  billion in market capitalization in a single day—and a massive gain for Defendants—over

17  $85 million in personal gain for Dendreon's officers and directors.  (*Id.* ¶¶ 5-7.)

18         The court must weigh these two versions of events to determine whether they are

19  equally compelling.  *Zucco*, 552 F.3d at 991.  Having performed this task and having

20  conducted a thorough examination of the complaint, the court concludes that Plaintiffs'

21

22

ORDER- 24

1    version of events is significantly less compelling than Defendants' version of events.[6]  In

2    conducting this analysis, the court assumes all pleaded facts are true, but ignores

3    conclusory allegations, unwarranted deductions of fact, and unreasonable inferences.  *See*

4    *Gilead Sciences*, 536 F.3d at 1055.  This conclusion is based on a holistic examination of

5    the complaint and all other submitted documentation.  *See Zucco*, 552 F.3d at 991-92.  As

6    the Ninth Circuit has held, a holistic approach is necessary and a "segmented analysis" is

7    not adequate.  *Id.*  Rather, the court must consider the totality of the circumstances and

8    determine whether the allegations of scienter, in light of the entire record, is "as cogent or

9    as compelling as an opposing innocent inference."  *Id.*  Thus, no one reason,

10   consideration, or factor determined the outcome of the court's analysis.  Nevertheless, to

11   assist Plaintiffs in drafting an amended complaint (should they choose to do so), the court

12   highlights some of the more salient factors below.

13          1.  Plaintiffs' claims with respect to Dendreon's capacity constraints are not
               compelling.  Plaintiffs claim that Defendants "repeatedly misrepresented the
14             demand for Provenge."  (Am. Compl. ¶¶ 60-101.)  Plaintiffs allege that
               Defendants knew they were making false statements when they said words to
15             the effect of "demand for Provenge will exceed our initial ability to supply it
               for the first 12 months" (*id.* ¶ 60) and "as we anticipated, the demand for this
16             product is currently exceeding our ability to supply it" (*id.* ¶ 75.)  Plaintiffs
               claim to allege facts demonstrating a strong inference of falsity and scienter
17             with respect to these statements.  (*See* Resp. at 18-26.)  However, the facts they
               allege barely support the inference they wish the court to draw.  Instead, the
18             facts support a much stronger inference that Dendreon was, in fact, capacity-
               constrained due to "well-publicized and well-understood facts about
19             Dendreon's sales ramp."  (*See* Mot. at 10.)  When Provenge first hit the

20    ───────────────

21      [6] This is not to say, by implication, that Plaintiffs could not eventually succeed in
     prosecuting their claims.  The court's task is to examine the complaint as it is presently written
22   and, having done so, to make a judgment about the relative strength of competing inferences at
     this stage of the litigation.  That is all the court has done, and nothing more.

market, it was made available for prescription at only the 50 institutions and physician groups that participated in the clinical trials of the drug. (Wechkin Decl. Ex. 1 at 5.) Additional institutions and physician groups were added only slowly. Thus, the vast majority of the marketplace did not have access to Provenge at first. (*See id.*) Plaintiffs claim Defendants' statements were false because Provenge was not being prescribed at maximum capacity when the statements were made. (Am. Compl. ¶¶ 60-101.) However, at the time the statements were made, the level of demand for Provenge in the marketplace as a whole did exceed Dendreon's ability to manufacture the drug. This became clear when, shortly after capacity was increased and more of the marketplace had access to Provenge, prescriptions increased beyond Dendreon's early capacity. (*See, e.g.*, Wechkin Decl. Ex. 6 at 3 ($15 million in revenue in April 2011—the first month new capacity came on line); *id.* Ex. 7 at 3 ($19 million in revenue in July 2011).) In light of this reality, Plaintiffs' inference of bad motive is not compelling with respect to statements about capacity constraints.

2. Dendreon met its early revenue guidance and sales targets. (*See, e.g.*, Am. Compl. ¶ 83; Wechkin Decl. Ex. 5 at 3-4 (showing that Dendreon was meeting its revenue guidance through year-end 2010).) This lends support to the inference that Dendreon and its executive officers were not issuing revenue guidance that they knew was false: sales would be easier to predict in the early part of Provenge's launch because the drug could be prescribed only by a limited group of physicians whose prescribing behavior Dendreon had already had an opportunity to observe during clinical trials. (*See* Wechkin Decl. Ex. 1 at 5.) It was only after Provenge was released to the wider marketplace that Dendreon began missing its sales targets. (*See, e.g.*, Am. Compl. ¶ 83; Wechkin Decl. Ex. 5 at 3-4, Ex. 6 at 3, 6, Ex. 7 at 3.) It would be more difficult to predict the behavior of the whole marketplace than to predict the behavior of a small group of physicians about whom much is known. The revenue guidance stopped reflecting reality only after the demographic shift that accompanied the wider launch of Provenge. (*See* Wechkin Decl. Ex. 6 at 3, 6, Ex. 7 at 3.) On balance, this line of reasoning strengthens the inference that the original sin in this case was not intentional fraud but rather executive misjudgment.

