**The Honorable James L. Robart**

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

DR. CHRISTOPH BÖLLING; JIMMY M. CONANT; BARBARA AND WILLIAM DETRICK, INDIVIDUALLY AND AS TRUSTEES OF THE DETRICK FAMILY LIVING TRUST; MICHAEL W. HENDRY; CAROLINE AND KENNETH HOFFMANN; JOYCE M. JOHNSON, BRIAN K. JOHNSON AND KENNETH R. JOHNSON; DR. RUBY KOCHHAR; KOCHHAR CANCER RESEARCH FOUNDATION; LINA CHAND-MILLER AND RICHARD B. MILLER, INDIVIDUALLY AND AS TRUSTEES OF THE MILLER FAMILY TRUST; JANET W. NOONE; MARGARET PALMER; JOHN R. PIOTTI, AS TRUSTEE OF THE JOHN ROBERT PIOTTI, REVOCABLE TRUST; KENNETH SAWYER; KAREN DUVALL; MARIO SETTE; JENNIFER TOLARBA; MONICA ALBANO; JACQUELINE DELAURO; KAREN CLATOR; CHARLES CLATOR; JOSEPH GOTTESMAN; STEPHANIE PIAZZA; DAVID PIAZZA; RHEA RUBIN; LAWRENCE BERMAN; CANDY WONG; AND JIM WONG,

                         Plaintiffs,

v.

MITCHELL H. GOLD, M.D., GREGORY T. SCHIFFMAN and HANS E. BISHOP,

                         Defendants.

Case No. 2:13-cv-872 JLR

**PLAINTIFFS' THIRD AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

**REDACTED VERSION PURSUANT TO LOCAL RULE 5(g)(3)**

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

# TABLE OF CONTENTS

I.    NATURE AND SUMMARY OF THE ACTION ............................................................. 1

II.   JURISDICTION AND VENUE ................................................................................... 8

III.  THE PARTIES ........................................................................................................... 8

      A.     Plaintiffs ....................................................................................................... 8

      B.     Defendants ................................................................................................ 12

IV.  CONFIDENTIAL WITNESSES CITED IN THIS COMPLAINT ................................. 13

V.   DENDREON'S COMMERCIALIZATION OF PROVENGE ....................................... 14

      A.     How Provenge Works ................................................................................. 14

      B.     Dendreon's Commercialization Of Provenge ............................................. 16

VI.  DEFENDANTS' FRAUDULENT SCHEME AND COURSE OF CONDUCT ............. 18

VII. DEFENDANTS FAILED TO DISCLOSE THAT PHYSICIANS'
     REIMBURSEMENT AND LOGISTICS CONCERNS HAD DERAILED
     THE COMMERCIALIZATION OF PROVENGE ......................................................... 21

      A.     Even Before Launch, Defendants Internally Identified Physicians' Concerns
            About Reimbursement And Treatment Logistics As A Major Risk.................... 21

      B.     Immediately After Launch, Defendants Learned Of, But Failed To Disclose,
            The Significant And Growing Problems Caused By Physicians' Concerns
            Regarding Reimbursement And The Logistics Of Treatment. ............................. 24

      C.     Dendreon's Internal Reports Confirm Defendants' Knowledge, Soon
            After Launch, That Sales Of Provenge Were Being Negatively Impacted
            By Physician Concerns As To Reimbursement And Treatment Logistics .......... 40

      D.     Physicians' Slow Adoption Of Provenge Caused Dendreon To Miss Both
            Its Internal 2010 Target And Analyst Expectations............................................. 45

      E.     Confidential Dendreon Witnesses Confirm That Defendants Were Aware
            Sales Of Provenge Were Being Negatively Impacted By Physician Concerns
            As To Reimbursement And Treatment Logistics ................................................. 46

VIII. TO COVER UP DENDREON'S UNDERPERFORMANCE, DENDREON
     SECRETLY BEGAN TO SIGN UP ADDITIONAL INFUSION SITES IN 2010 ......... 48

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

HUNG G. TA, ESQ. PLLC
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

IX.  TO FURTHER COVER UP DENDREON'S UNDERPERFORMANCE, DEFENDANTS MISLED INVESTORS THAT DENDREON WAS CAPACITY CONSTRAINED, AND THAT THIS CAUSED WAIT LISTS AND QUOTAS TO BE IMPOSED ON INFUSION SITES ........................................... 51

X.  DEFENDANTS MISLED INVESTORS THAT DENDREON WAS "ON TRACK" TO TREAT 2,000 PATIENTS, OR DELIVER 6,000 INFUSIONS, IN THE FIRST 12 MONTHS OF LAUNCH ................................................................. 62

XI.  DEFENDANTS FALSELY ASSURED INVESTORS THAT DENDREON WAS CURRENTLY "ON TRACK" TO ACHIEVE 2011 REVENUES OF $350-$400 MILLION ........................................................................................ 67

   A.  Defendants' Financial Model Underlying The $350-$400 Million Guidance...... 67

   B.  Despite Falling Behind On The Assumptions Underlying The 2011 Revenue Model, Defendants Continued To Mislead Investors That Dendreon Was "On Track" .......................................................................... 69

XII.  DEFENDANTS FURTHER MISLED INVESTORS BY FAILING TO DISCLOSE THE INFORMATION REQUIRED BY SEC REGULATION S-K, ITEM 303 ............. 84

XIII.  DEFENDANTS AND OTHER COMPANY INSIDERS ENGAGED IN UNLAWFUL INSIDER TRADING WHILE IN POSSESSION OF MATERIAL, NON-PUBLIC INFORMATION .............................................................. 86

XIV.  DEFENDANTS' FRAUD IS REVEALED........................................................ 90

XV.  LOSS CAUSATION.......................................................................... 95

XVI.  DENDREON CLEANS HOUSE AFTER THE REVELATION OF THE FRAUD ....... 97

XVII.  APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ................................................ 97

XVIII. STATUTORY SAFE HARBOR FOR FORWARD-LOOKING STATEMENTS NOT APPLICABLE ......................................................................... 99

XIX.  CLAIMS FOR RELIEF ...................................................................... 99

XX.  PRAYER FOR RELIEF ..................................................................... 109

XXI.  DEMAND FOR JURY TRIAL .............................................................. 110

Page ii – **TABLE OF CONTENTS**
Case No. 2:13-cv-872-JLR

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

Plaintiffs, by their undersigned counsel, make the following allegations against: (a) Mitchell H. Gold ("Gold"), the former Chairman and Chief Executive Officer of Dendreon Corporation ("Dendreon" or the "Company"); (b) Hans Bishop ("Bishop"), Dendreon's former Chief Operating Officer; and (c) Gregory T. Schiffman ("Schiffman"), Dendreon's former Chief Financial Officer (collectively, "Defendants"). For the avoidance of doubt, this complaint does not assert any claims against Dendreon itself.

Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon the investigation of their counsel, which included interviews with former Dendreon employees (identified herein as Confidential Witness ("CW __")); the review and analysis of internal documents produced by Dendreon, such as sales reports, emails and minutes of meetings of Dendreon's board of directors ("Board"); and review and analysis of annual reports, publicly filed documents, press releases, news articles, analysts' statements, conference call transcripts and presentations, and transcripts of speeches and remarks given by the Defendants. Plaintiffs' counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by the Defendants named in this Complaint, or are exclusively within their custody or control.

## I.    NATURE AND SUMMARY OF THE ACTION

1.    This action concerns a brazen fraud perpetrated by Dendreon and its senior officers Gold, Bishop and Schiffman in connection with Dendreon's one and only product, Provenge. Defendants' fraud continued for a year and a half, from April 29, 2010 through November 2, 2011 (the "Relevant Period").

2.    On April 29, 2010, Dendreon announced that the U.S. Food and Drug Administration ("FDA") had approved Provenge. At the time, Provenge offered a unique mechanism for harnessing a person's own body to fight prostate cancer, and the announcement was greeted with great fanfare.

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

3.      Almost immediately, however, the attention of investors turned to how Defendants would commercialize Provenge and the sales revenue that the treatment would generate.  With expectations very high for Provenge, the scrutiny from investors and analysts was particularly intense.  Defendants, in turn, followed very closely what analysts and the press were saying about Dendreon.  Defendants also received constant advice from Dendreon's major shareholders, such as SAC Capital Advisors, on how to commercialize Provenge and what message to convey to please investors.

4.      Amidst this pressure to deliver on investors' high expectations, Defendants embarked on a fraud that quickly mushroomed beyond their control.

5.      *First*, when announcing the approval of Provenge on April 29, 2010, Defendants provided guidance that Dendreon would treat 2,000 patients (generating $186 million in revenues) within the first 12 months of launch.  However, at the time they issued this guidance, Defendants knew, but failed to disclose that, a significant risk to these revenues was the concern of physicians with the peculiar characteristics of Provenge, which involved complicated treatment logistics and required the prescribing physician to pay a very steep upfront cost before seeking reimbursement from an insurer.  Defendants knew about these concerns from the preparations leading up to launch, and discussed these concerns at Board meetings throughout 2009 and early 2010.

6.      Within weeks of launch, Defendants learned that these risks had in fact materialized and that concerns amongst physicians as to reimbursement and treatment logistics were indeed inhibiting sales.  Through various weekly and other reports detailing Dendreon's sales performance, Gold, Bishop and Schiffman learned that physician concerns with reimbursement and treatment logistics were presenting a significant challenge to the adoption of Provenge. ███████████████████████████████████

████████████████████████████████████

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

7.      These problems with the Provenge launch were in turn relayed to the Board.  At numerous Board meetings held during the Relevant Period, Defendants and the Board discussed the facts that reimbursement concerns amongst physicians were "significant", that physicians experienced "reimbursement hassle and anxiety", and that these concerns and anxieties were "inhibiting Provenge's successful commercialization" and posed a "significant downside" risk to revenues.  As Dendreon's Board minutes further reveal, these were precisely the risks that Dendreon had flagged internally even before the launch of Provenge, and now these risks were coming to pass.  In addition, Defendants and the Board discussed the fact that these same concerns about reimbursement and treatment logistics resulted in the Company not fully utilizing its capacity at any time in 2010.

8.      Defendants concealed all of these and other facts from investors even though Defendants knew, at all relevant times, that the subject of physicians' concerns as to reimbursement and treatment logistics was a material and critical consideration for investors.  During the Relevant Period, investors repeatedly asked Defendants for updates on physicians' reimbursement concerns and how that was affecting sales.  Despite the importance to investors, Defendants never disclosed what they had learned, what they discussed in their Board meetings, or what the internal Company reports confirmed.

9.      _Second_, to mask the Company's underperformance, Defendants soon engaged in a more brazen fraud.  When announcing the approval of Provenge, and on numerous subsequent occasions, Defendants informed shareholders that the Company focused initially on rolling out Provenge to the approximately 50 medical centers that had previously participated in the clinical trials of Provenge, and were therefore most familiar with the treatment.  However, because the launch was proceeding so badly with these initial medical centers, Dendreon was left with significant excess capacity, even in the first couple of months.  Accordingly, in July 2010, less than three months into the launch, Defendants secretly began to roll out Provenge to additional medical centers to make up for the missing sales and soak up the excess capacity.

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

10.     Unbeknownst to investors, by the end of 2010, Dendreon in fact had increased the number of infusing medical centers to *83*, or *66%* more than the approximately 50 medical centers Defendants claimed.  Defendants concealed the existence of these additional medical centers because they did not want to admit that the launch was progressing badly.  Even worse, Defendants proceeded to include the revenues from *all* of these 83 medical centers in Dendreon's 2010 reported revenues, while representing to investors that the reported revenues were generated from just the approximately 50 launch medical centers.  Defendants therefore inflated the success of the Provenge launch.  Without the benefit of the revenues from the additional medical centers, Dendreon would have fallen significantly short of analyst expectations and their own internal forecasts.  Indeed, if these problems with the launch had been revealed early on, Defendants' fraud would have been stopped in its tracks.

11.     *Third*, even with the revenues from the additional, undisclosed medical centers, Dendreon *still* missed its internal forecasts for 2010 revenues, as well as analysts' consensus estimates.  This presented Defendants with a different problem.  Defendants now had to explain to puzzled investors why, if the launch was progressing as well as Defendants repeatedly claimed, Provenge sales performance continued to lag.

12.     To explain away this disparity, Defendants engaged in a further fraud.  At numerous investor conferences, on quarterly conference calls and in filings with the U.S. Securities and Exchange Commission ("SEC"), Defendants attributed the Company's lagging performance to the fact that the Company was "capacity constrained", that the Company had lengthy wait lists and had to impose quotas, and that all of this inability to supply Provenge to meet demand explained the Company's underperformance.  As the Board minutes and the Company's internal reports reveal, however, this was all false.  The Company operated at less than capacity throughout 2010.  In fact, in January and February 2011, the Company supplied fewer treatments than it did in October 2010, in which month Defendants claimed they had operated at "maximum" capacity.

Page 4 – **THIRD AMENDED COMPLAINT**
Case No. 2:13-cv-872-JLR

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

13.     _Fourth_, to further assuage investor concerns, Defendants repeatedly assured investors that the Company was currently "on track" to achieve the Company's guidance of treating 2,000 patients in the first twelve months of commercialization.  However, because of physicians' concerns with reimbursement and treatment logistics, Defendants knew after just the first month of launch that they were off-track.  As a result, without disclosing that physician pushback had slowed the Provenge launch, Defendants began to recast their 2,000 patient guidance in a manner that would buy them more time but not alarm investors.

14.     At numerous conferences and on numerous conference calls, Defendants began to emphasize that May 2010 was a startup month and should not be counted as part of the 12 months.  Defendants also began to state that the 2,000 patient guidance was dependent on additional capacity being approved in March 2011 (when they had previously and unequivocally stated that the 2,000 patient guidance did not depend on the additional capacity).  Along with this re-emphasis, Defendants now claimed that the 2,000 patient target would be reached in "mid-year" 2011.  Then, in subsequent messages, they claimed that "mid-year" 2011 meant "July 2011."  Because of all these constant, subtle changes to their guidance, Defendants were able to confuse investors and continue to maintain that they were on track to achieve their 2,000 patient guidance.

15.     At no time did Defendants disclose that they had in fact repeatedly shifted the goalposts for the 2,000 patient guidance or, more importantly, that they did this because of the poor Provenge launch.  Reflecting just how badly off track Dendreon was, in the end result, Defendants _still_ missed the revised July 2011 2,000 patient target by about 20%.

16.     _Fifth_, to pump up investor confidence even further, Defendants announced in November 2010 that the Company would earn revenues of $350-$400 million in 2011.  To put this in perspective, this was _double_ the revenues that Dendreon would earn from treating 2,000 patients in 12 months – a target that Defendants were already struggling to achieve, as described above. ██████████████████████████████████████████████

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 ██████████████████████

17.     Not only was the 2011 guidance suspect from the start, Defendants proceeded to mislead investors about the Company's progress towards achieving it.   As confirmed in their public statements, Defendants based their 2011 revenue guidance on a financial model.   This model relied on two key metrics – the number of medical centers added in each quarter, and the number of infusions each medical center would deliver on average each week.   However, almost from the start, Dendreon fell behind on both key metrics, ████████████████████████ █████████████████████████████████████████████ Despite falling behind on both key metrics, ██████████████████████████████████████████ ███████████████  Defendants repeatedly assured investors that Dendreon was currently on track to reach its 2011 revenue target.   These assurances were all false.   As Defendants knew and discussed, medical centers simply were not prescribing and treating patients in enough numbers to allow Defendants to meet their ambitious targets.

18.     Unsurprisingly, at the same time that they failed to disclose the material, adverse information concerning Provenge and were disseminating false statements to unsuspecting investors, Defendants were busily offloading their own holdings of Dendreon stock.   During the Relevant Period, because of Defendants' numerous omissions and their accompanying misrepresentations, Dendreon's stock price was inflated, hitting a high of $55.43.   During that same period, Dendreon's officers and directors engaged in unlawful insider trading and realized approximately *$82 million* in proceeds from stock sales while in the possession of material, adverse and non-public information about the Company.   Defendant Gold, Dendreon's Chief Executive Officer ("CEO"), personally reaped over *$33 million* from the sale of Dendreon stock during the Relevant Period, including millions from sales made just weeks before the fraud was revealed to investors.

Page 6 – **THIRD AMENDED COMPLAINT**
Case No. 2:13-cv-872-JLR

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

19.     It was not until August 3, 2011, after the close of trading, that Defendants were finally forced to come clean with the facts of their fraud.  Defendants were forced to admit that demand for Provenge had been negatively impacted all along by physician concerns about reimbursement and that the adoption of Provenge would be "more gradual", forcing Defendants to withdraw their financial guidance.  In fact, the impact of reimbursement concerns on sales was so great that Dendreon was forced to announce a restructuring plan that slashed the Company's workforce by 25%.

20.     The revelation of the Company's fraud was devastating, causing Dendreon's stock to fall **67%** and erasing **$3.5 billion** from Dendreon's market capitalization in a single day. Unlike Defendants, who were able to sell substantial holdings of Dendreon stock before the fraud was revealed, the Company's unsuspecting shareholders suffered crippling losses.   As *TheStreet.com* put it, Gold had turned out like other Chief Executive Officers who had "hone[d] the fine craft of investor bamboozlement."

21.     Even when forced to come clean, Defendants did not fully reveal the extent of the impact of physicians' "more gradual" adoption of Provenge.  ████████████████████ ███████████████████████████████████████████████████████████ Defendants portrayed the bad news of August 3 as a temporary setback, suggesting that the timeline for achieving their sales targets had merely been pushed out by several quarters. Among other things, Defendants put a positive spin on the August 3 results by pointing to the rapid pace with which they continued to add new infusion centers. ███████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

## II.     JURISDICTION AND VENUE

22.     The claims asserted herein arise under and pursuant to: (i) Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and (ii) Washington common law.

23.     This Court has original jurisdiction over Plaintiffs' claims under the Exchange Act and Rule 10b-5 pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

24.     This Court has supplemental jurisdiction over Plaintiffs' related state law claims pursuant to 28 U.S.C. § 1367.

25.     In addition, this Court has original jurisdiction over all the claims alleged in this Complaint pursuant to 28 U.S.C. § 1332 because there exists diversity of citizenship among the parties to this action and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

26.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §§ 1391(b), (c) and (d).  Many of the acts and transactions that constitute violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District. Further, Dendreon maintained its corporate headquarters and principal executive offices in this District throughout the Relevant Period.

## III.     THE PARTIES

### A.     Plaintiffs

27.     Plaintiff Dr. Christoph Bölling is a resident of Switzerland and purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

28.     Plaintiff Jimmy M. Conant is an individual residing at Keller, Texas and is a participant in and the owner of a beneficial interest in the Lockheed Martin Salaried Savings Plan.  Through this plan, Plaintiff Jimmy Conant purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

29.     Plaintiffs Barbara and William Detrick are individuals residing at Cromwell, Connecticut and are the trustees of the Detrick Family Living Trust and the owners of the beneficial interest in that trust.  Plaintiffs Barbara and William Detrick bring this action in their capacity as trustees and, individually, as beneficiaries of the Detrick Family Living Trust.  The Detrick Family Living Trust purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

30.     Plaintiff Michael W. Hendry is an individual residing at Bonita Springs, Florida and purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

31.     Plaintiffs Caroline and Kenneth Hoffmann are individuals residing at The Villages, Florida, and purchased securities of Dendreon at artificially inflated prices during the Relevant Period and were damaged thereby.

32.     Plaintiffs Joyce M. Johnson and Brian K. Johnson are individuals residing at Aurora, Illinois.   Plaintiff Kenneth R. Johnson is an individual residing at Alexandria, Minnesota, and has appointed Brian K. Johnson as his attorney-in-fact.  Plaintiffs Joyce, Brian and Kenneth Johnson purchased securities of Dendreon at artificially inflated prices during the Relevant Period and were damaged thereby.