3. Defendants' actions are inconsistent with fraud. During the relevant period, Dendreon poured millions of dollars into expanding manufacturing capacity for Provenge. (*See, e.g.*, *id.* Ex. 1 at 5-6, 10, Ex. 18 at 9.) Dendreon opened three new manufacturing facilities in New Jersey, California, and Georgia, and hired and trained numerous new workers to staff those facilities. (*Id.* Ex. 1 at 5-6, 10.) These actions are consistent with a belief that demand for Provenge would be sufficient to require these facilities. Plaintiffs ask the court to infer that Dendreon executives made these investments for no other reason than to

inflate Dendreon's stock price for personal gain, knowing that the house of cards would collapse as soon as the market realized that demand for Provenge was not as strong as Dendreon executives knew it to be all along. Notwithstanding the fact that courts decline to impute these kinds of economically self-destructive motives to securities defendants, *see Oppenheim Primerica Asset Mgmt. v. Encysive Pharms., Inc.*, No. Civ.A.H-06-3022, 2007 WL 2720074 (S.D. Tex. Sept. 18, 2007), this inference requires so many far-fetched assumptions and superhuman leaps in logic and that the court does not consider it compelling.

4. Along these same lines, the individual Defendants had more incentive to help Dendreon succeed than to commit a self-destructive fraud. Their compensation was largely based on Dendreon's success. (*See* Wechkin Decl. Ex. 14.) In particular, much of their incentive compensation was based on achieving revenue targets. (*See id.*) It makes little sense to assume Defendants would set revenue targets they knew the company could not meet given that their pay was largely based on achieving those targets.

5. Plaintiffs' claims with respect to stock sales do not add up. Plaintiffs contend that scienter may be inferred from the fact that "while Defendants were perpetrating the above-described fraudulent scheme and course of conduct, Individual Defendants Gold and Schiffman, as well as numerous other Dendreon officers and directors, were actively disposing of their personal holdings of Dendreon stock . . . [t]aking advantage of the opportunity presented by Dendreon's fraudulently-inflated stock price . . . ." (Am. Compl. ¶ 130.) Stock sales may be probative of scienter if they are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed insider information." *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 986 (9th Cir. 1999). Courts consider (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history. *Id.* In this case, the vast majority of the stock sales Plaintiff claims are suspicious were made immediately after Dendreon announced FDA approval for Provenge. (Wechkin Decl. Ex. 8, 9.) Thus, the timing of the sales does not suggest scienter. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002). Moreover, the sales were largely non-discretionary pursuant to a Rule 10b5-1 trading plan, and, in any event, the sales were consistent with Defendants' prior trading history. (*See, e.g.*, Wechkin Decl. Exs. 8, 9.) The court will not infer scienter from these stock sales.

This list is not comprehensive and describes only a handful of the problems with

Plaintiffs' complaint. After a holistic review of the complaint, the court concludes that

ORDER- 27

1 the inference of scienter in this case is not as compelling as the opposing inference.

2 Accordingly, dismissal of Plaintiffs' Rule 10(b) claims is appropriate and the court

3 GRANTS Defendants' motion to dismiss Plaintiffs' Rule 10(b) claims.

4 **G.    Ancillary claims**

5      All of Plaintiffs' ancillary federal securities claims are predicated on Section 10(b)

6 liability and therefore must be dismissed as well.  Plaintiffs' Sections 20(a) and 20A

7 claims for control person liability and insider trading both depend for their success on the

8 success of Plaintiffs' Section 10(b) claim.  *Lipton*, 284 F.3d at 1035 n.15 ("[T]o prevail

9 on their claims for violations of § 20(a) and § 20A, plaintiffs must first allege a violation

10 of § 10(b) or Rule 10b-5.").  Thus, dismissal of these claims is appropriate as well.