33.     Plaintiff Dr. Ruby Kochhar is an individual residing at Portsmouth, Virginia and purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

34.     Plaintiff Kochhar Cancer Research Foundation is a charitable organization organized under the laws of the State of Louisiana and 26 U.S.C. § 501(c)(3), and purchased

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

HUNG G. TA, ESQ. PLLC
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

35.     Plaintiffs Lina Chand-Miller and Richard B. Miller are individuals residing at Los Angeles, California and are the trustees of the Miller Family Trust and the owners of the beneficial interest in that trust.  Plaintiffs Lina Chand-Miller and Richard B. Miller bring this action in their capacity as trustees and, individually, as beneficiaries of the Miller Family Trust.  The Miller Family Trust purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

36.     Plaintiff Janet W. Noone is an individual residing at Portsmouth, Virginia, and purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

37.     Plaintiff Margaret Palmer is an individual residing at Newport, Michigan, and purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

38.     Plaintiff John R. Piotti is an individual residing in Largo, Florida, and is the trustee of the John Robert Piotti, Revocable Trust, UA Dated November 17, 1998, and the owner of the beneficial interest in that trust.  Plaintiff John R. Piotti brings this action in his capacity as trustee and, individually, as sole beneficiary of the trust.  The John Robert Piotti, Revocable Trust purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

39.     Plaintiff Kenneth Sawyer is an individual residing in Lancaster, California, and is a participant in and the owner of a beneficial interest in the Baxter Healthcare Incentive Plan.  Through this plan, Plaintiff Kenneth Sawyer purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.  In addition, Kenneth Sawyer and Karen Duvall (also a resident of Lancaster, California) purchased securities of

Page 10 – **THIRD AMENDED COMPLAINT**
Case No. 2:13-cv-872-JLR

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

Dendreon through another, jointly-held account at artificially inflated prices during the Relevant Period and were damaged thereby.

40.     Plaintiff Mario Sette is an individual residing in Las Vegas, Nevada, and purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

41.     Plaintiff Jennifer Tolarba is an individual residing in Las Vegas, Nevada, and purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

42.     Plaintiff Monica Albano is an individual residing in Delray Beach, Florida, and purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

43.     Plaintiff Jacqueline DeLauro is an individual residing in Delray Beach, Florida, and purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

44.     Plaintiffs Karen Clator and Charles Clator are individuals residing in Largo, Florida, and purchased securities of Dendreon at artificially inflated prices during the Relevant Period and were damaged thereby.

45.     Plaintiff Joseph Gottesman is an individual residing in Brooklyn, New York, and purchased securities of Dendreon at artificially inflated prices during the Relevant Period and was damaged thereby.

46.     Plaintiffs Stephanie Piazza and David Piazza are individuals residing in Glendale, California, and purchased securities of Dendreon at artificially inflated prices during the Relevant Period and were damaged thereby.

47.     Plaintiffs Rhea Rubin and Lawrence Berman are individuals residing in Oakland, California, and purchased securities of Dendreon at artificially inflated prices during the Relevant Period and were damaged thereby.

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

48.     Plaintiffs Candy Wong and Jim Wong are individuals residing in Beaverton, Oregon, and purchased securities of Dendreon at artificially inflated prices during the Relevant Period and were damaged thereby.

**B.     Defendants**

49.     During the Relevant Period, Defendant Gold served as President, CEO, and Chairman of Dendreon's Board.  From 1993 to 1998, Gold was a resident physician in the Department of Urology at the University of Washington.  In June 2001, Gold joined Dendreon as Vice President of Business Development.  In January 2003, Gold became CEO of Dendreon.  On or about January 31, 2012, Gold was terminated by the Company as President and CEO.  Gold is a resident of Seattle, Washington.

50.     During the Relevant Period, Defendant Hans E. Bishop was Chief Operating Officer ("COO") and Executive Vice President of Dendreon.  Bishop joined Dendreon in January of 2010.  Bishop was terminated by the Company on or about September 8, 2011. Bishop is a resident of New York, New York.

51.     During the Relevant Period, Defendant Gregory T. Schiffman was Chief Financial Officer ("CFO"), Executive Vice President, and Treasurer of Dendreon. Schiffman joined Dendreon in 2006.  Schiffman is a resident of Oregon City, Oregon.

52.     Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Dendreon's quarterly reports, press releases, and presentations to securities analysts, investment managers and institutional and individual investors, *i.e.,* the market.  During the Relevant Period, Defendants signed and certified the Company's SEC filings, including, but not limited to, Dendreon's Forms 10-Q and 10-K.  They were provided with copies of the Company's reports, press releases, conference call scripts and presentations prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  As alleged in this Complaint, because of their positions within the Company, and their access to material non-public information, Defendants

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

knew that the adverse facts alleged in this Complaint were being concealed from the public and that the representations being made were materially false and misleading.   Accordingly, Defendants are liable for the omissions and false and misleading statements alleged in this Complaint.

## IV.   CONFIDENTIAL WITNESSES CITED IN THIS COMPLAINT

53.   CW1 was the Regional Sales Manager, Northeast Region, at Dendreon from January 2010 until December 2010, and then a Sales Representative until December 2011.  As Regional Sales Manager for the Northeast Region of the United States, CW1 was responsible for more than five states and numerous sales representatives.  CW1's job responsibilities included, among other things, overseeing the sales of Provenge to accounts located in the Northeast Region, developing a regional business plan, and reporting to Defendants about the level of demand for Provenge.   CW1 regularly received and reviewed plant "Capacity Reports", "Apheresis Reports", "Prescriptions vs. Infusion Reports", and internal Dendreon market research reports.   CW1 had several conversations with Defendant Bishop and other senior executives concerning revenue guidance and sales of Provenge.   CW1 has over 20 years of industry experience, including 12 years of experience with the oncology and urology market.

54.   CW2 was the Director of Sales Operations at Dendreon from November 2009 until December 2011.  CW2 created the Company's plant Capacity Reports for the first three months of Provenge's launch, and sent them to Gold, Bishop, and other senior members of Dendreon management.  After CW2 ceased preparing the Capacity Reports, CW2 continued to receive the Capacity Reports, and reviewed and forwarded them to the sales management team. In addition, CW2's department created the Prescription vs. Infusion reports.  CW2 also received and reviewed "Provenge Weekly Performance Reports" and market research reports.   CW2 attended about a dozen "Commercial Team" meetings, which were held each Monday by Defendant Bishop and other high-level management at the Company's headquarters.  In these meetings, the prior week's performance was discussed, including how many Provenge treatments

Page 13 – **THIRD AMENDED COMPLAINT**
Case No. 2:13-cv-872-JLR

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

1   were scheduled, how many treatments were performed, and where the Company stood in terms

2   of its capacity.

3   **V.      DENDREON'S COMMERCIALIZATION OF PROVENGE**

4          **A.     How Provenge Works**

5          55.     Founded in 1992, Dendreon is a Delaware corporation with its principal place of

6   business at 1301 Second Avenue, Suite 3200, Seattle, Washington 98101.   Dendreon is a

7   biotechnology company focused on the discovery, development and commercialization of

8   therapies to treat various cancers.   Since its inception, however, the Company has received FDA

9   approval for only one drug, Provenge (sipuleucel-T), a therapeutic vaccine for the treatment of

10  advanced prostate cancer.   Although the Company has other "potential product candidates"

11  under development, none are beyond Phase I FDA testing.   Dendreon's securities have actively

12  traded on the NASDAQ Stock Market ("NASDAQ") since February 2002.

13         56.     Provenge is a form of "autologous cellular immunotherapy", under which cells

14  from a patient's own immune system are taken from the patient's body, cultured and processed

15  to activate them until their resistance to cancer is strengthened, and then placed back in the

16  patient's body.   In effect, Provenge trains a patient's immune system to fight the prostate cancer.

17         57.     Dendreon developed Provenge over fifteen years at a cost of over $1 billion.   In

18  2000, Dendreon began clinical testing of Provenge.   In 2006, Dendreon conducted a Phase III

19  trial.   Clinical studies showed that Provenge increased the median survival time of patients by

20  four months compared with a placebo, and posed fewer side effects than chemotherapy.   In April

21  2010, Provenge was approved by the FDA for men whose prostate cancer has spread into their

22  bodies, who have either no or minimal symptoms from the disease, and who will not respond to

23  hormone blocking drugs.

24         58.     There are three steps involved in the treatment of a patient using Provenge.   First,

25  a patient's blood is collected at an approved "apheresis" site and immediately shipped to a

26  Dendreon manufacturing plant for processing.   The patient's blood must be received for

---

Page 14 – **THIRD AMENDED COMPLAINT**
Case No. 2:13-cv-872-JLR

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

processing within 18 hours of removal from the patient's body.  Second, once received at the manufacturing plant, the patient's blood is turned into Provenge at individual workstations, by incubating the patient's white blood cells with a proprietary "antigen" similar to the one found in prostate cancer cells.  (An antigen is a substance that causes the body to react with an immune response.)  Third, once the immune cells are "primed" or "activated", which takes about 36 to 44 hours to complete, the Provenge is immediately shipped to an approved center for infusion into the patient.  Once infused, Provenge uses a patient's immune system to activate T-cells that in turn fight the prostate cancer cells.  The Provenge must be infused within l8 hours after shipment, or else the cells die and the drug is ineffective.

59.     Each Provenge infusion costs $31,000.  A full treatment of Provenge requires three infusions over a one-month period, for a total cost of $93,000.  The cost of Provenge is charged to the patient's physician or healthcare provider, who then must seek reimbursement from Medicare, Medicaid or the patient's private health insurer.

60.     Before launching Provenge, Dendreon was also required to obtain FDA validation and approval of its workstations for manufacturing Provenge.  In 2006, the FDA approved 12 workstations in the Company's Morris Plains, New Jersey plant ("NJ Facility") to conduct Phase III testing.  Dendreon used these 12 workstations exclusively to manufacture Provenge from the time of its launch in April 2010 until March 10, 2011, when the Company obtained FDA approval to manufacture Provenge at an additional 36 workstations at the NJ Facility.  On June 29, 2011, Dendreon received FDA approval to manufacture Provenge at an additional 36 workstations located at a facility in Seal Beach, California (referred to internally as the "Los Angeles" plant).  On August 26, 2011, Dendreon received FDA approval to manufacture Provenge at an additional 36 workstations located at a third facility in Atlanta, Georgia.

61.     Since the launch of Provenge in April 2010, Provenge has accounted for virtually all of Dendreon's revenue.  Accordingly, during the Relevant Period, the demand for Provenge was of critical importance to investors in assessing Dendreon's value and business prospects.

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

**B.     Dendreon's Commercialization Of Provenge**

62.     Dendreon began planning for the launch of Provenge at least a year before the widely anticipated FDA approval of Provenge on April 29, 2010.  At several Board meetings starting in May 2009, Dendreon's management gave presentations to the Board outlining the Company's plan for launching Provenge, the sales and marketing strategy, the information learned from pricing studies, the anticipated demand and capacity, and critical launch issues and risks.  These meetings continued all the way through the end of 2009 and into early 2010.

63.     As these pre-launch Board meetings reveal, Defendants were aware from the start that the commercialization of Provenge faced several significant challenges.

64.     One challenge was the cost of Provenge, and the effect this had on demand. Before its launch in April 2010, Wall Street analysts had projected a cost ranging from $40,000 to $75,000 for a full course of treatment per patient, with an average of $62,000.  When it launched Provenge, Dendreon announced that the price for a single, one-month treatment would be $93,000, making Provenge one of the most expensive cancer treatments on the market.  As *Forbes.com* reported in April 2010, this was "far higher than Wall Street expected." Accordingly, from the start, a critical question was the effect the price of Provenge would have on demand.

65.     A second, and related, challenge was the effect on demand of Provenge's "buy-and-bill" reimbursement model, under which treating physicians were required to purchase the $93,000 treatment and then seek reimbursement through Medicare, Medicaid or private insurance companies.  Not only would prescribing physicians have to purchase the treatment before waiting to be reimbursed, those physicians would also have to administer a full course of treatment and incur the entire $93,000 cost in a very short period of one month.  Thus, prescribing physicians would have to administer a full course of Provenge before they knew if they would be reimbursed, meaning they could not stop the treatment and mitigate their financial risk if a reimbursement problem developed.  In short, under the "buy-and-bill" reimbursement

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

model, the physician or healthcare provider bore all the risk.  If the insurer ultimately refused reimbursement, the entire cost of the treatment would fall on the physician.

66.     A third, and significant, challenge was navigating the logistical hurdles in getting a patient's blood from an apheresis center, using the patient's blood to manufacture Provenge, and then shipping the Provenge for infusion at an approved center – all within a tight window of three days, or else the treatment became ineffective.

67.     The challenges posed by Provenge's high cost and the buy-and-bill reimbursement model were magnified given the uncertain Medicare reimbursement environment. Medicare reimbursement is managed by Medicare administrative contractors ("MACs") in 15 regions across the country.  The MACs, in turn, are contracted by the Centers for Medicare & Medicaid Services ("CMS"), a government agency which oversees the Medicare program nationally.  Despite working under the national purview of CMS, each MAC sets its own policies for reimbursement.  Accordingly, Dendreon set a goal to have coverage by 14 MACs by the end of 2010.  Although the Company was generally able to meet its goals with respect to regional coverage, the extremely high cost of Provenge subjected the drug to national coverage scrutiny.

68.     Due to intensifying pressures to contain healthcare costs, CMS regularly scrutinizes expensive new therapies that are likely to be used by the Medicare and Medicaid population.  Thus, in June 2010, CMS launched a National Coverage Analysis ("NCA") to review the labeled use of PROVENGE.  An NCA is typically the first stage in developing a National Coverage Decision which imposes a uniform national coverage policy.  While an NCA is under way, concern may be heightened amongst physicians who are being asked to front the costs of an expensive drug with no guarantee of ultimate reimbursement.  Indeed, it was not until June 30, 2011, after a year of analysis and public comment, that the CMS issued a National Coverage Decision affirming coverage of Provenge as a "reasonable and necessary" treatment. Thus, during this entire period of public comment, which stretched out over most of the Relevant Period, physician reimbursement concerns were even more acute.

Page 17 – **THIRD AMENDED COMPLAINT**
Case No. 2:13-cv-872-JLR

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

69.     Importantly, Defendants knew from the outset that financial analysts and shareholders were keenly following the potential impact of any physician reimbursement concerns.  Investors were especially concerned about Dendreon's "buy-and-bill" reimbursement model, and whether physicians would be willing to carry large accounts receivables with the possibility that they would receive delayed or even no reimbursement.  Investors' concerns were heightened when Dendreon eventually announced that the cost of treatment for Provenge would be $93,000.

70.     In a prescient research note issued on April 22, 2010 (several days before FDA approval of Provenge), Lazard Capital Markets identified the risks of physician pushback, and the potential impact on Provenge sales:

> We note that physicians will not opt to pay for an expensive medication upfront, negatively impacting their cash flow while waiting 3-6 months for reimbursement by insurers. Also, since the product is patient specific, physicians would be assuming significant risk based on the reliability of patients who may not show up for treatment or if reimbursement is denied since the drug is personalized and cannot be used by other prostate cancer patients, unlike other chemo and biotherapeutics. Our consultants noted that the company could receive widespread pushback if physicians are required to purchase Provenge for their patients and then receive reimbursement by insurers. Should Dendreon choose this route, we believe it would negatively impact the Provenge sales trajectory as physicians "test the waters" and ensure that reimbursement is forthcoming, prior to broadly prescribing Provenge.

## VI.    DEFENDANTS' FRAUDULENT SCHEME AND COURSE OF CONDUCT

71.     It was against the above background that Defendants engaged in a multi-faceted fraud.  As described below, Defendants' fraud quickly snowballed, as Defendants issued one set of false statements to cover up the previous set of false statements.

72.     *First*, throughout the Relevant Period, Defendants repeatedly misled investors as to the progress of the commercialization of Provenge.  Even before Provenge's launch on April 29, 2010, Defendants discussed the significant risks posed by physicians' reimbursement

Page 18 – **THIRD AMENDED COMPLAINT**
Case No. 2:13-cv-872-JLR

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

concerns and the complex logistics associated with Provenge treatment.  Within weeks of launch, these risks quickly materialized, negatively impacting physicians' willingness to prescribe Provenge.   During 2010 and 2011, Dendreon's senior management (including Defendants) conducted detailed surveys and prepared numerous reports which showed the negative impact of these concerns on sales of Provenge, and which tracked cancellations of infusions due to these concerns.   These reports and surveys in turn were discussed at Dendreon's Board meetings.  Despite this open discussion amongst Dendreon's Board and its senior management of the troubling developments regarding reimbursement and treatment logistics, Defendants repeatedly assured investors that the Provenge launch was on track and failed to disclose any of this material, negative information to investors.

73.   *Second*, because the Provenge launch was performing so poorly, leaving the Company with low sales and excess capacity, Defendants decided in July 2010 (less than three months after launch) to secretly expand the rollout of Provenge beyond the approximately 50 launch medical centers.  In just the 2010 fourth quarter alone, Dendreon rolled out Provenge to an additional 28 medical centers, so that by the end of the year, there were 83 infusing medical centers in total.   Unbeknownst to investors, Dendreon proceeded to include the revenues generated by all 83 medical centers in Dendreon's reported revenues.   All the while, during conference calls and in other public statements, Defendants repeatedly claimed that, in 2010, Dendreon rolled out Provenge to just the 50 original medical centers.  In this manner, Defendants inflated their reported revenues and inflated the success of the Provenge launch.

74.   *Third*, because sales were in fact being impacted by physician concerns as to reimbursement and the logistics of treatment, quarter after quarter, Dendreon reported results that inevitably fell below analysts' expectations (even after including the revenues from the undisclosed medical centers).   To explain away Dendreon's underperformance, Defendants engaged in a further fraud by repeatedly attributing the underperformance to supposed capacity constraints.   In related misstatements, Defendants exaggerated the extent of waitlists amongst

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

physicians seeking to treat their patients with Provenge.  Defendants also reinforced the notion of capacity constraints by falsely stating that there were quotas on the number of patients that medical centers were allowed to treat.

75.   *Fourth*, to further assuage investor concerns, Defendants repeatedly and misleadingly assured investors that the Company was currently "on track" to treat 2,000 patients in the first 12 months of its launch.  However, just one month into the launch, this 2,000 patient target was already in jeopardy.  Therefore, Defendants shifted the goalposts to buy themselves more time: (a) first, by claiming that May 2010 should be ignored when calculating the 12 month period; (b) then, by claiming that, all along, they meant to say that most of the 2,000 patients would be treated in 2011 once additional workstations were approved at the NJ Facility; and (c) finally, by claiming that "within the first 12 months" meant by July 2011.  At each step of the way, Defendants hid from investors the true reason why Dendreon had to repeatedly push back the timetable for treating 2,000 patients, namely, that physician adoption of Provenge was simply poor.  In fact, when Defendants' fraud was finally revealed on August 3, 2011, investors learned that Dendreon still had not reached its goal of treating 2,000 patients.

76.   *Fifth*, in another attempt to pump up investor confidence, Defendants issued bullish guidance in November 2010 that Dendreon would earn revenues of $350-$400 million in 2011.  Defendants based this guidance on a financial revenue model that had two key metrics: (a) the number of infusing sites added in each quarter of 2011; and (b) the average number of patients each of these infusing sites would treat per week.  In providing the 2011 guidance, Defendants made assumptions as to each of these two metrics.  Within weeks of issuing their guidance, however, both assumptions were shown to be incorrect. ███████████

███████████████████████████████████████████

███████████████████████████████████████████

███████   Defendants publicly kept assuring investors that Dendreon was "on track" to reach its $350-$400 million guidance.  It was not until August 3, 2011 – more than 8 months after

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

concerns started materializing – that Defendants finally came clean, withdrawing their deliberately reckless guidance.

77.     While in the possession of the material, adverse non-public information concerning all the above issues, the Individual Defendants engaged in unlawful insider trading by selling large quantities of Dendreon stock.   During the Relevant Period, Defendants collectively sold 750,012 shares of Dendreon stock, reaping a total of over $37 million.   Other senior Company executives and directors on the Board collectively sold another 923,590  shares, generating another nearly $45 million in proceeds.