11 **H.    State Law Claims**

12      In addition to claims under the federal securities laws, Plaintiffs assert state law

13 claims for violation of Washington's Consumer Protection Act ("CPA"), RCW chapter

14 19.86, and common law claims for fraud[7] and negligent misrepresentation.[8]  (Am.

15

16 _____

17     [7] Under Washington law, a fraud claim requires proof of nine elements:  (1) a representation of an existing fact; (2) materiality of this representation; (3) falsity of the representation; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) intent that

18 the representation be acted on; (6) ignorance of its falsity by the person to whom the representation is made; (7) reliance on the truth of the representation; (8) a right to rely on the

19 representation; and (9) consequential damages.  *Kirkham v. Smith*, 23 P.3d 10, 13 (Wash. Ct. App. 2001).

20     [8] Under Washington law, a negligent misrepresentation claim requires proof of six

21 elements:  (1) the defendant supplied information for the guidance of others in their business transactions that was false; (2) the defendant knew or should have known that the information

22 was supplied to guide the plaintiff in his business transactions; (3) the defendant was negligent in obtaining or communicating the false information; (4) the plaintiff relied on the false

1   Compl. ¶¶ 183-206.)  These claims are not subject to analysis under the PSLRA.  *See,*

2   *e.g.*, *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 213

3   (5th Cir. 2009); *Mack Univ. LLC v. Halstead*, 2007 WL 4458615, at *5 (C.D. Cal. Nov.

4   14, 2007).  Thus, the court is not permitted to weigh competing inferences as it has done

5   above.  *Crumrine*, 565 F.3d at 213.  Instead, the analysis proceeds under Federal Rules of

6   Civil Procedure 12(b)(6) and 9(b).

7          Under Rule 12(b)(6), a complaint must be "plausible on its face."  *Iqbal*, 556 U.S.

8   at 678 (quoting *Twombly*, 550 U.S. at 570).  It is not enough that a claim to relief be

9   merely "possible" or "conceivable."  *See id.*  A claim for relief is plausible on its face

10  when "the plaintiff pleads factual content that allows the court to draw the reasonable

11  inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Twombly*,

12  550 U.S. at 556).  This standard is "not akin to a 'probability requirement,' but it asks for

13  more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  To cross the

14  threshold from conceivable to plausible, a complaint must contain a sufficient quantum of

15  "factual matter" alleged with a sufficient level of specificity to raise entitlement to relief

16  above the speculative level.  *Twombly*, 550 U.S. at 555.  As the Supreme Court said in

17  *Iqbal*, a complaint must do more than tender "'naked assertions' devoid of 'further

18  factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

19         Under Rule 9(b), allegations of fraud must be pleaded with particularity.

20  Specifically, a plaintiff alleging fraud must "state with particularity the circumstances

21

22  information; (5) the plaintiff's reliance was reasonable; (6) the false information proximately
    caused damages to the plaintiff.  *Ross v. Kirner*, 172 P.3d 701, 704 (Wash. 2007).

1   constituting fraud . . . , [although] [m]alice, intent, knowledge, and other conditions of a

2   person's mind may be alleged generally."  Rule 9(b) requires that, when averments of

3   fraud are made, the circumstances constituting the alleged fraud must be "specific enough

4   to give defendants notice of the particular misconduct . . . so that they can defend against

5   the charge and not just deny that they have done anything wrong. . . .  Averments of fraud

6   must be accompanied by 'the who, what, when, where, and how' of the misconduct

7   charged."  *Viss v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).  The

8   plaintiff also must set forth "what is false or misleading about a statement, and why it is

9   false."  *Id.*  Finally, a plaintiff who makes allegations on information and belief must state

10  the factual basis for that belief, even with regard to matters within the defendant's

11  knowledge.  *Neubronner v. Milken*, 6 F.3d 666, 672 (9th  Cir. 1993).

12          Plaintiffs have met these standards for their fraud and misrepresentation claims.

13  With respect to Rule 9(b), Plaintiffs have laid out the "who, what, when, where, and how

14  of the misconduct charged" with great particularity.  *See Viss*, 317 F.3d at 1106.  They

15  have identified and quoted the specific statements that form the basis of their claims and

16  identified when, by whom, and where they were made, what was said, why the statements

17  were allegedly false, and exactly how the alleged fraud unfolded.  (*See generally* Am.