78.     Each aspect of Defendants' fraud is described in greater detail below.

## VII.    DEFENDANTS FAILED TO DISCLOSE THAT PHYSICIANS' REIMBURSEMENT AND LOGISTICS CONCERNS HAD DERAILED THE COMMERCIALIZATION OF PROVENGE

### A.    Even Before Launch, Defendants Internally Identified Physicians' Concerns About Reimbursement And Treatment Logistics As A Major Risk.

79.     Even before the launch of Provenge, Defendants were aware that reimbursement and logistics were critical to the successful commercialization of Provenge.

80.     On April 14, 2009, the Company announced that Provenge's "Phase III" clinical trials had yielded favorable survival results.   Approximately one month later, on May 13-14, 2009, Dendreon's Board held a meeting at which it was presented the commercialization plan for Provenge.   The commercialization plan called for an initial (or "Beta") site to be established in each MAC region, and for each Beta site to start with one patient.   Once Provenge was approved by the FDA, each site would administer the drug to one patient and file a claim for reimbursement from Medicare.   The plan anticipated that the Beta site would have to wait at least thirty days for reimbursement.   Reflecting the importance of obtaining reimbursement, the commercialization plan envisaged that whether the Beta site could take on more patients or whether other sites could be launched in the same MAC region would depend on the Beta site

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

being reimbursed successfully.  In other words, Dendreon's commercialization plan recognized that individual sites would be reluctant to treat more than one patient at a time, due to the need to first see reimbursement.

81.  Less than a month later, on June 9-10, 2009, Dendreon's Board met again to discuss Provenge's commercialization plan.  At this meeting, the Board received forecasts for the number of future Provenge patients.  Those forecasts, however, were subject to both "upside" and "downside" risks.  In particular, under "Provenge Patient Forecast Risks", one of the specific downside risks highlighted was "***Reimbursement issues***." (emphasis added).  The presentation also identified "physician and patient response" and "payer response" as the two primary challenges for Provenge's then still undetermined price.  The commercialization plan emphasized the importance of reimbursement, stating that the Company would seek out Beta sites that had "experience with reimbursement of high priced biologics" and that were "***willing to accept reimbursement risk***." (emphasis added).  In other words, Dendreon would target Beta sites where the physicians had experience with the risks of obtaining reimbursement for drugs with high costs.

82.  On September 22, 2009, the Board held another meeting ██████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

83.  On March 21, 2010, approximately a month before FDA approval, Dendreon's Board held another meeting. ████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

1  ████████████████████████████████████████████

2  ████████████████████████████████████████████

3  ████████████████████████████████████████████

4  ████████████████████████████████████████████

5  ████████████████████████████████████████████

6  ████████████████████████████████████████████

7  ████████████████████████████████████████████

8  ███████████████████████████████████████

9       84.    █████████████████████████████████

10 ████████████████████████████████████████████

11 ████████████████████████████████████████████

12 ██████████████████

13       85.    On April 29, 2010, the FDA approved the use of Provenge for the treatment of advanced prostate cancer in certain patients.  On the same day, Defendants issued a press release and held a conference call with financial analysts to discuss Provenge's commercialization. During this conference call, Defendant Gold described Provenge as the "Holy Grail of Oncology."  Defendant Bishop provided an overview of Dendreon's plans for commercialization and stated that Dendreon would make Provenge available to approximately 2,000 patients over the next 12 months.  Initially, Dendreon would make Provenge available through approximately 50 oncology and urology clinics, because these were the medical centers which had previously participated in the Provenge clinical trials.

       86.    During the call, Defendants also revealed for the first time that a single, one-month treatment for Provenge would cost $93,000.  As such, from the outset, investors were keen to know about potential reimbursement obstacles and peppered Defendants with numerous questions about the subject.  For example, during the conference call, an analyst from Rodman & Renshaw asked: "A quick question on the reimbursement and maybe the reimbursement code.

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

Can you take us through what happens now?"  Reflecting analysts' understanding that urologists had less experience and familiarity with high-cost treatments than oncologists, and were therefore more sensitive to reimbursement risks, another analyst from Leerink Swann & Company asked: "Of the 55 [infusion sites] you are planning for the next year or so, how many are urology versus oncology sites?"  Yet another analyst from Lazard Capital Management asked "are you going to extend credit to the doctors in advance of their reimbursement? Can you help us understand some of these logistical issues with regard to the initial launch? ... [O]nce the infusion is made, … is that tied, at all, to when the [insurance] payor pays or reimburses the physician?"

87.    Finally, Defendants were asked "what are the challenges for getting the drug out there?"  Defendant Gold responded that the challenge for Dendreon was that "demand for this product early on will exceed our ability to supply it in the marketplace."

88.    At no point in response to this or any of the other questions from analysts did Defendants discuss the reimbursement issues previously presented to the Board at the various meetings throughout 2009 and early 2010.

**B.**    **Immediately After Launch, Defendants Learned Of, But Failed To Disclose, The Significant And Growing Problems Caused By Physicians' Concerns Regarding Reimbursement And The Logistics Of Treatment.**

89.    It was not long before reimbursement and treatment logistics were again being highlighted as concerns.  However, despite the critical importance that Dendreon investors attached to the issue of reimbursement and treatment logistics, Defendants knowingly failed, or acted with deliberate recklessness in failing, to disclose physicians' concerns and pushback.

90.    In order to track their commercialization of Provenge, Dendreon employees prepared a "Provenge Weekly Performance" report ("Weekly Performance Report") which tracked key performance indicators such as the cumulative revenues to date, the number of

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

medical sites currently infusing Provenge, and the average infusions per site.   The reports
changed in format over time, but the substance remained the same during the Relevant Period.

91.   ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████

92.   Two days later, on May 20, 2010, Gold and Bishop spoke on a JP Morgan
Biotech CEO Conference Call.   In response to a question from an analyst "have you experienced
any initial pushback from any of the doctors now that use is outside of a clinical trial setting?",
Bishop stated "No, none."   On the question of Provenge treatment logistics, Bishop further stated
"we're not concerned about it at all … this won't be an issue for us going forward."   Thus, three
weeks into launch, Defendants were already misleading investors by making statements that
directly contradicted the Company's internal Weekly Performance Reports.

93.   ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████

94.   These concerns were in turn relayed, almost word for word, to Dendreon's Board.
On June 1-2, 2010, Dendreon's Board held a regularly scheduled meeting.   Defendants Gold and
Schiffman were present at the meeting, as were other senior members of management.   ████████
████████████████████████████████████████████
████████████████████████████████████████████

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

HUNG G. TA, ESQ. PLLC
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ████████████████████████████

5    95.    ███████████████████████████████████████████

6 ████████████████████████████████████████████████████

7 ████████████████████████

8    96.    Just a day later, at the Jefferies Global Life Sciences Conference, Schiffman gave

9 a presentation at which he referred to reimbursement and stated: "at this point in time we have no

10 indications of concerns from our standpoint otherwise."

11    97.    In reality, Defendants were very troubled by the pace of the launch.  ██████████

12 ████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████

19 ████████████  ██████████████████████████████████████

20 ████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████

22 ████████████████████

23    98.    Defendants, however, continued to present a different story to the public.   On

24 June 22, 2010, JP Morgan issued a research note stating that "Reimbursement also appears on

25 track."  This research note was based on, among other things, "conversations with management

26 [which] indicate no issues thus far."

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

99.     On June 23, 2010, at the NASDAQ OMX Investor Program, Gold stated "the reimbursement coverage has been going just as we had planned.  And so we are seeing no hurdles in terms of reimbursement for providing coverage for PROVENGE."

100.     On June 24, 2010, Schiffman gave a presentation at the Wells Fargo Securities Healthcare Conference, where he stated "I actually feel we're ahead of where our internal projections were if we look at reimbursement coverage ….  I'd say we're completely on track. We're in sync with all internal metrics, whether [it's] facility, build out, reimbursement or signing up with physicians and patients."

101.     ████████████████████████████████████████████████████████████ ████████████████████████████████  ████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████

102.     On July 21, 2010, the Board held a meeting ████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ Defendant Gold and other Company insiders were present at this meeting.

103.     ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████

104.     On August 3, 2010, Dendreon hosted a conference call to discuss its 2010 second quarter results.  During the call, Defendants referred to reimbursement as a "critical element to

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

1   the long-term success of Provenge", but did not reveal that reimbursement concerns had actually

2   already impacted the launch, as discussed internally over the last few months.

3       105.    Furthermore, during the call, an analyst from J.P.Morgan asked about the 500

4   prescriptions that Dendreon reported it had received so far: "The 500 prescriptions you've seen,

5   can you give a sense of how many of those translated into a single infusion and how many went

6   all the way to the three?"  Bishop stated: "Yeah, the majority of our prescriptions result in three

7   infusions."  This was false.  As described further below (*see* ¶¶111, 116), due to physician

8   concerns, a large number of prescriptions did not result in *any* infusions, let alone three

9   infusions.

10       106.    As a result of Defendants' material omissions and misstatements during the

11   conference call, the market was led to believe that reimbursement concerns for Provenge were a

12   "non-issue", as Cowen & Company concluded in an August 4, 2010 analyst report.

13       107.    Defendants continued to mislead the market.  On August 10, 2010, Schiffman

14   gave a presentation at the Canaccord Adams Global Growth Conference, assuring investors and

15   analysts that "as we look at where we're at from a reimbursement standpoint, we're probably

16   ahead of where we thought we would be at this point in time."

17       108.    Internal Company documents, however, showed that Schiffman's statement was

18   untrue. ███████████████████████████████████████

19   ███████████████████████████████████████████

20   ███████████████████████████████████████████

21   ███████████████████████████████████████████

22   ███████████████████████████████████████████

23   ███████     ████████████████████████████████

24   ███████████████████████████████████████████

25   ███████████████████████████████████████████

26   ███████████████████████████████████████████

Page 28 – **THIRD AMENDED COMPLAINT**
Case No. 2:13-cv-872-JLR

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

1

2

3      109.

4

5

6

7

8

9

10

11      110.    Amidst all of this negative feedback, Defendants were even contacted directly by

12 certain medical centers complaining about reimbursement and Provenge treatment logistics.

13

14

15

16

17      111.

18

19

20

21

22

23

24

25

26

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

112. ████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████

113.   On September 7, 2010, Dendreon held a meeting of its Operating Committee, which comprised numerous individuals including Bishop. ██████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
█████████  ██████████████████████  ██████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████

114.   On September 13, 2010, Defendant Gold gave a presentation to analysts and investors at the Morgan Stanley Global Healthcare Unplugged Conference.   Again, analysts asked about physician confidence in reimbursement.   During his presentation, Gold stated "We're very pleased with the way the launch is going from several perspectives. One is we're seeing excellent demand out there in the physician community. There's an incredible amount of awareness of this product in the patient community, and we're seeing smooth reimbursement coming through from both the private and public sector."

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

115.    On September 14, 2010, the Board held a meeting, at which Dendreon's senior management presented many of the findings discussed at the September 7 Operating Committee meeting.  Gold, Bishop and Schiffman were all present at this meeting, as were other Company insiders. ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████        In his presentation, Bishop identified reimbursement as a "key issue", and informed the Board that "[r]eimbursement confidence [is] not yet fully established." ███████████████████████████████████████████████████████

███████████████████████████        Customers reported "[r]eimbursement hassle and anxiety." ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████

116.    ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████        Again,

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

these statistics showed that Bishop had misled investors when he categorically stated during the August 3, 2010 conference call that the majority of prescriptions resulted in a full course of three infusions.

117.    Importantly, Dendreon's senior management attempted to quantify the risks to Dendreon.  Bishop presented the Board with a sensitivity analysis detailing how reimbursement issues could affect revenue.  The analysis concluded that reimbursement issues could contribute to a "*significant downside*" in revenues of more than $100 million, ███████████████████ ████████████████████████████████████████████████ ████████████████████████████        █████████████        A "positive reimbursement environment", in contrast, would have only a "modest upside" effect on revenues of between $50 and $100 million.

118.    Publicly, Dendreon management continued to tell investors a different story.  On September 14, 2010, the same day as Dendreon's Board meeting, Cowen & Company issued a research note, based on a "corporate update" meeting with Gold and Bishop.   Based on statements by Defendants, Cowen & Company stated that "there no longer appear to be any significant barriers to adoption (logistical, reimbursement, educational or otherwise) and sales are capacity constrained."

119.    On September 16, 2010, at the Bank of America Merrill Lynch Global Healthcare Conference, Schiffman stated, "We've seen reimbursement happen to the physicians for both private pay and public pay. …  I would expect over the next month and month and a half to get more in a steady state and get everybody comfortable, all the reimbursement processes are working over the next probably three months."

120.    However, throughout the second half of 2010, physicians continued to push back on adopting Provenge.  Indeed, some physicians were so nervous about reimbursement risk that they started to request "guarantees" from Dendreon.  ████████████████████████ ████████████████████████████████████████████████

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

121.    On October 21, 2010, the negative feedback continued.

122.    Physician concerns with reimbursement and treatment logistics were especially acute in the "Local" scheduling region.  Dendreon divided infusing sites into three "scheduling regions": "Local" (comprising the key markets of New York, New Jersey, Connecticut and Pennsylvania), "East" and "Central/West."

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

HUNG G. TA, ESQ. PLLC
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

1

2

3        123.    In public statements, Defendants continued to describe a different state of affairs.

4  On the November 3, 2010 conference call to discuss the Company's 2010 third quarter results,

5  Gold stated "[t]here's certainly more confidence in the reimbursement process today than there

6  was when we launched the product back in May."  In fact, Gold claimed, it was this confidence

7  amongst physicians which, when added to other factors, allowed them to hit the Company's

8  "peak" capacity in October.  When asked by an analyst to provide additional detail about the rate

9  of attrition/cancellations from prescription to actual infusions, Gold refused to disclose the

10 significant cancellations caused by physician concerns.   To the contrary, Gold misleadingly

11 stated that cancellations were unrelated to physician concerns but were, instead, attributable to

12 the Company's capacity constraints: "We're not putting that [cancellation] number out there [ ]

13 for the simple reason that we don't think it tells you anything about our underlying business. It's

14 related mainly to the supply constraint and that's going to be gone as we get more supply early

15 next year."

16       124.    During the call, Bishop also stated that "[a]n important topic I'd like to cover is

17 the reimbursement landscape…. We're pleased to report that we haven't seen any major impact

18 from the NCA on the prescribing behaviors of our customers."  Neither Bishop nor any of the

19 other Defendants disclosed any of the adverse facts presented in Dendreon's internal reports and

20 discussed at the previous Dendreon Board meetings.   This was despite analysts asking

21 Defendants specifically whether they had any information to share concerning physicians'

22 willingness to write prescriptions.  An analyst from Deutsche Bank asked: "I am just wondering

23 do you have any color about why at some centers there isn't as long of a waitlist, and doctors

24 aren't writing more scripts, and why at some centers they were?"

25       125.    Again, investors were reassured by Defendants' above omissions and

26 misstatements.  On November 4, 2010, RBC Capital Markets issued a report concluding that

Page 34 – **THIRD AMENDED COMPLAINT**
Case No. 2:13-cv-872-JLR

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

Defendants' "positive outlook" should quiet the "bear thesis" that "reimbursement logistics are a barrier" to Provenge's success.

126. On December 7, 2010, Dendreon's Board met. Gold, Bishop and Schiffman all attended the meeting. At the meeting, Bishop reiterated that one of the five "[s]trategic [i]mperatives" for 2011 was to "[e]liminate the perception of financial barriers" that apparently was inhibiting Provenge's successful commercialization, and informed the Board that the "key strategies" to address this were to "educate on billing and reimbursement", ███████████ ██████████████████████████████████████████ The Board also discussed the fact that the Company had not been utilizing its full manufacturing capacity since the launch of Provenge, and that physicians' reimbursement concerns were a major contributing factor (*see* further below, ¶203).

127. ████████████████████████████████████████████
████████████████████████████████████ ████████████
████████████████████████████████████████████████
██████████████

128. In early January 2011, Defendants continued to receive or be forwarded emails from medical centers expressing their mounting concerns and frustration with Provenge reimbursement and treatment logistics. ███████████████████████
████████████████████████████████████████████████
██████████████████████████ ██████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

129. ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

130.    On February 25, 2011, the Board held a special meeting before the upcoming March 1, 2011 release of the Company's 2010 fourth quarter and year-end financial results.  At this meeting, Defendant Gold discussed specifically "challenges related to reimbursement."  Defendant Schiffman was also present at the meeting.

131.    On March 1, 2011, Dendreon hosted a conference call to discuss its 2010 fourth quarter results.  Again, analysts were focused on reimbursement and pushback from physicians.  During this conference call, an analyst from Bank of America Merrill Lynch asked "what do you think the key resistance or pushback is going to be, is it around the messaging that this is a totally new product or in the logistics or just not understanding the data?"  Bishop responded that "we are seeing a lot of enthusiasm from customers about the product profile.  So, I don't expect we are going to get pushback there. … The other thing which we know we're going to have to be very focused on this year is reimbursement…. [W]e know that payment timelines are frustrating some of our accounts and that's something that we will need to be very focused on throughout the rest of this year."

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

132.    This answer was misleading.  Bishop failed to disclose the numerous reports of physician concerns and pushback regarding concerns with reimbursement treatment logistics. ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

133.    On March 9, 2011, the Board held a regular meeting.  Defendants Gold and Schiffman were present at the meeting, as were other Company insiders.  Defendant Bishop informed the Board that, of the potential Provenge providers surveyed, more than 65% had medium or low confidence that they would be reimbursed if they prescribed Provenge to one of their patients.  Bishop also advised the Board that 12 of 83 (or over 14%) of providers who had performed a Provenge infusion in 2010 had not yet scheduled an infusion in 2011 because of "reimbursement concerns or errors."

134.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮

135.    On April 7, 2011, Schiffman gave a presentation at the Leerink Swann Cancer Roundtable Conference.  Schiffman stated: "we're not aware of any situations at all where physicians are not believing that they're going to be paid for a product that has been prescribed on label."  This was clearly false, based on the reports he was receiving and the reports shared with the Board.

Page 37 – **THIRD AMENDED COMPLAINT**
Case No. 2:13-cv-872-JLR

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

136. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████        ████████████████████
████████████████████

137.     On May 2, 2011, Dendreon held a conference call to discuss its 2011 first quarter results.    On the call, Defendant Bishop acknowledged the importance of physicians' reimbursement confidence, stating that "One of the most important steps in activating a new account to write their first prescription is generating confidence in reimbursement. Our customers are very focused on time to payment."  However, Bishop did not disclose any of the negative facts discussed at the Company's Board meetings and reflected in the emails from physicians, and surveys and studies of physician prescribing behavior.

138.     On May 10, 2011, Schiffman gave a presentation at the Bank of America Merrill Lynch Health Care Conference.  During his presentation, Schiffman stated: "I think today people are very comfortable, the product is being paid … And so I think the reimbursement concerns, people want to make sure they're processing the paperwork correctly, but I don't think they have a strong concern on reimbursement."

139.     Dendreon's surveys of physicians, however, continued to show significant pushback. ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

1

2

3

4

5

6

7

8          140.    On June 22, 2011, the Board held its next regular meeting.  Defendants Gold,

9  Bishop and Schiffman all attended.  Bishop gave a presentation in which he informed the Board

10  that reimbursement concerns continued to constrain Provenge's sales.  Bishop reported that

11  "customers lack confidence, and fear of denial [is a] major brake on sales."

12

13                                                  Bishop reported the results of the most recent

14  physician ATU study, advising the Board that approximately 45% of the oncologists and

15  urologists the Company surveyed strongly agreed that their practices could not afford to advance

16  the cost of Provenge pre-reimbursement.

17

18

19          141.    On July 28, 2011, the Board convened a special meeting.  Gold, Bishop and

20  Schiffman all attended.  In an update presentation as to Provenge sales, the Board was told that

21  "*[m]ost [health care providers] (75%) still view Provenge reimbursement as onerous*" and that

22  "[f]actors relating to reimbursement are the largest barriers to Provenge usage." (emphasis

23  added).

24                                                         By this time, the Company was

25  estimating revenues for the 2011 fiscal year of only between $211-$224 million, well short of the

26

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

$350-$400 million guidance it had earlier given to investors in November 2010 (*see* ¶289 below).