18  Compl.)  If Plaintiffs can be faulted in their drafting of this complaint, it cannot be for a

19  lack of particularity, specificity, or detail.  (*See id.*)  Their allegations are "specific

20  enough to give defendants notice of the particular misconduct . . . so that they can defend

21  against the charge and not just deny that they have done anything wrong."  *See Viss*, 317

22  F.3d at 1106.

1    For similar reasons, the court concludes that Plaintiffs have pleaded "plausible"

2    claims for common law fraud and misrepresentation.  The allegations in this complaint

3    sufficiently establish that Plaintiffs' claims are more than "possible" or "conceivable."

4    *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  And although certain

5    necessary inferences may not be "strong" as discussed above, Plaintiffs have presented

6    their claims with great detail and have alleged a sufficient quantum of "factual matter"

7    with respect to the alleged misrepresentations that it is not appropriate to dismiss their

8    claims at this stage.  *See Twombly*, 550 U.S. at 555.  In other words, Plaintiffs have

9    provided a sufficient level of factual specificity to raise entitlement to relief above the

10   speculative level.  *Id.*  The court DENIES Defendants' motion to dismiss Plaintiffs'

11   common law fraud and misrepresentation claims.

12       This is not the case, however, for Plaintiffs' claim under the CPA.  To prove a

13   claim for violation of the CPA, a plaintiff must show:  (1) an unfair or deceptive act or

14   practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to

15   plaintiff in his or her business or property; and (5) causation.  *Hangman Ridge Training*

16   *Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 532-33 (Wash. 1986).  The court

17   concludes that Plaintiffs have not adequately pleaded the public interest impact element.[9]

18   "When the transaction is a private dispute, as it is here, and not a consumer transaction, it

19   is difficult to show public interest in the subject matter.  There must be a likelihood

20

21   _____

     [9] This is not to say that the public interest element could not be properly pleaded in a

22   securities case, only that Plaintiffs' complaint, as it is currently written, does not plead facts that
     support a plausible inference of public interest impact.

ORDER- 31

1    additional persons have been or will be injured in the same fashion." *Goodyear Tire &*

2    *Rubber Co. v. Whiteman Tire, Inc.*, 935 P.2d 628, 635 (Wash. Ct. App. 1997).  The

3    Washington Supreme Court has set forth four factors that a fact finder may consider in

4    determining whether a private dispute sufficiently implicates the public interest so as to

5    support a CPA claim:  (1) whether the alleged acts were committed in the course of

6    defendant's business; (2) whether the defendant advertised to the public in general; (3)

7    whether the defendant actively solicited this particular plaintiff, indicating potential

8    solicitation of others; and (4) whether the plaintiff and defendant have unequal bargaining

9    positions. *Michael v. Mosquera-Lacy*, 200 P.3d 695, 700 (Wash. 2009).  Given these

10   factors, the court concludes that Plaintiffs have not stated a plausible claim for violation

11   of the CPA.  Plaintiffs have stated "possible" and "conceivable" impact on the public

12   interest, but this is not enough under *Iqbal* and *Twombly*.  *Iqbal*, 556 U.S. at 678.

13   Plaintiffs allege that "Defendants' misrepresentations and omissions were injurious to the

14   public interest because they in fact injured each of the Plaintiffs and other Dendreon

15   shareholders, and had the capacity to injure Plaintiffs and other Dendreon

16   shareholders . . . ."  (Am. Compl. ¶ 189.)  This is not "factual content that allows the

17   court to draw the reasonable inference that the defendant is liable for the misconduct

18   alleged," particularly in light of the seriousness of the allegations and the four factors

19   outlined above.  *See Iqbal*, 556 U.S. at 678.  Accordingly, the court GRANTS

20   Defendants' motion to dismiss with respect to Plaintiffs' CPA claim.

21

22

1    **I.      Leave to Amend**

2           The court grants Plaintiffs leave to amend in light of the fact that leave to amend

3    must be granted with "extreme liberality" in securities cases.  *Eminence Capital, LLC v.*

4    *Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).  Plaintiffs have 20 days to file an

5    amended complaint should they choose to do so.

6                              **III.      CONCLUSION**

7           For the reasons discussed above, the court GRANTS in part and DENIES in part

8    Defendants' motion to dismiss (Dkt. # 38), granting with respect to all federal claims and

9    Plaintiffs' CPA claim and denying with respect to all other state law claims.  Plaintiffs

10   may file an amended complaint within 20 days of the date of this order seeking to cure

11   the defects identified above.

12          Dated this 28th day of January, 2014.

13

14                                          _____

15                                          JAMES L. ROBART
                                            United States District Judge
16

17

18

19

20

21

22

ORDER- 33