**C.     Dendreon's Internal Reports Confirm Defendants' Knowledge, Soon After Launch, That Sales Of Provenge Were Being Negatively Impacted By Physician Concerns As To Reimbursement And Treatment Logistics**

142.    Dendreon's employees created several reports to track the progress of Provenge's commercialization.   These internal reports, which Defendants Gold, Bishop and Schiffman received, confirmed that physician concerns as to reimbursement and treatment logistics were negatively impacting sales of Provenge and derailing its commercialization.

143.    In addition to the Weekly Performance Reports described above, Dendreon's employees created plant Capacity Reports, excel spreadsheet reports which were disseminated via email on a weekly basis to top-ranking executives, including Defendants Gold, Bishop and Schiffman, and other senior executives such as the Senior Vice President – Global Commercial Operations (Nanda), the Senior Vice President of Operations (Heidi Hagen), and the Vice President of Finance (Greg Cox).   The Capacity Reports contained data about new and existing treatment schedules, as well as new and existing infusion sites.

144.    Over time, according to CW2, the Capacity Reports evolved into much more detailed reports known as "Prescription vs. Infusion Reports."   These reports displayed detailed information concerning the number of prescriptions and the number of infusions, month by month, for each individual medical center.   Based on this granular information, the Prescription vs. Infusion Reports assigned a color code "Green", "Yellow", or "Red" to each infusion site, based on the ability of the site to convert prescriptions into infusions.   Specifically, if the number of infusions in the current month was greater than the running average in the prior three months, the site was designated "Green" to indicate positive momentum.   If the number of infusions in the current month was less, the site was designated "red" to indicate negative momentum.   "Yellow" indicated the current month was flat compared to the running average of the prior three

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

months.  In this manner, based on the Prescription vs. Infusion Reports, Defendants knew in any given month precisely how many and which sites were treating patients, and the performance of each of these sites from month-to-month.  In short, Defendants cannot now claim that they were ignorant of, or surprised to later learn of, the information set forth in these internal reports.

145.    Relevant portions of a Dendreon Prescription vs. Infusion Report have been reproduced as Appendix A (the "Internal P&I Report").  The Internal P&I Report confirms the impact that reimbursement concerns were having on the willingness of physicians to prescribe Provenge, and when Defendants knew of these problems.  Specifically, the report shows that Defendants were aware of two material, negative developments.  First, at the approximately 50 medical centers chosen by Dendreon as the sites with which to launch Provenge, infusions dropped quickly after the first few months.  Second, with respect to subsequent "waves" of medical centers signed on by Dendreon to provide infusions, the performance was even worse.

146.    According to Defendants, Dendreon began by focusing on approximately 50 medical centers to provide infusions, chosen because these medical sites had previously participated in the Company's clinical trials of Provenge and therefore were familiar with the treatment.  So much is true, and is corroborated by the Internal P&I Report, which shows that, between May 2010 and September 2010, Dendreon "onboarded" or "in-serviced" 55 individual sites, all of which had provided at least one infusion by the end of September 2010 (*see* Appendix A-1).

147.    ██████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290



148.

149.

150.    In short, Defendants knew from the Internal P&I Report that a significant proportion of the initial 55 sites (who supposedly had the greatest familiarity with Provenge) were reluctant prescribers and were generating shrinking repeat business.

Page 42 – **THIRD AMENDED COMPLAINT**
Case No. 2:13-cv-872-JLR

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

151.    Furthermore, the performance of subsequent in-serviced sites was even worse. Unbeknownst to investors (and representing a separate fraud in itself, as described further in Section VIII below), Dendreon had in fact already commenced in-servicing many additional medical centers apart from the initial approximately 50 sites.  In just the period from October 2010 through December 2010, Dendreon in-serviced an additional *28* medical centers, all of which had begun providing infusions to patients by the end of the year, as reflected in the Internal P&I Report (*see*  Appendix A-2).  Thus, unbeknownst to investors, there was a total of *83* infusing medical centers by the end of 2010.

152.    The importance of the newer infusion sites to Provenge's commercialization plan cannot be understated.  On Dendreon's November 3, 2010 conference call, Defendant Gold explained that the "50 initial infuser sites that we've selected were selected because they participate in our clinical trials [and] weren't necessar[ily] sites where you would see high volumes of prostate cancer patients…. As we move forward, we're identifying sites that are classic high volumes of late state prostate cancer patients and those will be the sites that we bring up on board next…. [T]hose are the sites that are the classic high [ ] prescribers."  Later on the call, Defendant Bishop elaborated that, in the next wave of sites being in-serviced, Dendreon would be "targeting the top decile of prescribers and they're going to be our focus."  Therefore, the performance of the newer infusion sites was critical to the successful commercialization of Provenge.

153.    As Defendants knew from the Internal P&I Report, however, the newer sites were even more reluctant to prescribe Provenge than the initial sites which had participated in Dendreon's clinical trials.  ███████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████

Therefore, by the end of 2010, Defendants knew that the purportedly "top decile" of "high

1  prescriber" sites with "high volumes" of prostate cancer patients were, contrary to Defendants'

2  representations to investors, delivering much less infusions than the initial approximately 50

3  sites.

4       154.   The weak performance continued with the next wave of sites in-serviced by

5  Dendreon during the first quarter of 2011.   During that quarter, Dendreon in-serviced an

6  additional 52 medical centers, as reflected in the Internal P&I Report (*see* Appendix A-3),

7  resulting in a cumulative total of 135 in-serviced infusion sites by the end of March 2011.  (This

8  is confirmed by Defendants' statements to investors that the Company exited the 2011 first

9  quarter with a total of 135 active sites.)  However, the infusion performance of these newly in-

10  serviced 52 sites was just as poor as the performance of the 28 sites in-serviced in the 2010

11  fourth quarter.  ███████████████████████████████████

12  ████████████████████████████████████████████████

13  ████████████████████████████████████████████████

14  ████████████████████████████████████████████████

15  ████████████████████████████████████████████████

16  ██████████████████████████

17       155.   ██████████████████████████████████████

18  ████████████████████████████████████████████████

19  ████████████████████████████████████████████████

20  ███████████████████████████████  As Defendants revealed on a March 1,

21  2011 conference call, the financial model underlying Dendreon's 2011 revenue guidance

22  depended on all the sites treating, on average, between 1-2 patients a month – that is, achieving

23  an ***Average IWA of 1.0***.  As Defendants therefore knew, a critical assumption underlying their

24  business model had been proven to be incorrect.  Yet Defendants never disclosed this fact to

25  investors.

26

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

**D.** **Physicians' Slow Adoption Of Provenge Caused Dendreon To Miss Both Its Internal 2010 Target And Analyst Expectations.**

156.    On January 29, 2010, prior to the Provenge launch, Gold presented the Company's corporate goals for 2010.  These goals were intended to set benchmarks for assessing incentive compensation at the end of 2010. ████████████

████████████████████████████████

████

157.    ███████████████████████████

███████████████████████████████

███████████████          █████████████

███████████████████████████████

███████████████████████████████

██████████████████████████

158.    Even with their lower internal number, Dendreon failed to reach their 2010 budgeted revenues due to the slow adoption of Provenge caused by physician concerns over reimbursement and treatment logistics. █████████████

███████████████████████████████

███████████████████████████████

███████████████████

159.    ███████████████████████████

███████████████████████████████

█████████████████

160.    ███████████████████████████

███████████████████████████████

███████████████████████████████

█████████████████

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

HUNG G. TA, ESQ. PLLC
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

161.    In the end, Dendreon recorded 2010 revenues of just $48.1 million, missing their budgeted revenues ███████████████████ and analyst consensus estimates by even more.

**E.    Confidential Dendreon Witnesses Confirm That Defendants Were Aware Sales Of Provenge Were Being Negatively Impacted By Physician Concerns As To Reimbursement And Treatment Logistics**

162.    Dendreon's sales representatives operating in the field confirm that physician concerns as to reimbursement were negatively impacting sales, and that Defendants were aware of this.

163.    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

164.    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

165.    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

1 ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3 166.   According to CW2, the impact of all these different factors on revenues was

4 frequently discussed by the Individual Defendants and other senior executives.  Every Monday,

5 the Individual Defendants and Dendreon's senior executives attended a so-called "Commercial

6 Team" meeting at the Company's headquarters during which they discussed the prior week's

7 performance, including how many Provenge treatments were scheduled, how many treatments

8 were performed, and where the Company stood in terms of capacity.   CW2 attended

9 approximately twelve such meetings.  In addition, every Tuesday, the Individual Defendants held

10 Executive Committee meetings with the Company's Senior Vice President of Operations to

11 discuss the status of the Provenge launch, including all the details from the previous week and

12 any hot topics from the week.  At the weekly Executive Committee meetings, the participants

13 also discussed the Company's reports, sales trends and forecasts.

14 167.   According to CW2, the reasons for Provenge's poor performance were openly

15 discussed at the Commercial Team meetings.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22 168.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

1 ████████████████████████████████████████████████

2 █████████████████████████

3   169.   ████████████████████████████████████████

4 ████████████████████████████████████████████████

5 ████████████████████████████████████████████████

6 ████████████████████████████████████████████████

7 ████████████████████████████████████████████████

8 ████████████████████████████████████████████████

9 ██████████

## VIII.   TO   COVER   UP   DENDREON'S   UNDERPERFORMANCE,   DENDREON SECRETLY BEGAN TO SIGN UP ADDITIONAL INFUSION SITES IN 2010

170.   When Dendreon announced the launch of Provenge on April 29, 2010, Defendants stated that they initially would make the treatment available through approximately 50 medical centers, which medical centers were chosen because they had previously participated in the Company's clinical trials of Provenge and therefore were familiar with the treatment. However, due to the poor launch of Provenge caused by physician concerns as to reimbursement and treatment logistics, Dendreon decided less than three months into the launch to effect a major change in strategy and to immediately sign up additional medical centers.  The reason was that Dendreon needed to make up the missing sales.   In addition, because of the poor performance of the launch medical centers, Dendreon had ample spare capacity.

171.   The decision to add new infusing medical centers was all done in secret. ***Dendreon never told investors of the plan, and Dendreon never told investors that these additional medical centers had begun delivering infusions before the end of 2010.*** Importantly***, Dendreon never told investors that it included sales from these additional medical centers in the Company's reported revenues for 2010***.  To disclose any of these facts would have been to admit that the launch was not going to plan.  As described below, without the sales

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

from these additional medical centers, Dendreon would have missed its revenue targets – both budgeted and analysts' consensus estimates – even further.

172. ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████

173.   On August 3, 2010, during Dendreon's 2010 second quarter conference call, an analyst raised the precise issue of which sites were issuing the prescriptions that Dendreon had received so far.  Bishop responded that: "right now all the numbers we gave you are associated with – are approximately 50 sites that were part of trials that we started out with."

174. ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████

175.   The rollout of Provenge to additional infusing sites was an open secret amongst Dendreon's senior management, including Gold, Bishop and Schiffman. ████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

176. ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████

177.    All in all, by the end of 2010, there were a total of *83 sites* that had delivered at least one infusion, 66% higher than the "approximately 50" sites that Defendants repeatedly claimed.  As reflected in Appendix A-2, the undisclosed second wave of 28 sites added in the 2010 fourth quarter allowed Dendreon to record another ████ *infusions* in that quarter, or an additional ████████ *in revenues*.  This constituted nearly ████ of Dendreon's reported 2010 fourth quarter revenues of $25 million, and ████ of Dendreon's 2010 full-year revenues of $48.1 million.  Without the additional revenues, Dendreon would have missed its budgeted revenues and consensus estimates by an even greater margin.

178.    To avoid having to disclose the existence of these newer sites, and the fact that Dendreon had incorporated revenues from these newer sites, Defendants affirmatively lied to investors. ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

179.   On the November 3, 2010 conference call, Gold proceeded to mislead investors that "we've done very little to build awareness beyond our sales force activity *focused on our 50 early infuser accounts*." (emphasis added).

180.   On December 15, 2010, at the Deutsche Bank BioFEST conference, Deutsche Bank analyst Robyn Karnauskas asked Defendant Schiffman: "And in the U.S. [ ] you are increasing the number of sites that you'll be giving the drug?"  Schiffman lied, stating: "We are, that's a process that we are *just starting* …" (emphasis added).

181.   On Dendreon's January 7, 2011 conference call, Karnauskas again asked point blank "how many centers do you have now up and running?" Defendant Bishop lied: "Yes, Robyn, so you know, we said several times that obviously we started with around 50 centers. We finished the year *with slightly more than that*." (emphasis added).  Defendant Bishop failed to state that there were in fact 66% more infusion sites, and that their revenues were already being included in the reported 2010 fourth quarter revenues.

IX.   **TO FURTHER COVER UP DENDREON'S UNDERPERFORMANCE, DEFENDANTS MISLED INVESTORS THAT DENDREON WAS CAPACITY CONSTRAINED, AND THAT THIS CAUSED WAIT LISTS AND QUOTAS TO BE IMPOSED ON INFUSION SITES**

182.   As the commercialization of Provenge progressed, Defendants' failure to disclose the impact of physicians' reimbursement concerns became increasingly problematic. Specifically, because of the critical information being withheld by the Company, analysts and investors continued to maintain high expectations for sales of Provenge, unaware that physician concerns were negatively impacting sales.  As a result, the disconnect between analysts' and investors' expectations, on the one hand, and the Company's actual performance, on the other, grew increasingly wider.  Every time Defendants reported the Company's quarterly financial results during the Relevant Period, investors were inevitably disappointed.

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

183.    To assuage investor concerns, and to further deflect attention from the real underlying causes, Defendants engaged in a further fraud by repeatedly attributing the underperformance in 2010 and early 2011 to Dendreon's supposed capacity constraints.   In related misstatements, Defendants also exaggerated the number of patients who were waiting for infusions at medical centers across the country.   Furthermore, Defendants claimed that due to capacity constraints, Dendreon had to impose quotas on the number of Provenge treatments to be supplied to each medical center.

184.    All of these statements were false.  Dendreon had ample capacity from the date of launch, especially for the "Local" region, the most important sales market in the United States. ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ███████████████████████████████████   Furthermore, the real capacity situation reflected in Appendix B was an open secret amongst all levels of Dendreon's management as well as employees at the NJ Facility, and a constant subject of discussion in internal communications, internal reports and during Board meetings.

185.    Set forth below is a detailed description of what Defendants knew about Dendreon's capacity and when, and what Defendants said that was contrary to what they knew.

186.    ████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████   Capacity constraints thus were clearly not the reason for this underperformance.

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

187. ████████████████████████████████████
████████████████████████████████████████████
████████████████████

188.   On June 23, 2010, at the NASDAQ OMX Investor Program, Gold gave a presentation and stated "we know the demand for [Provenge] is incredibly high" and that "the vast majority of these [initial] infusion centers have substantial waiting lists for PROVENGE and they're waiting for us to bring additional capacity."  Gold also stated: "We've allocated each of these … initial infusion sites, about two to three patients a month, okay and the demand is exceeding that."

189. ████████████████████████████████████
████████████████████   ████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

190. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

191.   Despite the internal reports and presentations to the contrary, Defendants continued to represent that Dendreon was capacity constrained.  On August 3, 2010, Dendreon hosted a conference call to discuss its 2010 second quarter results.  During the call, Bishop stated that Dendreon was experiencing a "supply constraint for a period of time."  Gold similarly stated

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

1    "we ramped up and had almost full capacity for a couple of weeks in July." ████████████

2    ███████████████████████████████████████████████████

3        192.    Unsurprisingly, when asked to provide more details about Dendreon's capacity,

4    Defendants played cat-and-mouse with investors.  During the call, an analyst from Canaccord

5    Adams asked: "[Y]ou talked about New Jersey being at full capacity for two weeks…. Can you

6    give us more details about what full capacity means …?"  Bishop responded: "We are not giving

7    any more detailed guidance about that. We've given you before revenue ranges, reach of our

8    facilities and that's where we're going to stay right now."

9        193.    In addition, Defendants affirmed the existence of waiting lists and quotas.  During

10   the conference call, Bishop stated that "many [ ] physicians continue to have extensive waiting

11   lists of patients eager to receive Provenge" and, later, that "[w]hat I can tell you is that the

12   majority of our centers tell us that they have waiting lists."  When asked by an analyst about their

13   previous guidance concerning a quota of 1-2 patients per infusing site, Bishop confirmed that the

14   quota was still in place, stating that only when the additional capacity was approved in early

15   2011 would "we able to offer our existing infusers additional capacity."  These statements were

16   clearly false, ███████████████████████████

17       194.    On September 15, 2010, Bishop presented at the Baird & Co. 2010 Health Care

18   Conference.  During his presentation, Defendant Bishop again stated that "we are supply

19   constrained."

20       195.    On September 16, 2010, at the Bank of America Merrill Lynch Global Healthcare

21   Conference, Schiffman stated, "we have limited capacity at launch …."

22       196.    ████████████████████████████████████

23   ████████████████████████   ████████████████████████

24   ████████████████████████████████████████████

25   ████████████████████████████████████████████

26   ████████████████████████████████████████

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

HUNG G. TA, ESQ. PLLC
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290



197.

198.    Despite operating at just ████ of the Company's maximum capacity in October, Gold proceeded to mislead investors that the Company was operating at capacity.   On Dendreon's November 3, 2010 third quarter conference call, Gold stated numerous times that "clearly the demand out there is exceeding our ability to supply the market", that Dendreon was still "in a capacity constrained environment", and that the Company was currently experiencing a "supply constraint" – problems which Gold assured would be "resolved once additional capacity comes online" in early 2011.  Even more specifically, Defendant Gold stated that the Company reached its peak capacity in October 2010, stating that "clearly in October [2010] [we were] getting to the level where we're at around our monthly capacity limit" and, further, that "in October [2010], [ ] we're essentially at our peak capacity to be able to supply the market."  Gold explained that "[r]evenue for October was approximately $9.5 million [306 infusions]….  Our October revenue performance is close to our average maximum capacity of approximately $9 million to $10 million per month."

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

HUNG G. TA, ESQ. PLLC
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

199.    Bishop similarly stated that "the first point to reinforce is that we have got queues across the majority of the country … we're selling our capacity" and that "[w]e continue to see strong demand across the majority of the country, with most sites having waiting lists."  Bishop stated that Dendreon was experiencing "long waiting lists in many parts of the country due to our limited capacity" and that once additional capacity was available, the problem of waiting lists would be "behind us."

200.    Based on what had been presented to the Board at the September 14, 2010 meeting, all these statements by Bishop and Gold were false.

201.    In fact, prior to the conference call, Schiffman even expressed concern about how Dendreon's capacity statements were misleading investors.  ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████

202.    Defendants continued to make false statements about Dendreon's capacity.  On November 11, 2010, Gold made a presentation at the Credit Suisse 2010 Health Care Conference.  During his presentation, Gold stated that the capacity available at the NJ Facility was "[not] enough capacity to supply the demand that's out there in the market" and emphasized repeatedly that "we are in a capacity-constrained environment for this year."

203.    On December 7, 2010, Dendreon held a Board meeting.  Defendants Gold, Bishop and Schiffman all attended and openly discussed the fact that the Company had not been utilizing its full manufacturing capacity since the launch of Provenge.  ██████████████

███████████████████████████████████████████████

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

1 ██████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████

3 ██████████████████████████████████████████████████████

4 ██████████████████████████████████████████████████████

5 ██████████████████████████████████████████████████████

6 ██████████████████████████████████████████████████████

7 ██████████████████████████████████████████████

8    204.    Just eight days later, on December 15, 2010, Schiffman presented at the Deutsche

9 Bank BioFEST Conference.  During the conference, Schiffman reiterated that "the vast majority

10 of all sites that we talk with do have a good-sized queue of patients they want to get in and be

11 able to write scripts and they are waiting."  When Deutsche Bank analyst Robyn Karnauskas

12 noted that her checks indicated some sites had no queues, Schiffman affirmed that "I'm not

13 aware of any [sites] that don't have any in a queue."  When he was further asked: "Can you

14 remind [us] how many slots per center do people get?", Schiffman affirmed that there was a

15 quota, answering "it is very limited. It is two to three slots that physicians are getting and as you

16 look at that, pretty much all the centers are filling their slots."  These statements were false,

17 ██████████████████████████████████████████████████████

18 ████████████    In fact, because of the excess availability, Dendreon had to start adding new

19 infusion centers to soak up the available capacity.

20    205.    The Company continued to operate below capacity through the end of the fourth

21 quarter and into early 2011.  The table below summarizes the total number of monthly infusions

22 in 2010 and early 2011, immediately prior to the approval of more workstations at the NJ

23 Facility in March 2011:

24

25

26

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

| **2010** | **No. of Infusions** |
|----------|----------------------|
| May | |
| June | |
| July | |
| August | |
| September | |
| October | |
| November | |
| December | |
| **2011** | **No. of Infusions** |
| January | |
| February | |

206.   If the Company were indeed "capacity-constrained", as Defendants repeatedly claimed, one would have expected the monthly number of infusions to be *consistently at or around the same high number* of 306 recorded in the month of October.  As reflected in the table above, however, in the next four months from November 2010 through February 2011, the Company supplied only ▮▮▮▮▮▮▮▮▮ infusions respectively, never again reaching the 306 infusions recorded in October 2010.   Although Defendant Schiffman stated during the November 3, 2010 conference call that Dendreon expected November and December  revenues to be "slightly below October's $9.5 million … because of holidays and the need to cease production for some routine periodic maintenance", Defendants did not offer any such excuses for January and February 2011.  The reduced number of infusions for January and February 2011 therefore belies Defendants' repeated claims that the Company was in a capacity-constrained environment and that its financial underperformance was attributable to these purported capacity constraints.

207.   Despite the ample available capacity, Defendants continued to mislead investors.  On January 7, 2011, Dendreon hosted a conference call at which it pre-announced its expected financial results for the 2010 fourth quarter.  In his opening prepared remarks, Gold reassured investors that demand for PROVENGE was robust, and repeatedly asserted that sales for Provenge remained low only because "we are in a capacity constrained environment in 2010"

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

and "we're still in this capacity constrained environment."  Bishop similarly stated that, in 2011, the Company would "get rid of the supply constraint" they were currently experiencing.

208.    On January 10, 2011, Defendant Gold gave a presentation at the JP Morgan Healthcare Conference.  At the conference, Gold stated that Dendreon was currently "[u]tilizing existing 25% of [the] New Jersey facility, currently near maximum monthly capacity."

209.    On March 1, 2011, Dendreon reported its actual 2010 fourth quarter results, which confirmed sales of just $25 million.  Nevertheless, Defendant Gold boasted that, "[i]n Q4, we sold out our capacity in most geographic areas" and that the disappointing sales resulted from the Company being "capacity constrained."  Bishop reinforced these statements, stating that "we are still in the same supply constrained environment."

210.    During the March 1, 2011 earnings conference call, Defendants took steps to hide the truth when analysts came close to uncovering the real facts as to the Company's purported capacity constraints.  Previously, when infusions were increasing month-to-month, resulting in increasing revenues, Defendants had trumpeted the monthly revenue numbers.  Thus, on the Company's November 3, 2010 third quarter conference call, Defendant Schiffman stated "[r]evenue associated with the sales of PROVENGE for July was $5.2 million, $7.2 million in August, $7.8 million in September and $9.5 million for the month of October…. [W]e've continued to see our revenues increase month-over-month since the product launch in May."

211.    In contrast, after January and February 2011 produced weaker figures of only ███ ████████, generating revenues of █████████████████ respectively (below the Company's "maximum" capacity of 306 infusions or $9.5 million in October 2010), Defendants refused to disclose monthly revenue numbers to investors, because this would have revealed to analysts the number of infusions in those two months.  On the Company's March 1, 2011 conference call, an analyst from Bank of America Merrill Lynch pointedly asked: "Are you disclosing January sales?"  Defendant Gold artfully deflected the question by referring to the Company's expected overall *quarterly* number:

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

> Rachel, we gave guidance for the year which is $250 million to $400 million for the year which we expect approximately half of that will occur in the fourth quarter of this year. In addition, for the *first quarter*, we said that we are still in a capacity constraining environment and our peak capacity is $9 million to $10 million a month and that's what you should expect in terms of revenue for *Q1*. (emphasis added).

212.    Not only was this answer non-responsive, it was false and misleading because the January and February 2011 infusion/revenue numbers unequivocally showed that the Company was not in a "capacity constraining environment."  As a result, taking their direction from these assurances, a number of analysts published reports that same day affirming their positive outlook for Dendreon.   For example, RBC Capital affirmed its "Outperform" rating based on management's "confidence in patient demand", including Gold's representation "that all regions of US sold out in Q4, except NYC."  Canaccord also affirmed its "Buy" rating for Dendreon, noting that "management indicated strong demand for Provenge."

213.    In fact, Dendreon's excess capacity was even greater. █████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

214.  ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

215. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

216.     On April 7, 2011, Schiffman presented at the Leerink Swann Cancer Roundtable Conference.  During his presentation, Schiffman stated that "we've been completely sold out in capacity."

217.     On May 2, 2011, Dendreon reported its financial results for the first quarter of 2011.  Although sales of Provenge were a disappointing $28.1 million, once again Defendant Gold reassured investors that the poor sales were attributable to a supposed lack of manufacturing capacity.  Gold stated that at "a majority of the sites across the country there's still some sites that have waiting lists associated with them."

218.     On May 10, 2011, Schiffman gave a presentation at the Bank of America Merrill Lynch Health Care Conference.  During the presentation, Schiffman repeated the myth that the Company had operated under capacity constraints and had to impose quotas, stating that during the last year, "[w]e had a very limited amount of capacity.  We signed on 50 sites that were all clinical trial sites and we limited them to one to two patients purely because of our capacity."

219.     Even after the revelation of their fraud on August 3, 2011, Defendants continued to mislead investors.  On August 10, 2011, Defendants Gold and Bishop gave a presentation at the Canaccord Genuity Growth Conference.  During the conference, Defendants Gold and

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

Bishop again stated that the "initial launch was capacity constrained", reassuring investors that this impediment to sales had now been removed.

## X. DEFENDANTS MISLED INVESTORS THAT DENDREON WAS "ON TRACK" TO TREAT 2,000 PATIENTS, OR DELIVER 6,000 INFUSIONS, IN THE FIRST 12 MONTHS OF LAUNCH

220.    In order to further assure investors that the Provenge launch was on track, Defendants repeatedly claimed that they were currently on track to achieve their guidance of treating 2,000 patients in the first 12 months of launch.  However, as set forth below, Defendants were aware almost from the start that they were not on target to reach that milestone, and had to repeatedly extend the end date for the "first 12 months" in order to buy more time and allow Defendants to continue to claim that Dendreon was on track with their 2,000 patient guidance. All the while, Defendants pretended that nothing had changed with their guidance.  Investors were thus misled because they never learned the real reason why Defendants repeatedly changed the parameters of the 2,000 patient guidance: the Provenge launch was progressing badly.

221.    On April 29, 2010, on the investor conference call to discuss the FDA approval of Provenge, Defendant Bishop first announced that "[o]ver the next 12 months, we'll provide Provenge to approximately 2,000 patients.  This is consistent with past guidance we've shared as we will be launching Provenge with only 25% of our New Jersey facility."  In other words, Defendants were claiming that they could treat 2,000 patients in the first 12 months with just the initial 12 approved workstations at the NJ Facility.  Over the course of numerous investor meetings and conference calls, Defendants made it clear that investors should regard treating 2,000 patients as the equivalent of selling 6,000 infusions.

222.    In fact, during the April 29 conference call, Defendants indicated that the 12 workstations could in theory treat *more than* 2,000 patients.  Citigroup analyst Lucy Lu asked: "So assuming that 25% of the facility is online, can I assume the New Jersey facility will be able, eventually, to take care of 8,000 patients per year?"  Bishop responded: "don't extrapolate those

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

patient numbers I shared to broader capacity assumptions.  And the reason for that is that we're not actually operating New Jersey at 100% of that 25% initially."  In other words, Bishop implied that if the 12 workstations were operating fully, Dendreon would be able to treat more than 2,000 patients.

223.    Shortly following the investor conference call, Gold reaffirmed in a May 3, 2010 letter, "We are proud to be able to provide PROVENGE to approximately 2,000 patients … within the first 12 months."  On the same day, at a Deutsche Bank Health Care Conference, Schiffman echoed to analysts and investors, "And as we look over the first 12-months, we believe that we will be able to provide PROVENGE to approximately 2,000 patients."

224.    Almost immediately after launch, however, reimbursement concerns were such a problem that Defendants began to discuss shifting the goalposts for attaining the 2,000 patient/6,000 infusion target.  In early June, Defendants internally began discussing the need to give themselves more time and to emphasize that more of the 2,000 patients would be treated in 2011 than in 2000, when the additional 36 workstations would be approved at the NJ Facility.

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████  However, this was clearly misleading, because Defendants previously had told investors that Dendreon could reach 2,000 patients with just the 12 initially approved workstations.

225.    ████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████  By shifting the goalposts in this manner, Defendants were able to claim that they were still on track.

Page 63 – **THIRD AMENDED COMPLAINT**
Case No. 2:13-cv-872-JLR

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

226.    On June 8, 2010, Schiffman gave a presentation at the Jefferies 2010 Global Life Sciences Conference presentation.  During his presentation, Schiffman stated: "So certainly when we look at the $180 million in revenue [*i.e.* 2,000 patients] that we'd approximately get in the first year, more of that will happen next year than this year. We're on track for the 2,000 patients and everything is consistent with what we've had as expectations for a ramp and a launch."

227.    On June 9, 2010, Schiffman gave a presentation at the Needham 2010 Health Care Conference.  During the presentation, Schiffman again stated that the Company was on track to treat 2,000 patients in the first 12 months.  Schiffman noted that "[w]e do expect to see those patients back-loaded somewhat next year given that early next year we will have the rest of the capacity of New Jersey coming on line, increasing that capacity by a favor of three, so we have four times the capacity early next year as we have today."

228.    On June 16, 2010, Schiffman gave a presentation at the Goldman Sachs Healthcare Conference.  Schiffman stated, "we'll have about 2000 patients processed in the first 12 months."   He also assured investors and analysts, "We are pleased to say that we've made tremendous progress and we're on track with our launch at this point in time.  All the internal metrics that we established have been hit."

229.    On June 23, 2010, at the NASDAQ OMX Investor Program, Gold gave a presentation, during which he stated, "we can provide PROVENGE to about 2,000 patients during the first 12 months of the commercialization of the product.  And we expect more patients to be part of that in 2011 as oppose to 2010, as we bring up additional capacity from our New Jersey plant, okay?"  He then clarified, "So there is a tail to the 2,000 patients that we are treating during the first 12 months and it's weighted heavily into when the New Jersey facility comes online early in 2011."

230.    On June 24, 2010, Schiffman gave a presentation at the Wells Fargo 2010 Securities Healthcare Conference.  During the conference, Schiffman stated: "I guess if you look

Page 64 – **THIRD AMENDED COMPLAINT**
Case No. 2:13-cv-872-JLR

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

at the launch and the components of it, I feel we're on track in terms of actual bringing patients in, it's in line with our model, it's in line with our projection for the 2,000 patients."

231.   On August 3, 2010, Dendreon issued a press release announcing Dendreon's second quarter results and providing a further update on the current progress towards treating 2,000 patients in the first 12 months.  The press release stated that "Dendreon is on track to provide Provenge to approximately 2,000 patients over the first 12 months of the launch and to date has already received prescriptions from more than 500 patients."

232.   During the Company's conference call on the same day to discuss these results, Bishop made sure to shift the goalposts: "I'd like to reiterate our guidance of treating approximately 2,000 patients over the first 12 months of launch. I'll also remind you this number relies on the additional capacity becoming available following the build out and subsequent regulatory approval of the remaining 75% of our New Jersey facility, and so a significant percentage of these 2,000 patients will be treated early in 2011."  Later on the call, Bishop stated that Dendreon was on track: "I would reiterate [ ] that we said, at the time of the launch we expect to treat about 2,000 patients over the first 12 months, we're on track with that."

233.   As the twelve-month milestone in fact neared, Dendreon was still far from reaching 2,000 patients/6,000 infusions, forcing Defendants once again to extend the timeframe for achieving the goal, this time by a *further three months* to mid-2011.  During the Company's November 3, 2010 third quarter conference call, an analyst asked whether "you still expect to treat 2,000 patients, which calculates up to 6,000 doses, by the end of April 2011 as per your original guidance."  Gold responded that the "guidance was principally given [ ] to get patients educated on the capacity constraints that we'll be facing at the time of approval…. May [2010] was principally a start-up month for us so we expect that number to be hit sometime *mid-year*." (emphasis added).  On the Company's January 7, 2011 conference call, Defendant Gold defined "mid-year" as being July 2011.  In this manner, Defendants misled investors by failing to admit

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

that they in fact had extended the timeline for meeting the 2,000 patient goal, and by failing to disclose the underlying reason that the Provenge launch was progressing badly.

234.    Even as this twice-extended deadline of July 2011 came closer, the ability of Dendreon to hit the 2,000 patient milestone caused consternation amongst Defendants. ███

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████

235.    Despite being told they were short of their 2,000 patient goal, Bishop continued to publicly state that Dendreon was "on track." On the same day, Dendreon hosted a shareholder conference call to discuss its 2010 fourth quarter results. In his prepared remarks, Bishop stated: "We are on track with providing PROVENGE to approximately 2,000 patients by the end of July. Our U.S. manufacturing operations is performing well."

236.    ██████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████

237.    On May 2, 2011, during a conference call to discuss Dendreon's 2011 first quarter results, Bishop proceeded to state that "we are on track to provide Provenge to approximately 2,000 patients by the end of July."

238.    In the end result, Dendreon badly missed the 2,000 patients/6,000 infusions milestone. As the Dendreon revealed on August 3, 2011, the Company recorded cumulative revenues from May 2010 through July 2011 of just *$146 million*, or just 4,732 infusions (the

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

equivalent of 1,577 patients) – approximately 22% less than the 2,000 patients/6,000 infusions Defendants repeatedly assured investors that the Company was "on track" to accomplish.

## XI.   DEFENDANTS FALSELY ASSURED INVESTORS THAT DENDREON WAS CURRENTLY "ON TRACK" TO ACHIEVE 2011 REVENUES OF $350-$400 MILLION

239.   In addition to deflecting attention from Dendreon's underperformance by making false assurances concerning the Company's current, on track progress towards treating 2,000 patients, Defendants repeatedly assured investors that Dendreon was currently "on track" to achieve $350-$400 million in revenues in 2011.

### A.   Defendants' Financial Model Underlying The $350-$400 Million Guidance

240.   On the Company's November 3, 2010 third quarter conference call, Defendants told investors for the first time that the Company would record revenues of $350-$400 million for Provenge in 2011.  To put that in perspective, in order to generate $350-$400 million of revenues in 2011, Dendreon would have needed to treat approximately 3,760 to 4,300 patients in 2011 (assuming each patient obtained a full course of three infusions at a cost of $93,000) – representing a *doubling* of the 2,000 patients that they said they would treat within the first 12 months of launch.  Despite already being behind on the 2,000 patient target, Defendants assured investors that they could achieve the projected 2011 revenues.

241.   Defendants based their 2011 revenue guidance on a financial model (the "2011 Revenue Model"), which Bishop explained to the Board at a December 7, 2010 meeting.

Page 67 – **THIRD AMENDED COMPLAINT**
Case No. 2:13-cv-872-JLR

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

242.    Defendants believed that they could achieve the above quarterly numbers of infusions (revenues) based on assumptions as to two key variables.  First, Defendants assumed that they would add new accounts at a certain run-rate, resulting in ███████████████ infusing (actually infusing, not just in-serviced) accounts at the beginning of the 2011 1Q, 2Q, 3Q and 4Q, respectively (the "Run-Rate").  Second, Defendants assumed that the infusing accounts would have an ***Average IWA of 1.0***.  In other words, the 2011 Revenue Model required as follows:

### 2011 Revenue Model

| Quarter | No. of Infusing Accounts at Beginning of Quarter | No. of Infusing Weeks in Quarter | Average Infusions per Week per Account | Total No. of Infusions in Quarter | Quarterly Revenues |
|---|---|---|---|---|---|
| 2011 1st Quarter | █ | █ | █ | █ | ██████ |
| 2011 2nd Quarter | █ | █ | █ | █ | ██████ |
| 2011 3rd Quarter | █ | █ | █ | █ | ██████ |
| 2011 4th Quarter | █ | █ | █ | █ | ██████ |
| **Total** | | | | ████ | ██████ |

243.    Therefore, the Average IWA of 1.0 and the Run-Rate became the two key metrics underlying the 2011 Revenue Model.  Dendreon's employees in turn continually referred to these two metrics when judging their progress towards achieving the Company's 2011 revenue guidance.

244.    In their public statements, Defendants confirmed the two parts of the 2011 Revenue Model.  On the Company's March 1, 2011 conference call, Defendants stated that they modeled their $350-$400 million guidance based on the number of sites they expected to in-service and the expected number of patients they expected each site to treat.  Defendants stated that "[o]n average we expect that this year these sites will prescribe PROVENGE to about ***one to***

Page 68 – **THIRD AMENDED COMPLAINT**
Case No. 2:13-cv-872-JLR

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

*two patients per month* at first and we expect that number to increase into next year." (emphasis added).  One to two patients per month per account equates to an average of 4.5 infusions per month per account, which in turn equates to an Average IWA of 1.0.

245. █████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████.

**B.**     **Despite Falling Behind On The Assumptions Underlying The 2011 Revenue Model, Defendants Continued To Mislead Investors That Dendreon Was "On Track"**

246. Even before Dendreon announced its $350-$400 million guidance, one of the two key assumptions was already proving to be incorrect. ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

1    ██████████████████████    As alleged above, Defendants also knew this from Capacity

2  Reports and Prescription vs. Infusion Reports, and the data set forth in Appendix A.

3         247.    ████████████████████████████████████████████

4  ████████████████████████████████████████████████████████

5  ████████████████████      █████████████████████████████

6  ████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████

12 ██████████████████████████████████████████████

13        248.    Nanda's warnings about issuing guidance were ignored.  On November 3, 2010,

14 at Dendreon's 2010 3Q conference call, Gold, Bishop and Schiffman proceeded to announce

15 guidance of $350-$400 million in revenues for 2011.  By November 18, 2010, Nanda had been

16 terminated.

17        249.    Within just weeks, Nanda's warnings proved prescient.  Internally, numerous

18 questions were being raised as to the feasibility of attaining the 2011 guidance.  ████████████

19 ████████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████████

21 ████

22        250.    ████████████████████████████████████████████

23 ████████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

1 ████████████████████████████████████████████████████████

2 ███████████

3 251.   ███████████████████████████████████████████████

4 ████████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████

11 ██████████████████████████████████████████████

12 252.   ███████████████████████████████████████████████

13 ████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████████

18 █████████████

19 253.   Just two days later, on December 10, 2010, Gold entered into a Rule 10b-5

20 trading plan with Merrill Lynch to sell his Dendreon stock.  Under the plan, Gold warranted that

21 "I have established the Plan in good faith, in compliance with the requirements of Rule 10b5-1,

22 and at a time when I was not aware of material nonpublic information about the Shares or the

23 Issuer."  This representation was clearly false.

24 254.   On January 5, 2011, David Munno of SAC Capital Advisors (Dendreon's second

25 largest shareholder) emailed Gold, stating: "There is a ton of confusion about your guidance and

26 we've spent the last 3 days (not to mention the prior 6 weeks, 6 months, etc.) talking to people

Page 71 – **THIRD AMENDED COMPLAINT**
Case No. 2:13-cv-872-JLR

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

HUNG G. TA, ESQ. PLLC
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

who think you are lying, don't believe #s [numbers], and say there is no credibility in anything you guys say."

255.    Through January and February 2011, Dendreon's sales performance continued trending below the benchmarks in the 2011 Revenue Model.  On January 31, 2011, a Weekly Performance Report was circulated indicating that Dendreon would miss its 2011 first quarter revenue target ███████████████████████      ███████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████

256.    On February 9, 2011, Dendreon's Board held a telephonic conference during which they received a "Commercialization Update" from Gold and Bishop.  ████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
██████████████████████████████████████

257.    ████████████████████████████████████████████████████████
████████████████████████████████      ███████████████████████████████████
███████████████████████████████████████████████████████████████████████
████████████████████████████████████████████.

258.    ████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
██████████████████████████████████████████

259.    Critically, Dendreon's early 2011 performance was off track when measured against both key metrics underpinning Dendreon's 2011 Revenue Model.  ████████████████
███████████████████████████████████████████████████████████████████████

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

260.    On March 1, 2011, Dendreon held its fourth quarter earnings conference call. Analysts again quizzed Defendants about their progress towards achieving $350-$400 million in 2011 revenues.  An analyst from Deutsche Bank asked: "To meet your guidance, you're going to have to have a lot of patients to get treated in 2Q [2011].  Will there be patients already in the system when you get approved [for the New Jersey facility] in the Q, so that when the facility is approved, they'll have slots?"  During his presentation, Defendant Gold stated that Dendreon's guidance "is $350 million to $400 million for the year, of which we expect approximately half of that will occur in the fourth quarter of this year."  Gold assured investors that Dendreon was "well-positioned to execute on our plans this year, to achieve our year-end revenue guidance" of $350-400 million in revenues.  Gold failed to disclose that Dendreon in fact had fallen behind on both of the assumptions underlying its 2011 Revenue Model.

261.    During the March 1 conference call, Defendants knowingly misled investors in another way.  Bishop stated that "by the end of quarter two, we expect to have around 225 accounts that will have been in-serviced and are prepared to treat their first patients."  In making this statement, Bishop failed to disclose that this was actually *behind* the Run-Rate required by Dendreon's 2011 Revenue Model.  That model required Dendreon to have ███ infusing accounts by the end of the 2011 second quarter.  Thus, Bishop misled investors by converting the Company's under-performance into a positive fact.

Page 73 – **THIRD AMENDED COMPLAINT**
Case No. 2:13-cv-872-JLR

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

262.    On March 8, 2011, Schiffman gave a presentation at the Cowen & Company Health Care Conference.  During his presentation, Schiffman stated: "What we need to see on average is about one to two orders a month by site, and that's consistent with what we've seen with our launch, to be able to hit the guidance that we've put out there."  This was false, because Dendreon at that time certainly was not observing 1-2 patients per site per month (*i.e.* an Average IWA of 1.0).

263.    On March 9, 2011, the Board held a meeting at which Bishop provided a commercial overview.  Gold and Schiffman were both present.  Bishop informed the Board that Dendreon was behind on both key metrics underlying its 2011 Revenue Model, ██████████

264.    ████████████████████████████████████████████████████

265.    ██████████████████████████████████████████████████

266.    ██████████████████████████████████████████████████

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████

267.     Most importantly, as Defendants were aware, accelerating the addition of new accounts did not solve the underlying problem because the newer accounts also had to be high-quality accounts capable of *sustaining* the required Average IWA.  As Defendants repeatedly acknowledged in their communications internally and to investors, and as their own internal reports were showing, the newer accounts delivered less infusions and were less receptive to adopting Provenge.  It was the newer accounts which were, in fact, dragging down the overall Average IWA.

268.     In this manner, the April 4, 2011 Weekly Performance Report demonstrated that Dendreon was not on track with its 2011 revenue guidance.  In fact, the April 4, 2011 Weekly Performance Report was, in essence, the first of several *reforecasts* that Dendreon would conduct over the next several months.

269.     On April 6, 2011, Schiffman made a presentation to investors and analysts at the Needham & Company Healthcare Conference.  During that presentation, he stated: "We've given revenue guidance for this year of between $350 million to $400 million. Given the low amount of capacity that we had at launch, it is back-end loaded. This capacity coming on throughout the year and we expect approximately 50% of that revenue to occur in the fourth quarter, with a very strong exit rate as we enter into 2012."  During the question and answer session, Schiffman was asked about Dendreon's guidance for Provenge.  In response, he stated that "with L.A. or Atlanta on board, either of those facilities, we would be able to hit our fourth quarter guidance."

270.     On April 7, 2011, Schiffman made a presentation to investors and analysts at the Leerink Swann Cancer Roundtable Conference.   During the question and answer session,

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

Schiffman was asked to provide a sense of where Dendreon was tracking with respect to the number of patient accounts.  Without identifying any of his statements as "forward-looking", or providing any accompanying cautionary language or referring to any written documents that might contain cautionary language, Schiffman responded as follows: "So – and actually, *I think these goals or metrics, this is probably where we're tracking closest inside the organization* as the real key this year is we've got the capacity, we see it coming online.… And I think we have the revenue guidance out there where we're looking for $350 million to $400 million, but approximately half of that in the fourth quarter just tied to how our facilities are coming online." (emphasis added).  Schiffman added that "what we're looking for is essentially, on average, one to two accounts, and one or two patients a month per account.  *And we're hitting our guidance*." (emphasis added).  Schiffman knew, based on the actual Average IWA and the number of infusing accounts as reported in the Weekly Performance Reports, that these statements were false.

271.    In April, Dendreon decided to hire Robert Rosen as the new head of Global Commercial Operations, replacing Nanda. ████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

272.    ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████            ██████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

█████████████████████████████████████████████████████

███████

273.    Despite at least *two* internal reforecasts of 2011 revenues, Dendreon publicly continued to affirm that it was on track to meet its 2011 revenue guidance of $350-$400 million. On May 2, 2011, Dendreon issued a press release disclosing its 2011 first quarter financial results.  In that press release, Dendreon again stated to investors: "Dendreon continues to expect revenue this year of between $350-400 million with approximately half of that anticipated in the fourth quarter."  On Dendreon's 2011 first quarter conference call for investors and analysts that same day, Defendant Gold stated that "[w]e continue to expect revenue this year of between $350 million and $400 million, with approximately half of that expected in the fourth quarter. To put this year's anticipated revenues in perspective, it will rank among the top product launches in oncology history."  Defendant Bishop stated that "during the second quarter, we expect to utilize on average an additional 12 workstations…. We believe we have carefully budgeted our capacity to meet our revenue guidance for 2011 of $350 to $400 million."

274.    Relying on Defendants' repeated assurances that it was currently on track to achieve $350-$400 million in 2011 revenues, analysts issued research reports repeating Defendants' representations that Dendreon was "on track" to achieve that metric.  On May 2, 2011, Deutsche Bank reported that "[e]verything looks on track to meet '11 sales guidance of $350-400M in Provenge sales."  On the same day, research analysts at Collins Stewart also reported that "DNDN is on-track to meet its FY11 revenue guidance of $350M-$400M."

275.    On May 10, 2011, Schiffman gave a presentation to investors and analysts at the Bank of America Merrill Lynch Health Care Conference.  During his presentation, Schiffman stated: "And we are looking to achieve revenues of between $350 million to $400 million for the year, which we think puts this in one of the top launches of any novel oncology product." Despite Dendreon being significantly behind on their addition of new infusing accounts, Schiffman stated that "[w]e're on track to meet a goal of 500 accounts infusing by year end,

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

again a 10x increase of where we launched last year."  In addition, even though the Average IWA at the time was ■■■ (less than the benchmark 1.0, the equivalent of 1-2 patients per month), Schiffman continued to state: "We're expecting for the year to see on average one to two patients per account per month."

276.    On May 13, 2011, Gold gave a presentation at the Canaccord Genuity conference. During his presentation, Gold continued to state that Dendreon "expect[s] 1-2 patients on average per account per month this year."

277.    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

278.    On May 26, 2011, RBC Capital Markets met with Dendreon management, and then released a research note to investors stating that "Management Meetings Confirm Our View of Green Lights Ahead" and "Business *on track* at DNDN." (emphasis added).  RBC stated that "Management reiterated confidence in guidance of $350-400M."

279.    ████████████████████████████████████████████████████████████████████████████████████████████████████████████

280.    On June 3, 2011, Defendants spoke at a reception held during the ASCO Annual Meeting.  Based on Defendants' statements, Cowen & Company issued a research note stating that, based on their "opportunity [ ] to speak to senior DNDN management", "[w]e believe the commercial timelines, goals, and milestones laid out by management are on track."  Similarly, Gleacher & Company issued a research note stating: "we came away from the Analyst & Investor Reception feeling comfortable about the launch trajectory of Provenge", the "launch of

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

Provenge remains on track", and "management expressed optimism about the ongoing launch of Provenge."

281.    On June 7, 2011, Defendant Schiffman made a presentation at the Goldman Sachs Global Health Care Conference.   During the question-and-answer session, Schiffman was directly asked by a Goldman Sachs research analyst: "The one question I really want to make sure we touch on is 2011 guidance. I mean there is a lot of focus on – or a lot of nervousness I should rather say that whether you will hit that or not. So assure us why will you hit that guidance, and how do you get there, the guidance update?"   Without identifying any of his statements as "forward-looking," or providing any accompanying cautionary language or referring to any written documents that might contain cautionary language, Schiffman responded: "So as we look at the guidance, I think we looked at it several different ways. But in the end, the critical metrics for us to hit our guidance and I think what we're sharing – and thus far if we looked at the data we've released I think we were **on track** – it's getting accounts signed up" (emphasis added).   Schiffman also stated that "[t]he early metrics are in line that it seems like **we're hitting what we need to achieve it**. It's not – I'm not going to downplay that Hans has a heck of a job ahead of him and it's keeping him very busy because it is a substantial growth of the substantial launch, but one that **thus far seems to be going well**." (emphasis added).

282.    These statements were false because, as Schiffman knew, Dendreon was behind on the "critical metrics for us to hit our guidance", namely the Average IWA and the number of infusing accounts required by the 2011 Revenue Model.   Schiffman even admitted at the conference that "[w]e need to start prescribing. And then we need to see the uptick where **on average we're seeing it, across all accounts, one to two [patients]. And it needs to be in that range per month, per account** [*i.e.* an Average IWA of 1.0] **to hit our guidance**." (emphasis added).   However, Schiffman failed to disclose that the Average IWA had already fallen way below 1.0, and was just ▮▮▮ as of the end of May 2011.

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

283.    By June, Defendants were in a state of panic as to their revenue guidance. ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮

284.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

285.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

286.    At the June 22, 2011 Board meeting, Bishop informed the Board of the significant

physician concerns with reimbursement. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

287.    Publicly, Defendants continued to mislead investors.  On June 29, 2011, Leerink

Swann issued a research note, based on "our visit to the company yesterday."  As a result of their

discussions with Dendreon's management, Leerink Swank stated that "[t]he number of

commercial sites that have been signed up for infusion have far exceeded management

expectations."  Given that Dendreon was behind on the number of infusing accounts needed to achieve its 2011 revenue guidance, this information provided by management was clearly misleading.

288.  By the end of June, Dendreon continued to fall behind on both key metrics underlying its 2011 Revenue Model. ███████████████████████████████

██████████████████████  Furthermore, the strategy of adding new accounts to make up for the lower number of average infusions was shown to be an utter failure. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████

289.  In July, Dendreon's senior management finally decided to present to the Board the true picture as to 2011 revenues. █████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████   ██████████████████████████

█████████████████   ███████████████████████████████████

Demonstrating that senior management had known of the problems for some time, the Board was also informed that Dendreon had frozen hiring in early July.

290.  ███████████████████████████████████████████

███████████████████████████   ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

291. █████████████████████████████████████████████████████████████
████████████████

292.     It was not until August 3, 2011 that Defendants finally came clean with investors. During the conference call to discuss Dendreon's 2011 second quarter results, Defendants threw in the towel and announced that Dendreon was withdrawing its 2011 revenue guidance.

293.     In trying to explain away Dendreon's underperformance, however, Defendants continued to mislead investors.  On the conference call, Gold stated that "[b]y the end of the second quarter, we had more than 265 accounts infusing PROVENGE which was in excess of our guidance of 225. At the end of July, we had more than 300 accounts that have infused PROVENGE."  In suggesting that Dendreon was progressing well by continuing to add new infusing accounts at a rapid pace, Gold misled investors because he omitted to disclose that the 265 accounts figure was in fact behind the ████ figure needed under the 2011 Revenue Model. Gold also failed to disclose that, as reported to him at the end of June, a substantial number of those accounts were actually inactive, and had not infused in the last month.  In addition, Gold failed to disclose that the total number of infusing accounts by itself was meaningless, ████████
███████████████████████████████████████████████████████████

294.     During his prepared remarks, Gold also stated: "I think a fair question to ask is why didn't we see this trend earlier? Keep in mind for the initial 12 months of our launch, we were capacity constrained and we did not see the real impact of the reimbursement headwinds until after additional capacity was brought online. It wasn't until the July revenue was known and the trends for early August orders came in that we realized the growth would be more gradual than we had anticipated."  Later on the call, in response to a question, Gold again stated that "while we [were] in a capacity-constrained environment, these [reimbursement] issues didn't pop up."  These statements were all false because, as Gold knew, Dendreon had not been capacity constrained for the first twelve months (*see* Section IX above.).  That was simply a fiction created by the Company to explain away its underperformance.  In addition, as described

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

above, revenues did not start deteriorating, and Defendants did not learn of the deterioration, starting only in July.  Instead, Defendants were already *reforecasting* revenues much earlier in 2011.

295.    Defendants made other statements suggesting that Dendreon's setback was recent and temporary.  When an analyst pointed out that the type of workforce reduction proposed by Dendreon was "typically [ ] for something longer term", Gold responded that "I think, where you are seeing us today is really reflecting a more gradual launch curve than we had anticipated both for 2011 and for 2012."  Gold also stated that "we are going to continue to keep our facilities staffed at a level that allows us to respond very rapidly to when these reimbursement changes do take hold in the physician community, so we're in a position that we can respond to them very rapidly."  On numerous other occasions during the call, Defendants referred to the "more gradual launch curve" and "more modest growth" for the remainder of the year.

296.    In this manner, even as Defendants withdrew their 2011 revenue guidance, Defendants continued to mislead investors.  By emphasizing the number of accounts added and the recent nature of their setback, ███████████████████████████████████ ████████████████████████████ Defendants conveyed the impression that Dendreon's setback was temporary, and that the timeline for Dendreon achieving its sales targets merely had been pushed out several quarters.  In reality, the problems with Provenge were permanent. Among other reasons, as Defendants were aware, Dendreon had already targeted most of the universe of eligible medical centers and, of this universe, a small proportion of medical centers accounted for the majority of sales.  Continuing to add newer accounts would not alter the sales trajectory.

297.    The Confidential Witnesses confirm the state of panic at Dendreon in 2011 as senior management grappled with the declining sales performance.  Defendants were urged on numerous occasions by Dendreon's sales officers to lower the Company's financial guidance to bring it in line with reality.  This is confirmed by CW2, who was very involved in Provenge's

pre-launch meetings and had constant communications with the executive leadership through attendance at the weekly Commercial Team meetings, and through ongoing interaction with the Senior Sales Director and the Director of Global Marketing and Commercial Operations.

298. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

299. Ultimately, confirming the falsity of Defendants' statements, Defendants missed their guidance of "$350-400 million in 2011 revenues" by approximately *35% to 43%*. On January 5, 2012, Dendreon announced full-year sales of Provenge in 2011 of just $228 million, significantly below the Company's Relevant Period guidance of $350-$400 million.

## XII.  DEFENDANTS FURTHER MISLED INVESTORS BY FAILING TO DISCLOSE THE INFORMATION REQUIRED BY SEC REGULATION S-K, ITEM 303.

300. SEC Regulation S-K requires that every Form 10-Q filing (quarterly report) contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K. The MD&A disclosures are intended to provide material historical and prospective textual disclosures which enable investors to more accurately assess the financial condition and results of operations of the company. As the SEC explained in Financial Reporting Release 36:

Page 84 – **THIRD AMENDED COMPLAINT**
Case No. 2:13-cv-872-JLR

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.

301.    Item 303(a)(3)(ii) imposes an affirmative obligation on companies to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).  The SEC has provided guidance on Item 303, clarifying that disclosure is necessary "where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations." Management's Discussion and Analysis of Financial Condition and Results of Operations, Exchange Act Release No. 33-6835, 43 S.E.C. Docket 1330 (May 18, 1989).

302.    To help illustrate the types of disclosures required by Item 303, the SEC provides the following example in which a company discloses the reasonably likely material effects on operating results of a known trend in the form of an expected further decline in unit sales of mature products:

> While market conditions in general remained relatively unchanged in 1987, unit volumes declined 10% as the Company's older products, representing 40% of overall revenues, continue to approach the end of their life cycle. Unit volumes of the older products are expected to continue to decrease at an accelerated pace in the future and materially adversely affect revenues and operating profits.

303.    In breach of their obligation under Item 303 of Regulation S-K, Defendants failed to disclose in Dendreon's Form 10-Qs/Form 10-K filed May 10, 2010, August 3, 2010, November 3, 2010, March 1, 2011, May 2, 2011, and August 3, 2011 the following trends and

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

uncertainties that were known by Defendants and that were likely to have a material impact on Dendreon's financial conditions and results of operation:

- the significant concerns amongst physicians regarding reimbursement, "cost density" and treatment logistics, and the impact this was having on the rate of adoption of Provenge by physicians;

- the declining trends in Provenge sales, as reflected in several reforecasts by Dendreon employees, which trends directly contradicted Dendreon's 2011 revenue guidance of $350-$400 million; and

- the declining trend in the Average IWA of infusion sites and the slow addition of new infusion sites, both of which metrics had fallen behind the benchmarks underlying Dendreon's 2011 Revenue Model.

304. By failing to disclose the above information, Defendants misled Dendreon's shareholders.

## XIII. DEFENDANTS AND OTHER COMPANY INSIDERS ENGAGED IN UNLAWFUL INSIDER TRADING WHILE IN POSSESSION OF MATERIAL, <u>NON-PUBLIC INFORMATION</u>

305. During the Relevant Period, while knowingly in possession of the material, adverse non-public information described in Sections VII to XI above, Defendants Gold and Schiffman, as well as numerous other Dendreon officers and directors, disposed of large quantities of their personal holdings of Dendreon stock.  Specifically, Dendreon's officers and directors collectively disposed of approximately ***$82 million*** of Dendreon stock between April 29, 2010 and August 3, 2011, led by CEO Gold (who sold over $33 million of stock); General Counsel, Richard F. Hamm (approximately $18 million); Chief Science Officer David L. Urdal (over $10 million); and CFO Schiffman (over $4 million).  The unlawful insider trading of Dendreon's officers and directors is set forth below:

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

| Insider | Date of Sales | Shares Disposed | Proceeds | Percent of Holdings |
|---|---|---|---|---|
| Gold (Chief Executive Officer) | 4/29/2010 | 400,000 | $20,405,120 | 64% |
| | 4/30/2010 | 154,887 | $8,473,790 | |
| | 3/3/2011 | 19,000 | $627,505 | |
| | 3/25/2011 | 19,000 | $630,908 | |
| | 4/25/2011 | 19,000 | $773,454 | |
| | 5/25/2011 | 19,000 | $759,939 | |
| | 6/27/2011 | 19,000 | $735,169 | |
| | 7/25/2011 | 19,000 | $728,964 | |
| Schiffman (Chief Financial Officer) | 4/30/2010 | 54,125 | $3,042,009 | 21% |
| | 11/19/2010 | 27,000 | $1,021,772 | |
| Hamm (General Counsel and Secretary) | 4/29/2010 | 90,000 | $4,592,637 | 60% |
| | 4/30/2010 | 183,960 | $10,255,734 | |
| | 9/16/2010 | 16,828 | $704,593 | |
| | 5/6/2011 | 9,113 | $357,074 | |
| | 5/23/2011 | 51,457 | $2,011,017 | |
| Urdal (Chief Science Officer) | 4/30/2010 | 40,000 | $2,157,348 | 41% |
| | 8/4/2010 | 40,000 | $1,568,300 | |
| | 8/25/2010 | 7,369 | $264,781 | |
| | 8/30/2010 | 7,369 | $268,588 | |
| | 9/2/2010 | 5,000 | $200,000 | |
| | 9/3/2010 | 5,000 | $205,000 | |
| | 9/7/2010 | 12,369 | 501,643 | |
| | 9/8/2010 | 10,000 | $411,850 | |
| | 9/9/2010 | 10,000 | $425,500 | |
| | 9/10/2010 | 4,000 | $166,440 | |
| | 3/29/2011 | 85,716 | $3,000,060 | |
| | 4/15/2011 | 14,211 | $593,767 | |
| | 4/18/2011 | 2,035 | $84,819 | |
| | 4/21/2011 | 1,016 | $41,697 | |
| | 7/15/2011 | 5,312 | $208,177 | |
| | 7/17/2011 | 2,035 | $78,205 | |
| | 7/21/2011 | 1,015 | $39,331 | |
| Frohlich (Chief Medical Officer) | 4/30/2010 | 43,599 | $2,373,530 | 35% |
| | 8/4/2010 | 4,283 | $171,320 | |
| | 10/18/2010 | 2,855 | $107,565 | |
| | 12/3/2010 | 7,896 | $303,536 | |
| | 1/18/2011 | 2,855 | $105,018 | |
| | 1/21/2011 | 2,250 | $79,347 | |
| | 4/14/2011 | 4,282 | $171,2800 | |
| | 4/21/2011 | 3,230 | $130,751 | |
| | 5/3/2011 | 18,000 | $731,371 | |
| | 7/21/2011 | 3,230 | $126,402 | |
| Cox (Vice President Accounting/ Finance) | 5/3/2010 | 14,460 | $796,920 | 74% |
| | 5/25/2011 | 11,174 | $454,782 | |
| Bayh (director) | 4/29/2010 | 56,550 | $2,997,207 | 48% |
| Canet (director) | 5/26/2010 | 4,000 | $174,176 | 100% |
| | 12/14/2010 | 4,456 | $161,837 | |

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

HUNG G. TA, ESQ. PLLC
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

| | | | |
|---|---|---|---|
| | 6/3/2011 | 5,000 | $206,900 | |
| Clark (director) | 5/3/2010 | 8,744 | $477,510 | 100% |
| | 8/20/2010 | 7,500 | $280,967 | |
| Dziurzynski (director) | 5/24/2010 | 30,000 | $1,330,191 | 80% |
| | 6/14/2010 | 16,250 | $634,593 | |
| | 3/11/2011 | 33,000 | $1,086,703 | |
| Watson (director) | 4/30/2010 | 36,171 | $2,045,998 | 78% |
| **TOTAL** | | **1,673,602** | **$81,824,615** | |

306.   Not only were these trades made by the Company insiders while in possession of material, non-public information, they were dramatically out of line with their prior trading, both in terms of size and timing.

307.   The above insider sales during the Relevant Period were extraordinarily large both in absolute and percentage terms.  For example, Defendant Gold sold 668,887 shares at an average price of nearly $50 per share, generating proceeds of over $33 million.  These sales represented approximately 64% of the total shares he held/acquired during the Relevant Period (whether available for sale or not).  Hamm, Dendreon's General Counsel and Executive Vice President of Corporate Development, sold 351,358 shares for approximately $18 million, representing 60% of his total holdings.  Likewise, Defendant Schiffman sold approximately 21% of his total holdings, for proceeds of more than $4 million.

308.   The directors on Dendreon's Board also sold unusually large amounts of their Dendreon Stock during the Relevant Period.  While in possession of material, adverse non-public information about Dendreon, Directors Bayh, Canet, Clark, Dziurzynski and Watson sold between approximately 50% and 100% of their holdings during the Relevant Period.

309.   In addition to being substantial in absolute and percentage terms, the timing of the insider selling was in marked contrast to the timing of prior selling activity.  For example, during the period from April 29, 2010 to August 3, 2011, the number of shares sold by Defendant Gold (668,887) reflected an increase of *140%* compared to the number of shares he sold (279,207) during the entire preceding five year period (beginning on April 29, 2005, and ending on April

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

28, 2010, and excluding sales on April 29, 2009[1]).  Also, the proceeds of Gold's sales during the period April 29, 2010 through August 3, 2011 ($33,134,849) reflected an increase of more than **737%** compared with the proceeds of all sales he made during the preceding five year period ($3,956,911).  To underscore just how suspicious was the timing of his sales, Defendant Gold sold 19,000 shares on July 25, 2011, just one week approximately before Defendants' fraud was finally revealed on August 3, 2011, as described below.

310.    Similarly Schiffman's sales during the period April 29, 2010 through August 3, 2011 stood in stark contrast to his sales during the preceding five-year period – reflecting an approximately **400%** increase in the number of shares sold (81,125 compared to 16,190) and an increase of over **700%** in terms of sale proceeds ($4,063,781 compared to $511,794).

311.    ***Significantly, none of the Defendants – including Gold and Schiffman – purchased a single share of Dendreon stock on the open market during the Relevant Period***.

312.    Defendant Gold's entry into a Rule 10b5-1 plan does not provide him with an affirmative defense with respect to his insider trading, because Gold entered into the plan while in possession of material, non-public information about Dendreon, and because Gold did not enter into the plan in good faith.  On December 10, 2010, seven years after becoming CEO and while in possession of material nonpublic information with respect to the reimbursement concerns of physicians, Gold implemented a trading plan pursuant to SEC Rule 10b5-1.  Prior to this, Gold had never implemented such a plan during his entire time with Dendreon.  Importantly, at the time he entered into this plan in December 2010, Gold was aware of the material, non-public information described in Sections VII to XI above.

313.    Even the pattern of Defendant Gold's trading under his Rule 10b5-1 plan reflects his lack of good faith.  In the first week after the launch of Provenge, Gold sold 554,887 shares

---

[1] To ensure a meaningful comparison, all trades on April 29, 2009 are excluded because these trades occurred on the day after Dendreon's stock price plummeted 69% in 75 seconds and then dramatically rebounded to its original price, which caused of a flurry of irregular trading and was the subject of a NASDAQ investigation.

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

for proceeds of nearly $29 million.  Then, before entering into the Rule 10b5-1 plan, Gold sold an average of 2,544 shares per trade.  However, once the 10b5-1 plan was implemented in December 2010, around the time when the problems with Provenge's commercialization were becoming manifest, the frequency of Gold's selling increased significantly, and his sales under the plan skyrocketed to 19,000 shares per trade.  Cumulatively, Gold sold 114,000 of the 286,764 shares allowed under the plan, or nearly **40%** – all within five months of the plan's implementation, and just before the revelation of Defendants' fraud on August 3, 2011.  In fact, Gold sold 19,000 shares on July 25, 2011, just one week before the August 3, 2011 corrective disclosure.

314.    The seemingly fortuitous timing and amounts of Defendants' insider selling has sparked public outrage.  As *CBS Moneywatch* reported on August 3, 2011, Dendreon has been "bedeviled" by insider transactions and "a general lack of transparency from CEO Mitchell Gold. … *Retail investors are already asking how long Gold has known he could not meet his revenue targets*" given that the August 3, 2011 conference call was scheduled back on July 8, 2011 and "*Gold sold roughly $1 million in DNDN stock between the scheduling and today's retraction*." (emphasis added).

## XIV.   DEFENDANTS' FRAUD IS REVEALED

315.    Ultimately, as a result of the ever-widening discrepancy between investors' expectations and Dendreon's poor performance as described above, Defendants were forced to admit the truth.  Defendants were forced to reveal not only that physicians' concerns with reimbursement and treatment logistics were negatively impacting demand, but also the falsity of Defendants' representations as to capacity constraints and their repeated assurances that the Company was "on track" to achieve its financial metrics.

316.    On August 3, 2011, after the market closed, Dendreon halted trading in its securities and issued an announcement that for the first time revealed the extent of Defendants' fraud.  Specifically, the Company announced that: (i) notwithstanding the Company's additional

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

manufacturing capacity in the second quarter of 2011, the Company's second quarter sales totaled only $49.6 million, which was well below the market's estimates of approximately $58 million; (ii) the Company was abandoning its previous revenue guidance of $350-$400 million for 2011 and now expected only "modest quarter over quarter revenue growth for the remainder of the year"; (iii) the Company would be reducing its workforce and other expenses to align with its "manufacturing requirements" for Provenge; and (iv) the disappointing results were attributable to physician concern over reimbursement for Provenge, which Defendant Gold now stated would result in a "gradual" adoption of Provenge.

317.   In a conference call held later that evening to discuss the announcements, Defendants made several additional revelations.  Defendant Gold admitted that "reimbursement still remains the most prominent concern amongst physicians prescribing Provenge."  Gold stated what Dendreon had known since 2010 – that "the cost coupled with the short duration of therapy results in a higher cost density for PROVENGE compared to other oncology products which are administered over the course of many months or years"; that this "cost density has created significant customer anxiety regarding outstanding receivables"; and that, given the "increased sensitivity to the impact of cost density on their practice economics, we have seen that the average number of treatments per account has declined."  Specifically, according to Gold, Dendreon's in-serviced accounts were generating Provenge sales of only 0.8 patients per month (equivalent to an *Average IWA of 0.55*), which was substantially less than the 1 to 2 patients (an Average IWA of 1.0) that Defendants had previously represented to investors.  Revealing what Defendants had known for months from their internal reports and surveys, Gold stated that the anxiety about reimbursement was "particularly true for our recently added customers" and that it was the addition of the newer accounts in the last six months that caused "the average number of treatments per account [to] decline[]."

318.   Gold also admitted that treatment logistics had hampered the adoption of Provenge, stating that "our product is novel. It is personalized and has a unique supply chain. In

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

speaking with our physicians, it is clear to me that we need to streamline our customer experience to ensure that patients and physicians have a simple and expeditious way of easily accessing Provenge."

319.    Furthermore, Defendant Gold disclosed that July 2011 sales of Provenge were only $19 million.  In other words, when added to the Company's cumulative 2010 and 2011 revenues to date, the Company had only generated $146 million in Provenge sales since launch. As the Company's Internal P&I Report confirmed, this was the equivalent of only 4,732 infusions or 1,577 patients treated through the end of July 2011.  The August 3, 2011 corrective disclosure therefore revealed that Dendreon had missed its "revised" guidance of 2,000 patients/ 6,000 infusions by approximately 22%.

320.    Defendants' August 3, 2011 disclosures were also significant because of the decision to reduce the Company's workforce and manufacturing capacity.  On the August 3, 2011 conference call, Defendant Gold elaborated that "we need to reduce expenses, including our workforce to support our near-term capacity and manufacturing requirements."  Accordingly, the August 3, 2011 disclosures revealed that the demand for Provenge had *not* been hampered by "capacity constraints", as Defendants had repeatedly and falsely claimed throughout the Relevant Period, but that demand was simply weak.

321.    Reflecting the extent to which investors had been misled as to physician reimbursement concerns, the very first question directed to Defendants on the Company's conference call was from JPMorgan Chase, who asked "it's still kind of bizarre to me that the reimbursement issues are just surfacing now ….  So, *I'm wondering what changed those suddenly because it doesn't seem like capacity constraints would hide [the] reimbursement issue from your field reps, and it seemed like this is something that was being positively talked about from a coverage standpoint as recently as [ ] early June.*" (emphasis added).  In an analyst report on August 4, 2011, JPMorgan expressed "*shock*" that physicians held significant reimbursement concerns, which investors had been led to believe was an issue "*in the rear-view mirror.*"

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

322.     The market's reaction to the August 3, 2011 revelations was swift and severe.  In after-hours trading on August 3, 2011, Dendreon's stock price plummeted by $23.11, or 64.5%. On the first regular trading day after these announcements, August 4, 2011, the price of Dendreon stock plummeted to close at just $11.69, a drop of *$24* from the prior day's close of $35.84, a staggering one-day decline of *67%* that *erased over $3.5 billion* in market capitalization.  As *Bloomberg* reported, this was "the biggest single day decline since the company's initial public offering in June 2000."

323.     Within twenty four hours of the August 3, 2011 revelations, Dendreon was downgraded by at least eight major research analysts, including Bank of America, Robert W. Baird, RBC Capital Markets, and Cowen & Company, all of whom reacted with dismay and anger in response to the Company's revelations.  As research analysts at BioHealth Investor put it, "[t]o say that Dendreon caught most of the market off balance would be a severe understatement."  In an August 4, 2011 note to clients, Cory Kasimov of JP Morgan wrote: "This was obviously a crushing blow to our overweight thesis and one that we certainly did not see coming. We don't think anyone did."  Another analyst at Robert W. Baird wrote in a note to investors that Defendants' August 3, 2011 disclosures were "a shocking about-face."

324.     In an August 4, 2011 report downgrading Dendreon, analysts at Cowen & Company stated:

> [W]e are *tired of making excuses* for what has been a disappointing commercial trajectory *since day one* of launch. In our view, the simplest explanation for the drug's poor commercial performance is that *demand is lower than we had predicted* . ... [A]dditional capacity came on line in March 2011, and demand has *not* materialized as quickly as we expected.

325.     Similarly, in an August 4, 2011 article entitled "Dendreon's Provenge Sales Surprise Raises Questions About Reasons", *Dow Jones* described how analysts have "questioned whether the company's explanation [for its lackluster sales] *told the whole story*", pointing out that "a company expecting a short-term problem likely wouldn't take the drastic step of cutting

Page 93 – **THIRD AMENDED COMPLAINT**
Case No. 2:13-cv-872-JLR

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

jobs, often the move of a company adjusting to the new realities of a business model."  The article further quoted Goldman Sachs analyst, Sapna Srivastava, who explained that "there are many reasons to believe this at least in part also "*a permanent demand issue.*"

326.   Other members of the financial press published similar comments.  In an article published on August 4, 2011, *Forbes* stated that, "[n]ow when the veil was supposed to lift and give everyone a real glimpse of Provenge demand, Provenge has run into a new problem .... The fact that earnings missed could mean there is *simply less demand* for Provenge than anyone thought."  On the same day, *The Wall Street Journal* reported that Dendreon's "scaling back [of] recently scaled-up manufacturing capacity" was because of a lack of demand for Provenge, and that the Company's workforce reductions would stay in place "*pending evidence that demand for Provenge is coming back.*"

327.   The confirmation that there was a permanent demand issue with Provenge did not come until several months later.  On November 2, 2011, Dendreon announced its 2011 third quarter financial results.  In a press release, Dendreon announced that net revenue for the quarter was $64.3 million, and $139.5 million for the nine month period ended September 30, 2011, well short of the previous $350-$400 million guidance.  Dendreon announced that by the end of the third quarter, more than 425 different sites had actually infused Provenge.

328.   On the conference call to discuss the results, Gold stated that "we continue to expect modest growth for the next several quarters", "we anticipate modest growth in the fourth quarter compared to Q3 even with the seasonality that's occurring in the fourth quarter", and that "[l]ooking ahead, we see our November bookings slightly below our October bookings."  Thus, Defendants revealed that, contrary to their statements on the August 3, 2011 conference call, Provenge sales were afflicted not just by a temporary setback, but by a permanent demand problem that could not be fixed.  Specifically, even though there were now *more infusing accounts* than at the time of the August 3 conference call, November sales would *decrease*

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

HUNG G. TA, ESQ. PLLC
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

compared to October sales.   In short, Defendants finally revealed that the addition of new infusing accounts could not fix Dendreon's fundamental, underlying problems.

329.    Once again, investors reacted swiftly and negatively to these further revelations. In after-hours trading, Dendreon's stock price fell by more than 20%.  On November 3, 2011, the first trading day after the new revelations, Dendreon's stock price fell by approximately *37%*, from $10.46 to $6.55.

## XV.    LOSS CAUSATION

330.    As discussed above, Dendreon's August 3, 2011 revelations caused an immediate and direct decline in the Company's stock price.   When trading resumed after the Company's stunning August 3, 2011 disclosures, the price of the Company's stock immediately collapsed, falling by $23.11, or 64.5% in after-hours trading on August 3, 2011.   At the close of regular market trading on August 4, 2011, the price of Dendreon shares had fallen to only $11.69, down by more than $24 from the prior day's close of $35.84, a staggering decline of 67% that erased over $3.5 billion in market capitalization.

331.    The swift and sudden decline in the Company's stock reflected a materialization of the risks concealed by Defendants' ongoing fraud.   As set forth above, prior to the August 3, 2011 revelations, and throughout the Relevant Period, Defendants omitted material, adverse information that physicians had serious concerns about Dendreon's "buy-and-bill" reimbursement model and treatment logistics, and that these concerns had impacted sales.   To compensate for the Provenge underperformance, Defendants secretly added new infusing accounts in 2010 to inflate sales.   To further assuage investor concerns over Provenge's lagging performance, Defendants misrepresented that any weak demand for Provenge was caused by the Company's capacity constraints, and that the Company was still presently "on track" to meet Defendants' 2,000 patient guidance and Defendants' revenue guidance.

332.    The August 3, 2011 disclosures revealed that: (i) physicians had serious concerns about Dendreon's "buy-and-bill" reimbursement model and treatment logistics and these

Page 95 – **THIRD AMENDED COMPLAINT**
Case No. 2:13-cv-872-JLR

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

concerns had negatively impacted sales of Provenge; (ii) the Company had not been experiencing capacity constraints and lengthy wait lists; (iii) the sales performance for Provenge since launch was in fact much worse than the Company had been letting on, and this poor performance was simply attributable to weak demand; and (iv) the Company had not been "on track" to either treat 2,000 patients in the first 12 months, or to deliver $350-$400 million in 2011 revenues.  The Company had delivered only 4,732 infusions (*i.e.* treated 1,577 patients) through July 2011, well short of the 2,000 patients the Company repeatedly said it was "on track" to treat.  In addition, Dendreon was way off achieving its goal of $350-$400 million in 2011 revenues.

333.   When Defendants' omissions and misrepresentations were revealed to investors on August 3, 2011, the price of Dendreon's securities plummeted and the prior artificial inflation in the price of Dendreon's securities was partially erased.  As a result of their purchases of Dendreon securities during the Relevant Period, Plaintiffs suffered economic losses.

334.   Similarly, the November 2, 2011 revelations caused an immediate and direct decline in the Company's stock price, causing Dendreon's stock to plummet from $10.46 to $6.55.  The swift and large decline reflected a materialization of the risks concealed by Defendants' ongoing fraud.  Specifically, the November 2 disclosures revealed that Dendreon's revenues setback was not a recent phenomenon and not temporary, but a permanent issue.  The November 2 disclosures further revealed that Dendreon's continued emphasis on the addition of new infusing accounts was meaningless, because, despite more infusing accounts, sales were projected to decrease.  This therefore showed that Dendreon had exhausted its universe of infusing accounts, and that the real problem was simply the amount of demand from these existing infusing accounts.

335.   As with the partial corrective disclosure on August 3, 2011, when Defendants' omissions and misrepresentations were fully revealed to investors on November 2, 2011, the price of Dendreon's securities plummeted, erasing the prior artificial inflation in the price of

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

1  Dendreon's securities.  As a result of their purchases of Dendreon securities during the Relevant

2  Period, Plaintiffs suffered economic losses.

3  ## XVI.  <u>DENDREON CLEANS HOUSE AFTER THE REVELATION OF THE FRAUD</u>

4  336.  On September 8, 2011, in the immediate aftermath of the August 3, 2011

5  revelations, Dendreon issued a press release announcing the departure of Defendant Bishop, the

6  Company's chief operating officer.

7  337.  On February 1, 2012, Dendreon announced that the Company's Board had voted

8  to remove Defendant Gold from his position as President and CEO.  The Company further

9  announced that Gold would no longer serve as Chairman of the Board, effective June 30, 2012.

10  As reported by *Pharmalot.com* that day, Gold's termination was the latest in the "chain of events

11  follow[ing] increasing complaints from some investors that Dendreon was repeatedly missing

12  forecasts, failing to disclose important info" and "that Dendreon management had sold big

13  chunks of stock just weeks before the bad news was announced."

14  338.  On May 7, 2012, Dendreon filed a Form 10-Q with the SEC in which the

15  Company disclosed that it had "become aware that the Securities and Exchange Commission [ ]

16  has commenced a formal investigation" into the events underlying the August 3, 2011 events.

17  339.  Dendreon's stock price never recovered from the August 3, 2011 and November

18  2, 2011 revelations.  On November 10, 2014, Dendreon filed for bankruptcy, wiping out the

19  investments of all its shareholders.

20  ## XVII. APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD-ON-THE-

21  MARKET DOCTRINE

22  340.  Plaintiffs are entitled to rely upon the presumption of reliance established by the

23  fraud-on-the-market doctrine, for the following reasons:

24  (a)  The Defendants failed to disclose material facts and made public

25  misrepresentations during the Relevant Period;

26  (b)  The omissions and misrepresentations were material;

Page 97 – **THIRD AMENDED COMPLAINT**
Case No. 2:13-cv-872-JLR

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

1        (c)     Dendreon's common stock traded in an efficient market;

2        (d)     The omissions and misrepresentations alleged would induce a reasonable

3        investor to misjudge the value of Dendreon's common stock; and

4        (e)     Plaintiffs purchased Dendreon securities between the time Defendants

5        failed to disclose or misrepresented material facts and the time the true

6        facts were disclosed, without knowledge of the omitted or misrepresented

7        facts.

8        341.   At all relevant times, the market for Dendreon's publicly traded common stock

9 was efficient for the following reasons:

10       (a)     Dendreon's stock was listed and actively traded on the NASDAQ;

11       (b)     As a regulated issuer, Dendreon filed periodic public reports with the

12       SEC;

13       (c)     Dendreon's securities volume was substantial during the Relevant Period;

14       (d)     Dendreon was followed by numerous analysts who published research

15       reports that were distributed and entered the public market; and

16       (e)     Dendreon regularly communicated with public investors via established

17       market communication mechanisms, including through regular

18       dissemination of annual and quarterly reports and press releases that were

19       carried by the media, newswires and on the Internet, as well as through

20       presentations to investors and analysts, and conference calls with analysts.

21       342.   Accordingly, the market for Dendreon's publicly traded common stock promptly

22 digested current information with respect to the Company from publicly available sources and

23 reflected such information in the price of Dendreon common stock.  Each of Plaintiffs relied on

24 the integrity of the market price for the Company's stock and is entitled to a presumption of

25 reliance with respect to Defendants' misstatements alleged in this Complaint.

26

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

# XVIII. STATUTORY SAFE HARBOR FOR FORWARD-LOOKING STATEMENTS NOT APPLICABLE

343.    The statutory safe harbor applicable to certain forward-looking statements does not apply to any of the false statements alleged in this Complaint.  The statements alleged to be false or misleading herein relate to then-existing facts and conditions from which the truth or falsity of the statements could be determined at the time spoken, and were therefore not "forward-looking statements" when made.

344.    To the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not identified by Defendants as forward-looking or accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  For example, Defendants' false statements made on April 7, 2011 and June 7, 2011, as described in ¶¶270 and 281 above, were not identified as forward-looking statements and were not accompanied by meaningful cautionary statements.

345.    Furthermore, if any of Defendants' statements alleged herein to be false or misleading may be characterized as forward-looking, Defendants had actual knowledge at the time they made the statements that the particular forward-looking statement was false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Dendreon who knew that those statements were false or misleading when made.

# XIX.    CLAIMS FOR RELIEF

## COUNT I
### For Violations of Section 10(b) Of The Exchange Act And Rule 10b-5 –
### Fraudulent Omissions And Misrepresentations
### (Against All Defendants)

346.    Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

347.     This Count is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Defendants Gold, Schiffman and Bishop.

348.     Throughout the Relevant Period, Defendants Gold, Schiffman and Bishop as well as non-party Dendreon individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the United States mail, engaged and participated in a continuous course of conduct to conceal adverse material information about Dendreon, its business operations and future prospects, as set forth in this Complaint.

349.     In violation of Section 10(b) of the Exchange Act and Rule 10b-5, Defendants and non-party Dendreon individually and jointly (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; (c) engaged in acts, practices and a course of conduct which operated as a fraud and deceit upon all purchasers of the Company's common stock.  The misconduct was designed to create and maintain artificially high market prices for Dendreon's securities.  Each of Defendants and non-party Dendreon was a direct, necessary and substantial participant in the common course of conduct alleged herein.

350.     Defendants and non-party Dendreon failed to disclose material, adverse non-public facts regarding physician concerns as to reimbursement and treatment logistics, and the impact that this was having on sales of Provenge.  Defendants and non-party Dendreon failed to disclose this information even though it was highly material to the decisions of investors to invest in Provenge.  Defendants and non-party Dendreon also failed to disclose that, in 2010, Dendreon in fact had already started infusions at additional sites (contrary to their statements that they only had about 50 sites), and that Defendants incorporated the revenues from these additional sites into Dendreon's 2010 reported revenues.

351.     To the contrary, Defendants and non-party Dendreon deflected investor scrutiny from the discrepancy between Dendreon's actual performance and investors' expectations by falsely attributing the Company's lagging performance to "capacity constraints."  To further

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

HUNG G. TA, ESQ. PLLC
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

assuage investor concerns, Defendants and non-party Dendreon repeatedly assured investors that the Company was nevertheless presently "on track" to treat 2,000 patients or deliver 6,000 infusions, and that the Company was presently "on track" to earn $350-$400 million in 2011 revenues.

352.   Further, in violation of Item 303 of Regulation S-K, Defendants and non-party Dendreon also failed to disclose, in the Company's Form 10-Qs and Form 10-K filed on May 10, 2010, August 3, 2010, November 3, 2010, March 1, 2011, May 2, 2011, and August 3, 2011, the above known, material trends and uncertainties.

353.   Defendants and non-party Dendreon acted with scienter throughout the Relevant Period in that they knowingly failed, or acted with deliberate recklessness in failing, to disclose the material, adverse non-public information regarding physicians' concerns about reimbursement and treatment logistics.  Defendants and non-party Dendreon also knew but failed to disclose the additional infusing sites in 2010, and the fact that Dendreon had incorporated the revenues from these sites in Dendreon's reported revenues for the 2010 fourth quarter. Furthermore, Defendants and non-party Dendreon knew or, but for their deliberate recklessness, should have known, that their statements concerning the Company's capacity constraints and "on track" progress to achieving the Company's financial guidance were materially false.  Among other direct evidence, over many months from 2010 to 2011, Defendants openly discussed the negative impact of physicians' concerns on sales of Provenge, including at numerous Board meetings and presentations.  Furthermore, Defendants knew, from tracking medical sites through the Capacity Reports and the Prescription vs. Infusion Reports, that repeat business from these sites was decreasing.  Defendants also knew that concerns with reimbursement and treatment logistics were even greater amongst the newer medical centers who had not previously participated in the Company's clinical trials.  Defendants knew from the Prescription vs. Infusion Reports that the Company was not operating at capacity and was therefore not "capacity constrained", a fact that was discussed at Dendreon's Board meetings.  Defendants also knew

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

HUNG G. TA, ESQ. PLLC
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

1   from the internal reports that Dendreon was way off track in achieving the two key metrics

2   underlying the Company's 2011 revenue guidance.

3   354.   As a result of the above omissions and misstatements, the market price of

4   Dendreon common stock was artificially inflated during the Relevant Period.   During the

5   Relevant Period, Plaintiffs were ignorant of the fact that market prices of Dendreon's securities,

6   including its publicly traded common stock, were artificially inflated.  Plaintiffs relied directly or

7   indirectly on the absence of material adverse information that was concealed by Defendants and

8   non-party Dendreon during the Relevant Period, the false and misleading statements made by

9   Defendants and non-party Dendreon, and/or upon the integrity of the market in which

10  Dendreon's securities trade.

11  355.   As a result, Plaintiffs acquired Dendreon securities during the Relevant Period at

12  artificially high prices and were damaged thereby.   Defendants' conduct was a direct and

13  proximate cause of Plaintiffs' damages.

14  356.   Had Plaintiffs known of the material adverse information not disclosed, or been

15  aware of the truth behind the material misstatements, Plaintiffs would not have purchased or

16  otherwise acquired Dendreon securities at artificially inflated prices, or at all.

17  357.   By virtue of the foregoing, Defendants and non-party Dendreon violated Section

18  10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

19

20  ## COUNT II

**For Violations of Section 10(b) Of The Exchange Act And Rule 10b-5 –**
**Insider Trading**
**(Against Defendants Gold and Schiffman)**

22  358.   Plaintiffs repeat and re-allege each and every allegation above as if fully set forth

23  herein.

24  359.   Defendants Gold and Schiffman, along with the other officers and directors listed

25  in paragraph 305 above, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated

26  thereunder by engaging in insider trading.   On numerous dates during the Relevant Period,

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

HUNG G. TA, ESQ. PLLC
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

Defendants Gold and Schiffman and other Dendreon officers and directors sold shares of Dendreon common stock and generated sales proceeds as set forth in paragraph 305.

360.    At the time of each of these sales, Gold, Schiffman and the other officers and directors possessed material, adverse and non-public information concerning the Company, as alleged above.  While in possession of this material, adverse and non-public information, Gold, Schiffman and the other Dendreon officers and directors were under a duty to disclose that information or abstain from trading in Dendreon stock.  Gold, Schiffman and the other Dendreon officers and directors knew that the non-public, adverse information was material to the decision of investors to invest in the stock of Dendreon.

361.    When they made their sales, Gold, Schiffman and the other Dendreon officers and directors did not disclose the material, adverse and non-public information to the investing public.

362.    By reason of the foregoing, Gold, Schiffman and Dendreon's other officers and directors, directly and indirectly, by use and means of instrumentalities of interstate commerce, electronic communications mailing, and the facilities of a national securities exchange, employed devices, schemes, and artifices to defraud, and engaged in acts and transactions and a course of business which operated as a fraud or deceit upon members of the investing public who purchased Dendreon common stock contemporaneously with the sale of such stock by Gold or Schiffman.

363.    Plaintiffs bought shares of Dendreon common stock contemporaneously with the sales made by Gold, Schiffman and the other Dendreon officers and directors.

364.    Plaintiffs suffered damages in that they paid artificially inflated prices for Dendreon common stock.  Plaintiffs would not have purchased Dendreon common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' failure to disclose material non-public information, or if they had been aware of the material non-public information Defendants failed to disclose.

Page 103 – **THIRD AMENDED COMPLAINT**
Case No. 2:13-cv-872-JLR

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

## COUNT III

### For Violations Of Section 20A Of The Exchange Act
### (Against Defendants Gold and Schiffman)

365.    Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

366.    During the Relevant Period, Defendants Gold and Schiffman and other officers and directors of Dendreon sold shares of Dendreon common stock at market prices artificially inflated by the non-disclosure of material, adverse and non-public facts, and generated sales proceeds as set forth in paragraph 305.

367.    At the time of each of these sales, Gold, Schiffman and the other officers and directors possessed material, adverse and non-public information concerning the Company, as alleged above.  While in possession of this material, adverse and non-public information, Gold, Schiffman and the other Dendreon officers and directors were under a duty to disclose that information or abstain from trading in Dendreon stock.  Gold, Schiffman and the other Dendreon officers and directors knew that the non-public, adverse information was material to the decision of investors to invest in the stock of Dendreon.

368.    When they made their sales, Gold, Schiffman and the other Dendreon officers and directors did not disclose the material, adverse and non-public information to the investing public.

369.    By reason of the foregoing, Gold, Schiffman and Dendreon's other officers and directors, directly and indirectly, by use and means of instrumentalities of interstate commerce, electronic communications mailing, and the facilities of a national securities exchange, employed devices, schemes, and artifices to defraud, and engaged in acts and transactions and a course of business which operated as a fraud or deceit upon members of the investing public who purchased Dendreon common stock contemporaneously with the sale of such stock by Gold or Schiffman.

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

HUNG G. TA, ESQ. PLLC
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

370.   Plaintiffs bought shares of Dendreon common stock contemporaneously with the sales made by Gold, Schiffman and the other Dendreon officers and directors.

371.   Plaintiffs suffered damages in that they paid artificially inflated prices for Dendreon common stock.  Plaintiffs would not have purchased Dendreon common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' failure to disclose material non-public information, or if they had been aware of the material non-public information Defendants failed to disclose.  At the time of the purchases of the securities by Plaintiffs, the fair and true market value of the securities was substantially less than the price paid by Plaintiffs.

## COUNT IV
### For Violations Of Section 20(a) Of The Exchange Act
### (Against All Defendants)

372.   Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

373.   This Count is asserted against Defendants Gold, Bishop and Schiffman with respect to the violations set forth in Count I.

374.   Defendants acted as controlling persons of Dendreon within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions within Dendreon, their ownership and contractual rights, participation in and awareness of the Company's operations, and intimate knowledge of the Company's actual performance, Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and the dissemination of the various false and misleading statements set forth in this Complaint.

375.   Defendants were provided with and had unlimited access to, copies of the Company's reports, press releases, public filings and other statements alleged in this Complaint prior to and shortly after these statements were issued, and had the ability to correct the material

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

HUNG G. TA, ESQ. PLLC
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

omissions and prevent the issuance of false statements and or cause such misleading omissions and statements to be corrected.

376.   In addition, each of Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.   For example, Defendants were able to and did control the content of various SEC filings, press releases, investor presentations, and other public statements pertaining to the Company during the Relevant Period.   Defendants had access to the adverse undisclosed information about Dendreon's business, operations, products, trends, financial statements, markets, and present and future business prospects via participation at management and Board meetings and committees thereof; reports and other information provided to them in connection with these meetings; access to Dendreon internal documents (including but not limited to plant Capacity Reports, Prescriptions vs. Infusion Reports, Provenge Weekly Performance Reports, Reimbursement Confidence Reports, Apheresis reports and internal Dendreon market research reports); and conversations and communications with other corporate officers, employees, and customers.

377.   Defendants each participated in the drafting, preparation and/or approval of the various public shareholder and investor reports and presentations, as well as other communications alleged herein.

378.   As alleged in Count I above, Defendants and non-party Dendreon each violated Section 10(b) and Rule 10b-5 by their fraudulent omissions and misrepresentations.   By virtue of their positions as controlling persons, Defendants are liable under Section 20(a) of the Exchange Act.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Dendreon securities during the Relevant Period.

Page 106 – **THIRD AMENDED COMPLAINT**
Case No. 2:13-cv-872-JLR

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

## COUNT V
### Common Law Fraud
### (Against All Defendants)

379.     Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

380.     Throughout the Relevant Period, Defendants Gold, Schiffman and Bishop, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse material information about Dendreon, its business operations and future prospects, as set forth in this Complaint.

381.     In furtherance of this unlawful scheme, plan and course of conduct, Defendants, individually and jointly, omitted material, adverse facts concerning Dendreon that Defendants were under a duty to disclose.  Specifically, in numerous SEC filings, press releases, conference calls, analyst presentations and other publicly disseminated statements, Defendants knowingly failed to disclose that physicians were expressing significant concerns about Dendreon's "buy-and-bill" reimbursement model as well as the treatment logistics for Provenge, and that this was negatively impacting sales.  Defendants also knew but failed to disclose the existence of the additional infusing sites in 2010, and the fact that Dendreon had incorporated the revenues from these sites in Dendreon's reported revenues for the 2010 fourth quarter.  In addition, Defendants knowingly misrepresented that any sales underperformance reported by the Company was attributable to capacity constraints, and that the Company was still, presently "on track" to meet Defendants' guidance and business plans.

382.     As alleged in this Complaint, Defendants knew that the facts they omitted to disclose was material to investors.  In addition, Defendants knew their statements were false.

383.     Defendants intended that their omissions and misstatements would be relied upon by Plaintiffs and other Dendreon shareholders.

384.     Plaintiffs did not know and did not have the ability to know of Defendants' omissions, or the falsity of Defendants' statements.

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

385.     Plaintiffs justifiably and reasonably relied on Defendants' omissions and misstatements in Defendants' SEC filings, press releases, conference calls, analyst presentations and other publicly disseminated statements, when determining and assessing, among other things, Dendreon's financial condition and business prospects.

386.     As a direct and proximate result of Defendants' fraudulent omissions and misrepresentations, Plaintiffs have suffered and continue to suffer substantial harm and are entitled to recover from Defendants damages in amount to be proven at trial.

<u>COUNT VI</u>
**Common Law Negligent Omissions And Misrepresentation**
**(Against All Defendants)**

387.     Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

388.     Plaintiffs bring this cause of action in the alternative to the other causes of action set forth above.

389.     During the Relevant Period, in numerous SEC filings, press releases, conference calls, analyst presentations and other publicly disseminated statements, Defendants neglected to disclose that physicians were expressing significant concerns about Dendreon's "buy-and-bill" reimbursement model and the treatment logistics for Provenge, and that this was negatively impacting sales.  Defendants also neglected to disclose the existence of the additional infusing sites in 2010, and the fact that Dendreon had incorporated the revenues from these sites in Dendreon's reported revenues for the 2010 fourth quarter.  In addition, Defendants represented that any sales underperformance reported by the Company was attributable to capacity constraints, and that the Company was still, presently "on track" to meet Defendants' guidance and business plans.

390.     At the time that Defendants made these omissions and representations, Defendants knew that the omissions and representations would be relied upon by Dendreon's

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

shareholders, including Plaintiffs, for assessing and determining Dendreon's financial condition and business prospects.

391.   At the time that Defendants made the above material omissions and representations, Defendants knew or should have known that the above material omissions and representations were false, and/or Defendants negligently disregarded whether these omissions and representations were true or false.  Defendants nevertheless made these negligent material omissions and representations with full knowledge and intention that they would be relied upon by Dendreon's shareholders, including Plaintiffs.

392.   At all relevant times, Plaintiffs justifiably relied on Defendants' material omissions and misstatements in their SEC filings, press releases, conference calls, analyst presentations and other publicly disseminated statements, when determining and assessing, among other things, Dendreon's financial condition and business prospects.

393.   As a direct and proximate result of Defendants' negligent omissions and misrepresentations and omissions, Plaintiffs have suffered and continue to suffer substantial harm and are entitled to recover from Defendants damages in amount to be proven at trial.

## XX.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.   Awarding Plaintiffs compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.   Awarding Plaintiffs punitive damages against all Defendants, jointly and severally;

C.   Ordering Defendants Gold and Schiffman to disgorge the profits of their insider sales of Dendreon stock during the Relevant Period;

D.   Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

SLINDE NELSON STANFORD
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

HUNG G. TA, ESQ. PLLC
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

E.      Such other and further relief as the Court may deem just and proper.

**XXI.    DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury.

DATED:  May 22, 2015.

SLINDE NELSON STANFORD

By: _____/s/ Christina Haring-Larson_____
        Christina Haring-Larson, WSBA No. 30121
        *Of Attorneys for Plaintiffs, Local Counsel*

HUNG G. TA, ESQ. PLLC

By: _____/s/ Hung G. Ta_____
        Hung G. Ta, Esq., NYSBA No. 3972544
        JooYun Kim, Esq., NYSBA No. 4041851
        Natalia D. Williams, Esq. NYSBA No. 4142352
        250 Park Avenue, 7th Floor
        New York, New York 10177
        Tel:    (646) 453-7288
        Fax:    (646) 453-7289
        *Of Attorneys for Plaintiffs*
        *Admitted Pro Hac Vice*

KYROS LAW OFFICES

By: _____/s/  K. William Kyros_____
        K. William Kyros, MASBA No. 634442
        17 Miles Road
        Hingham, MA 02043
        *Of Attorneys for Plaintiffs*
        *Admitted Pro Hac Vice*

Page 110 – **THIRD AMENDED COMPLAINT**
Case No. 2:13-cv-872-JLR

**SLINDE NELSON STANFORD**
4400 Two Union Square
601 Union Street
Seattle, WA 98101
Tel: 206.237.0020

**HUNG G. TA, ESQ. PLLC**
250 Park Ave., 7th Floor
New York, NY 10177
Tel: 646-453-7290

# APPENDIX A

## Initial 55 Infusion Sites

| | Medical Center | May-10 | Jun-10 | Jul-10 | Aug-10 | Sep-10 | Oct-10 | Nov-10 | Dec-10 | Jan-11 | Feb-11 | Mar-11 | Apr-11 | May-11 | Jun-11 | Jul-11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | | | | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |



**Second Wave of 28 Infusion Sites**



## Third Wave of 52 Infusion Sites



# APPENDIX B

## Capacity Utilization



DNDN-WA 0088458