1

2

3

4

5

6

7          UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON
8                    AT SEATTLE

9

10   CHRISTOPH BOLLING, et al.,              CASE NO. C13-0872JLR

11              Plaintiffs,                  ORDER DENYING PLAINTIFFS'
                                             MOTION FOR PARTIAL
12        v.                                 SUMMARY JUDGMENT

13   MITCHELL H. GOLD, et al.,

14              Defendants.

15                        I.      INTRODUCTION

16        Before the court is Plaintiffs' motion for partial summary judgment.  (Mot. (Dkt.

17   ## 129 (redacted), 133 (sealed).)  Plaintiffs are investors who purchased securities in

18   Dendreon Corporation  ("Dendreon"), a Seattle-based biotechnology firm that makes and

19   distributes a prostate cancer treatment called Provenge.  (*See* TAC (Dkt. ## 113

20   (redacted), 116 (sealed)) ¶¶ 27-48, 55.)  Defendants are individuals who were officers at

21   Dendreon during the launch period for Provenge.  (*See id.* ¶¶ 49-51.)  Plaintiffs claim

22   they were harmed by an extensive fraud related to Dendreon's launch of Provenge, and

ORDER- 1

1   they allege various federal securities fraud and state common law causes of action.  (*See*

2   *id.* ¶¶ 346-93.)

3       Plaintiffs' motion seeks partial summary judgment "as to the three elements of

4   falsity, scienter, and materiality with respect to three . . . parts of Defendants' fraud,

5   specifically:  (1) the secretly-added [Provenge] infusing sites, (2) Dendreon's capacity

6   and purported capacity constraints [related to Provenge], and (3) Dendreon's progress

7   towards achieving its 2011 revenue guidance and the metrics underlying that guidance."

8   (Mot. at 1.)  The court has reviewed the motion, all submissions filed in support of and

9   opposition thereto, the balance of the record, and the applicable law.  The court also

10  heard the oral argument of counsel on November 5, 2015.  Being fully advised, the court

11  DENIES Plaintiffs' motion.

12                          **II.      BACKGROUND**

13      Plaintiffs are roughly 30 investors in Dendreon who opted out of a class action

14  settlement in 2013.  (*See* TAC ¶¶ 27-48.)  Defendants are three senior Dendreon officers,

15  including Mitchell H. Gold, who served as Dendreon's President, Chief Executive

16  Officer ("CEO"), and Chairman of the Board; Gregory R. Schiffman, who served as

17  Chief Operating Officer ("COO") and Executive Vice President; and Hans E. Bishop,

18  who served as Chief Financial Officer ("CFO"), Executive Vice President, and Treasurer.

19  (*Id.* ¶¶ 49-51.)  Plaintiffs allege they were victims of a fraud perpetrated by Dendreon and

20  its senior officers in connection with Dendreon's one and only product, Provenge, and

21  that Defendants' alleged fraud continued for about a year and a half, from April 29, 2010,

22  through November 2, 2011.  (*See id.* ¶ 1.)

1    Plaintiffs initially filed this action on May 16, 2013, and filed an amended

2  complaint on July 16, 2013.  (*See* Compl. (Dkt. # 1); Am. Compl. (Dkt. # 32).)

3  Thereafter, the parties engaged in extensive motion practice related to the adequacy of

4  Plaintiffs' allegations.  On January 28, 2014, the court dismissed Plaintiffs' federal

5  securities fraud claims under the Private Securities Litigation Reform Act ("PSLRA"),

6  but granted Plaintiffs leave to amend.  (1/28/14 Order (Dkt. # 54).)  Plaintiffs filed their

7  second amended complaint repleading their federal securities fraud claims on February

8  17, 2014.  (SAC (Dkt. ## 55 (redacted), 56 (sealed)).)  On June 5, 2014, the court again

9  dismissed Plaintiffs' federal securities fraud claims, but allowed Plaintiffs the opportunity

10  to file a motion for leave to amend within 20 days.  (6/5/14 Order (Dkt. # 75).)  Plaintiffs

11  did not file a motion for leave to amend within the court's 20-day timeframe and instead

12  proceeded to conduct discovery on their state law claims.  (*See generally* Dkt.)

13    Then, on February 24, 2015, more than eight months after the court's June 5,

14  2014, order, Plaintiffs filed a motion to amend their second amended complaint asserting

15  that documents they had obtained in the course of discovery on their state law claims had

16  provided the necessary factual basis for the federal securities fraud allegations that the

17  court had previously found lacking.  (Mot. to Amend (Dkt. ## 101 (redacted), 102

18  (sealed)).)  On May 19, 2015, the court granted Plaintiffs' motion to amend, reviving

19  their federal securities fraud claims.  (5/19/15 Order (Dkt. # 112).)

20    Plaintiffs filed their third amended complaint on May 22, 2015.  (*See* TAC.)

21  Defendants then filed another motion to dismiss portions of Plaintiffs' third amended

22  complaint.  (Mot. to Dismiss TAC (Dkt. # 117).)  On September 9, 2015, the court

1    granted in part and denied in part Defendants' motion, but significant portions of

2    Plaintiffs' federal securities fraud claims remain.  (9/9/15 Order (Dkt. # 150).)

3           Plaintiffs now move for partial summary judgment concerning certain elements

4    and portions of their federal claim under Section 10(b) of the Securities Exchange Act of

5    1934 ("Exchange Act"), 15 U.S.C. § 78j(b).[1]  (Mot. at 1.)  Specifically, Plaintiffs seek

6    partial summary judgment regarding the elements of falsity, scienter, and materiality on

7    the following three aspects of Defendants' alleged securities fraud:  (1) that Defendants

8    secretly added infusion sites and then misled investors about the number of sites that

9    were operating in the latter half of 2010; (2) that Defendants misled investors to believe

10   that Dendreon was operating at or near maximum capacity and was capacity-constrained

11   in 2010; and (3) that Defendants misled investors about Dendreon's progress towards its

12   2011 revenue guidance and the metrics underlying that guidance.  (*See generally* Mot.)

13

14          [1] Plaintiffs also purport to move for partial summary judgment "with respect to their

15   common law claims for negligent and fraudulent omission/misrepresentation (to the extent
     falsity, scienter and materiality are elements of these common law claims)."  (Mot. at 1.)

16   Plaintiffs offer no specific analysis concerning their state law claims or how the evidence
     presently before the court relates to the elements of those claims.  Without some analysis from

17   Plaintiffs as to how the elements of their Section 10(b) claims overlap with their common law
     state law claims, the court declines to consider partial summary judgment on those claims.  It is

18   not the role of the court to perform this analysis on behalf of Plaintiffs.  It is Plaintiffs' counsel's
     job to provide that analysis to the court and permit Defendants an opportunity to respond.

19   Further, the court notes that (assuming Washington law applies) Plaintiffs must establish each
     element of their state law claims by clear, cogent, and convincing evidence.  *See Ross v. Kirner*,

20   172 P.3d 701, 704 (Wash. 2007); *Kirkham v. Smith*, 23 P.3d 10, 13 (Wash. Ct. App. 2001) ("It is
     well established in Washington that the standard of proof in civil fraud cases is clear, cogent, and

21   convincing evidence.").  This evidentiary burden is significantly more onerous than the
     applicable burden related to their federal securities claims.  Yet, Plaintiffs provide no analysis as

22   to how this would affect the summary judgment analysis for those claims.  Accordingly, the
     court declines to consider partial summary judgment with respect to any of Plaintiffs' state law
     claims.

1    Plaintiffs base their motion on documents produced by Defendants, as well as

2    interviews Defendants provided to the United States Securities and Exchange

3    Commission ("SEC").[2]  (*See* Ta Decl. (Dkt. ## 130 (redacted), 134 (sealed)).)  As

4    Defendants point out, Plaintiffs bring this motion without taking any depositions in this

5    litigation.  (Wechkin Decl. (Dkt. # 138) ¶ 2.)  The Ninth Circuit, however, has recognized

6    that the transcript of an interview provided under oath during the course of an SEC

7    investigation may be considered as the equivalent to a declaration in ruling on a motion

8    for summary judgment.  *See SEC v. Phan*, 500 F.3d 895, 913 (9th Cir. 2007).

9    In response to Plaintiffs' motion, Defendants have filed extensive declarations

10   from themselves and others, which they argue create genuine issues of material fact

11   requiring a jury's consideration of Plaintiffs' federal securities fraud claims.[3]  (*See* Resp.

12

13   _____

14   [2] Following Defendants' testimony to the SEC, the SEC closed its investigation without
     recommending any action against Dendreon or anyone else.  (Resp. at 5, 6 n.2; Reply (Dkt.
15   ## 145 (redacted), 146 (sealed)) at 3 n.2.)

16   [3] Plaintiffs argue that Defendants' declarations cannot create a genuine issue of material
     fact because they are "uncorroborated and self-serving testimony."  (Reply (Dkt. # 146) at 1
17   (citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)).)  Defendants'
     declarations are not "uncorroborated."  Defendants offer the declaration of at least one non-party
18   witness that corroborates large portions of their testimony.  (*See generally* Hagen Decl. (Dkt. #
     140).)  Further, Defendants' declarations are largely (if not entirely) consistent with their
19   statements to the SEC.  (*Compare* Schiffman Decl. (Dkt. # 139) *with* Wechkin Decl. Ex. 2;
     *compare* Gold Decl.(Dkt. # 141) *with* Wechkin Decl. Ex. 1; *compare* Bishop Decl. (Dkt. # 137)
20   *with* Wechkin Decl. Ex. 3.)  Of course, in one sense, testimony offered by any party in any
     litigation is "self-serving" if it is supportive of the party's position.  In *Phan*, 500 F.3d at 910, the
21   Ninth Circuit stated that the "district court was . . . wrong to disregard the [defendants']
     declarations as 'uncorroborated and self-serving.'"  *Id.*  Only when a declaration states mere
22   conclusions and not facts that would otherwise be admissible in evidence can a court disregard a
     self-serving declaration for purposes of summary judgment.  *Id.*  Defendants' declarations are
     highly factual, and Plaintiffs have not challenged the admissibility of their statements.  The

1  (Dkt. # 137) at 1; Wechkin Decl.; Schiffman Decl. (Dkt. # 139); Hagen Decl. (Dkt. #

2  140); Gold Decl. (Dkt. # 141); Carruth Decl. (Dkt. # 142); Bishop Decl. (Dkt. # 143).)

3  The court will discuss the facts, evidence, and reasonable evidentiary inferences relevant

4  to the three portions of Plaintiffs' motion separately in the correlating sections of its

5  analysis below.

6                                    III.    ANALYSIS

7  A.  Standards for Summary Judgment and Private Securities Fraud Cases

8          Summary judgment is appropriate if the evidence shows "that there is no genuine

9  dispute as to any material fact and the movant is entitled to judgment as a matter of law."

10  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v.*

11  *Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  A fact is "material" if it might affect the

12  outcome of the case and requires a trial to resolve the parties' differing versions of the

13  truth.  *SEC v. Seaboard Corp.*, 677 F.2d 1289, 1293 (9th Cir. 1982) (citing *United States*

14  *v. First Nat'l Bank of Circle*, 652 F.2d 882, 887 (9th Cir. 1981)); *see also Anderson v.*

15  *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "'genuine' only if

16  there is sufficient evidence for a reasonable fact finder to find for the non-moving party."

17  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477

18  U.S. at 248-49).

19          The moving party bears the initial burden of showing there is no genuine issue of

20  material fact and that he or she is entitled to prevail as a matter of law.  *Celotex*, 477 U.S.

21

22  court, therefore, declines Plaintiffs' suggestion that it should disregard these declarations for
   purposes of its summary judgment analysis.

1    at 323.  If, like here, the moving party will bear the ultimate burden of persuasion at trial,

2    then that party must establish a prima facie showing in support of its position on that

3    issue.  *UA Local 343 v. Nor-Cal Plumbing, Inc*., 48 F.3d 1465, 1471 (9th Cir. 1994).

4    That is, the moving party must present evidence that, if uncontroverted at trial, would

5    entitle it to prevail on that issue.  *Id*. at 1473.  If the moving party meets its burden of

6    production, the burden then shifts to the nonmoving party to identify specific facts from

7    which a fact-finder could reasonably find in the nonmoving party's favor.  *Celotex*, 477

8    U.S. at 324; *Anderson*, 477 U.S. at 252.

9         The court is "required to view the facts and draw reasonable inferences in the light

10   most favorable to the [non-moving] party."  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

11   The court may not weigh evidence or make credibility determinations in analyzing a

12   motion for summary judgment because these are "jury functions, not those of a judge."

13   *Anderson*, 477 U.S. at 249-50.

14        Under Rule 56(g), where summary judgment is not proper on the entire claim, the

15   court may grant partial summary judgment on discrete elements of the claim.  Fed. R.

16   Civ. P. 56(g)[4]; *Lies v. Farrell Lines, Inc*., 641 F.2d 765, 769 (9th Cir. 1981).  "The

17   required elements of a private securities fraud action are: "(1) a material

18   misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or

19   sale of a security, (4) transaction and loss causation, and (5) economic loss."  *Petrie v.*

20

21        [4] The court, however, is not required to enter an order for partial summary judgment on a
     claim.  *See U.S. Bank v. Verizon*, 761 F.3d 409, 428 n.15 (5th Cir. 2014) ("The Rule's use of the
22   word 'may,' as opposed to 'shall,' indicates that district courts are not *required* to enter a
     separate order under Rule 56(g).") (italics in original).

1   *Elec. Game Card, Inc.*, 761 F.3d 959, 970 (9th Cir. 2014) (quoting *Metzler Inv. GMBH v.*

2   *Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008) (internal quotations

3   omitted)); *see also Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

4          The element of "materiality depends on the significance the reasonable investor

5   would place on the withheld or misrepresented information." *Basic Inc. v. Levinson*, 485

6   U.S. 224, 240 (1988).  To fulfill the materiality requirement, "there must be a substantial

7   likelihood that the disclosure of the omitted fact would have been viewed by the

8   reasonable investor as having significantly altered the 'total mix' of information made

9   available." *Id.* at 231-32.  In other words, a statement is material if "a reasonable investor

10  would have considered it useful or significant." *United States v. Smith*, 155 F.3d 1051,

11  1064 (9th Cir. 1998).  Since the issue of materiality is a mixed question of law and fact,

12  determining materiality in securities fraud cases is ordinarily left to the trier of fact.

13  *Phan*, 500 F.3d at 908.

14         In order to meet the scienter requirement, Plaintiffs must show that Defendants

15  had "a mental state embracing an intent to deceive, manipulate, or defraud." *See Ernst &*

16  *Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  Plaintiffs must show either knowing

17  or reckless conduct on the part of Defendants. *See Hanon v. Dataproducts Corp.*, 976

18  F.2d 497, 507 (9th Cir. 1992); *see also Hochfelder*, 425 U.S. at 214 (negligent conduct is

19  not actionable under Rule 10b-5).  "[C]ircumstantial evidence can be more than

20  sufficient" to prove scienter due to the "difficulty of proving the defendant's state of

21  mind." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n. 30 (1983).  Where

22  scienter or "intent is a primary issue, however, summary judgment is usually

1    inappropriate." *SEC v. Clark*, 699 F. Supp. 839, 845-46 (W.D. Wash. 1988) (quoting

2    *SEC v. Seaboard Corp.*, 677 F.2d 1297, 1298 (9th Cir.1982)).

3         In this securities fraud case, the court is mindful that "[a]lthough materiality and

4    scienter are both fact-specific issues which should ordinarily be left to the trier of fact,

5    summary judgment may be granted in appropriate cases." *In re Worlds of Wonder Sec.*

6    *Litig.*, 35 F.3d 1407, 1412 (9th Cir. 1994).

7         **B.  The Number of Infusion Sites**

8         When Dendreon announced the launch of Provenge on April 29, 2010, Defendants

9    stated that they would make the treatment available initially through "approximately 50"

10   medical centers or infusion sites.  (Ta Decl. Ex. 8 at 5 ("As of today, Provenge will be

11   made available through approximately 50 oncology and urology clinics.").)  Plaintiffs

12   argue, however, that Dendreon began adding infusion sites during the course of 2010 and

13   by the end of that year had 83 such sites.  To support this figure, Plaintiffs cite to two

14   documents—Exhibits 39 and 39A to the declaration of Plaintiffs' counsel.  (*See* Mot. at 2

15   (citing Ta Decl. Exs. 39, 39A).)  Plaintiffs' counsel testifies that "Exhibit 39 and Exhibit

16   39A are true and correct copies of excerpts from the Dendreon 'Prescription v. Infusion

17   Report' for the period from May 2010 through August 2, 2011," and that the report was

18   obtained from Nancy Carruth, a former Dendreon employee who Plaintiffs identified as a

19   confidential witness in this action.  (Ta Decl. ¶ 41.)  Plaintiffs' counsel also testifies that

20   "Exhibit 39 is a true and correct copy of an excerpt from the report, filtered to show the

21   83 infusing sites that had completed at least one infusion in 2010," and "Exhibit 39A is a

22   true and correct copy of an excerpt from the report, filtered to show the 28 additional

1  infusing sites that completed their first infusion in the fourth quarter of 2010." (*Id.*)

2  Plaintiffs argue, based on Exhibit 39A, that these additional 28 sites allowed Dendreon to

3  record an additional 127 infusions in the fourth quarter of 2010, generating $3.94 million

4  in revenues. (*See* Mot. at 2 (citing Ta Decl. Ex. 39A).) Plaintiffs further argue that these

5  additional revenues constituted 16% of Dendeon's 2010 fourth quarter revenues of $25

6  million, and 8% of Dendreon's 2010 full-year revenues of $48.1 million. (*See* Ta Decl.

7  Ex. 7 at 1).

8        Plaintiffs argue that these additional infusion sites were material because

9  Defendants had told investors that all the revenues generated by Dendreon came from

10  just the initial "approximately 50 sites." (*Id.* Ex. 9 at 8 (Mr. Bishop: "[R]ight now all the

11  numbers we gave you are associated with our approximately 50 sites.").) Plaintiffs argue

12  that investors were gauging the level of demand for Provenge based on the revenues per

13  infusing site. (Mot. at 5.) Plaintiffs contend that Dendreon's revenue per site was

14  artificially inflated when Dendreon started to include revenues generated by the

15  additional infusing sites without disclosing the number of additional sites to investors.

16  (*See id.*) Plaintiffs support their argument that the number of infusing sites was material

17  to investors by pointing to the number of questions analysts asked about the subject[5] and

18

19

20  _____

21    [5] (*See, e.g.*, Ta Decl. Ex. 10 at 7 ("How many sites do you think would come on versus
     the 50 now?"); Ex. 11 at 7 ("[H]ow many centers do you have now up and running?"); Ex. 59 at

22  7 ("And in the U.S. [] you are increasing the number of sites that you'll be giving the drug?").)

the number of reports and notes issued by analysts that explicitly incorporated the fact

that there were "approximately 50" sites as of the end of 2010.[6]  (*Id.*)

Plaintiffs base their motion on the following statements made by Defendants

concerning the number of infusion sites in 2010:

- Mr. Gold's statement during the November 3, 2010, quarterly earnings call that Dendreon had "done very little to build awareness beyond our sales force activity focused on our 50 early infuser accounts."  (Ta Decl. Ex. 10 at 2.)

- Mr. Schiffman's statement during a December 15, 2010, investor conference that Dendreon was "just starting" the process of adding sites beyond the first 50-55 accounts.  (*Id.* Ex. 59 at 7.)

- Mr. Gold's statement during a January 7, 2011, conference call that "the initial launch sites, the 50 initial launch sites, were sites that had participated in our clinical trials," and that "[t]he next wave of sites we're going after . . . are the classic high prescribers that you would go after in a traditional launch."  (*Id.* Ex. 11 at 12.)

- Mr. Bishop's statement during the same call that Dendreon ended 2010 with "slightly more" sites than the group with which it had begun the launch.  (*Id.* at 7.)

(*See* Mot. at 4.)  Plaintiffs contend that Defendants knew these statements were false

because both Mr. Bishop and Mr. Gold testified to the SEC that they knew that Dendreon

was adding additional sites in 2010 beyond the initial approximately 50 sites.  (Ta Decl.

---

[6] (*See, e.g.*, Ta Decl. Ex. 46 at DNDN-WA 0062842 (RBC Capital Markets research note stating Dendreon "[f]inished 2010 w/ slightly more than 50 [infusion centers] . . . . The 50 were only in trials – many were small clinics"); *id.* Ex. 47 at DNDN-WA 0062905 (Needham & Company, LLC research note stating "the Company increased its sales force to ~100 and expects to serve ~450 centers (up from current ~50 centers) by YE11"); *id.* Ex. 50 at DNDN-WA 0027981 (Coven & Company research report stating "Provenge is capacity constrained and available to only 100 patients/month at the roughly 50 sites that were involved in clinical studies").)

1   Ex. 1 at 75:14-76:1, 444:2-9; Ex. 2 at 476:22-25.)  In addition, Defendants received

2   copies of certain reports indicating the addition of sites during the course of 2010.  (*See

3   id.* Ex. 23 at DNDN-WA 0073274; Ex. 17 at DNDN-WA 0100524-25.)

4        Despite this evidence, Defendants contend that partial summary judgment is

5   inappropriate on Plaintiffs' federal securities fraud claim based on the number of infusion

6   sites in 2010.  Before the court examines the substance of the parties' positions, however,

7   it addresses a dispute that has arisen between the parties concerning Exhibits 39 and 39A

8   referenced above.  These exhibits are based on the report that Plaintiffs' counsel states

9   Ms. Carruth, Dendreon's former employee and Plaintiffs' confidential witness, provided

10  to them.  (Ta Decl. ¶ 41.)  Defendants mount a blistering attack on the origin of this

11  report and Plaintiffs' counsel's reliance on Ms. Carruth's testimony.  (*See* Resp. at 6-8.)

12  Defendants submit a declaration from Ms. Carruth in which she denies ever providing the

13  report or any other document to Plaintiffs' attorneys, denies that she agreed to serve as a

14  confidential witness in this case, and denies that she ever met with Plaintiffs' attorney or

15  "anyone who identified himself or herself as representing plaintiffs in the [present]

16  litigation." (Carruth Decl. (Dkt. # 142) ¶¶ 7-11.)  She even denies that she has ever lived

17  at the address Plaintiffs claim is hers.  (*Id.* ¶ 6.)  Finally, Ms. Carruth disavows many of

18  the statements attributed to her in Plaintiffs' third amended complaint.  (*Id.* ¶¶ 12-17.)

19  Defendants argue that Ms. Carruth's declaration obliterates any foundation Plaintiffs may

20  have laid for Exhibits 39 and 39A, and Defendants object to the court's consideration of

21  these documents.  (Resp. at 8 n.3.)  Defendants suggest that Plaintiffs' counsel's conduct

22

ORDER- 12

1  in not confirming the information they attribute to Ms. Carruth "may well be

2  sanctionable."  (Resp. at 7.)

3        Plaintiffs respond by submitting evidence indicating that Ms. Carruth was indeed

4  interviewed by an investigator hired by Plaintiffs' counsel and that Ms. Carruth emailed

5  the report in question to that investigator.  (Ta Reply Decl. (Dkt. ## 148 (sealed), 147

6  (redacted)) ¶¶ 3-5, Exs. 60-62.)  Based on this evidence, Plaintiffs' counsel accuses

7  Defendants' counsel of violating Federal Rule of Civil Procedure 11 by failing to check

8  their facts.  (Reply at 2.)  Further, Plaintiffs' counsel testifies that, based on a search he

9  "caused to be conducted" of the documents produced by Defendants, "there are at least

10 567 versions of the same [report] found . . . in Defendants' Production."  (Ta Reply Decl.

11 ¶ 10.)  Plaintiffs' counsel testifies that these "different versions differ as to their date of

12 creation, but their cumulative infusion and prescription data is the same in all versions of

13 the [report]."  (*Id.*)  Based on this information, Plaintiffs' counsel accuses Defendants'

14 counsel of violating their duty of candor and misleading the court by failing to disclose

15 that Exhibits 39 and 39A were corroborated by at least 567 other versions of the same

16 report.  (Reply at 2.)

17       Notably absent from Plaintiffs' counsel's declaration, however, is any testimony

18 indicating that (1) Plaintiffs' counsel personally interviewed Ms. Carruth to verify the

19 information provided by the investigator, (2) their investigator identified himself to Ms.

20 Carruth as working for Plaintiffs in this litigation, or (3) Plaintiffs' counsel or counsel's

21 investigator ever informed Ms. Carruth that Plaintiffs intended to identify her in their

22 complaint or any of its amended versions as a confidential witness.  (*See generally* Ta

ORDER- 13

1  Reply Decl.)  Indeed, if Ms. Carruth were working as cooperatively with Plaintiffs as

2  their counsel's declaration suggests, then the court is puzzled as to why Plaintiffs'

3  counsel did not simply contact her to secure a declaration authenticating Exhibits 39 and

4  39A.

5          Instead, it appears to the court that Plaintiffs' counsel has never directly contacted

6  Ms. Carruth to verify any of her testimony—testimony that is central to Plaintiffs'

7  complaint and Plaintiffs' motion for partial summary judgment.[7]  More than one court

8  has criticized this type of conduct in the context of a securities fraud lawsuit.  *See, e.g.*,

9  *City of Livonia Emps. Ret. Sys. v. The Boeing Co.*, 306 F.R.D. 175, 181 (N.D. Ill 2014)

10 ("Plaintiffs' counsel filed the [complaints] after their investigators interviewed Singh[, a

11 confidential witness].  Plaintiffs' counsel never interviewed Singh themselves, however,

12 and never attempted to verify any of the information he allegedly provided the

13 investigator."); *In re Millennial Media, Inc. Sec. Litig*., No. 14 CIV. 7923 PAE, 2015 WL

14 3443918, at *11 (S.D.N.Y. May 29, 2015) ("[W]here a Complaint proposes to rely on

15 quotes drawn from an investigator's memo recounting an unrecorded witness interview, it

16 is reasonable to expect counsel, before filing the Complaint, to attempt to confirm with

17 the witness the statements that counsel proposes to attribute to him and to assure that the

18 Complaint is presenting these statements in fair context.").)

19         This case is now one among a "growing body of cases chronicling the repudiation

20 by [confidential witnesses] of statements attributed to them" in complaints alleging

21 _____

22         [7] Indeed, Plaintiffs' counsel admitted during oral argument that no attorney had ever
contacted Ms. Carruth on behalf of Plaintiffs prior to the filing of Plaintiffs' complaint.

1   securities fraud.  *See id.* at \*12.  Indeed, "[n]umerous reported decisions have recounted

2   claims by [confidential witnesses] that . . .  complaints [alleging securities fraud]

3   inaccurately attributed facts and statements to them."  *Id.* (citing *City of Pontiac Gen.*

4   *Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 952 F. Supp. 2d 633, 636-37 (S.D.N.Y.

5   2013); *Belmont Holdings Corp. v. SunTrust Banks, Inc*., 896 F. Supp. 2d 1210, 1231-33

6   (N.D. Ga. 2012); *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 330 & n.54

7   (S.D.N.Y. 2009); *cf. In re St. Jude Med., Inc. Sec. Litig*., 836 F. Supp. 2d 878, 901 n.9 (D.

8   Minn. 2011); *In re Dynex Capital, Inc. Sec. Litig*., No. 05 Civ. 1897(HB)(DF), 2011 WL

9   2581755, at \*2 (S.D.N.Y. Apr. 29, 2011), *report and recommendation adopted*, 2011 WL

10  2471267 (S.D.N.Y. June 21, 2011)).

11          The court is seriously troubled by the apparent conduct of both Plaintiffs' and

12  Defendants' counsel with respect to issues surrounding Exhibits 39 and 39A and the

13  testimony of Ms. Carruth.  At some point during the course of this litigation it is likely

14  that these issues will require further examination, and the court may decide that some of

15  the conduct described above merits the imposition of sanctions.  At this point in time,

16  however, the court does not believe it has the record necessary to make such a

17  determination.[8]  Further, it is not necessary for the court to rule on the authenticity or

18

19
_____

20          [8] Indeed, the court recognizes that there are may be "competing pressures" on
    confidential witnesses that impact their reliability as witnesses and create problems for both
    plaintiffs and defendants.  *See Lockheed Martin Corp*., 952 F. Supp. 2d at 636-37.  For example,

21  the court in *Lockheed Martin Corp.* recognized that some confidential witnesses may be lured by
    investigators "into stating as 'facts' what [a]re often mere surmises, but then when their
    indiscretions [a]re revealed, fe[el] pressured into denying outright statements they had actually

22  made."  *Id.*  The present record is insufficient for the court to determine why Ms. Carruth's

1    admissibility of Exhibits 39 and 39A at this time because even assuming the court

2    admitted these documents, it would nevertheless deny partial summary judgment on

3    Plaintiffs' claim concerning the number of infusion sites.

4           In response to the evidence Plaintiffs set forth, Defendants do not dispute that the

5    number of infusion sites increased during 2010 from approximately 50 or 55 to

6    approximately 83.  (*See* Resp. at 14-18.)  Instead, Defendants argue that they never

7    concealed the addition of sites in 2010 from investors.  (Resp. at 14-15.)  Indeed,

8    Defendants point to evidence that analysts repeatedly discussed this information.  For

9    example, in a bulletin on September 14, 2014, an analyst from Cowen & Company

10   reported meeting with Mr. Gold and Mr. Schiffman and learning that "Denreon is

11   beginning to recruit new Provenge treatment centers on the East Coast."  (Schiffman

12   Decl. ¶ 28, Ex. C.)  During the November 3, 2010, quarterly earnings call that Plaintiffs

13   also cite, an analyst asks "can you say how many sites you have now?  I think you have

14   expanded the number of sites?"  (Ta Decl. Ex. 10 at 14.)  Mr. Bishop confirmed both that

15   sites had been added and that Dendreon was not providing specific numbers.  (*Id.* (Mr.

16   Bishop:  "Yes. We have not put that number out.").)  Later, another analyst again referred

17   to the additional sites, stating "I know you mentioned that you are not providing more

18   details as far as how many additional sites have now been recruited."  (*Id.* at 17.)  Mr.

19   Bishop repeated that the company was not "putting the absolute number out there."  (*Id.*)

20

21   declaration varies so significantly from the statements apparently attributed to her in Plaintiffs'
     Third Amended Complaint.  This is an issue, however, that will undoubtedly arise again, and the
22   court will endeavor to ensure a proper record at that time.

1    Finally, during the same the January 7, 2011, conference call cited by Plaintiffs, an

2    analyst noted that Dendreon began with 50 sites and asked "how many centers do you

3    now have up and running?"  Mr. Gold responded that Dendreon had "already begun to

4    add additional sites" and "about a third" of the 450 sites Dendreon planned to have at

5    year-end "had already started to come on line."  (*Id.* Ex. 11 at 7.)

6         Based on the foregoing evidence, Defendants argue that the market knew

7    Dendreon was adding sites in 2010.  Defendants also argue that given Dendreon's aim to

8    build 450-500 sites by the end of 2011, Mr. Gold's statement that Dendreon had done

9    "very little" to build awareness of beyond the initial sites (Ta Decl. Ex. 10 at 2), Mr.

10   Schiffman's statement that the company was "just starting" to recruit sites (*id.* Ex. 59 at

11   7), and Mr. Bishop's statement that Dendreon ended 2010 with "slightly more" infusion

12   sites at 83 than the original group of approximately 55 (*id.*Ex. 11 at 7), were all accurate

13   characterizations of the company's situation at the time the statements were made.  In

14   other words, Dendreon's initial growth from about 55 to 83 sites was just the beginning if

15   the ultimate aim was the addition of 450-500 such sites.  (*See* Gold Decl. ¶ 27; Schiffman

16   Decl. ¶ 28; Bishop Decl. ¶¶ 35-36, 45.)  Based on the foregoing evidence, the court

17   concludes that Defendants have raised a triable issue of fact with respect to the falsity of

18   their statements concerning the additional infusion sites to investors.  This same evidence

19   precludes summary judgment on the element of scienter as well.

20        Further, Defendants argue that contrary to Plaintiffs' assertions, Exhibits 39 and

21   39A, if credited, refute the element of materiality.  Plaintiffs assert that the Defendants

22   added the new sites in 2010 to generate revenue Dendreon could not have earned with

1    only its original group of 50-55 sites.  (*See* Mot. at 5.)  Plaintiffs argue that the number of

2    sites was material because investors were calculating Dendreon's 2010 revenue stream

3    based on the existence of only 50-55 sites when in actuality there were at least 83 such

4    sites by the end of 2010; and these undisclosed additional sites artificially inflated

5    Dendreon's future revenue potential.  Indeed, Plaintiffs argue that Exhibit 39A shows that

6    Dendreon earned $3.94 million or 8% of its 2010 revenue from these new sites.  (Mot. at

7    2.)  Defendants, however, note that the vast majority of these new sites were located in

8    regions of the country where Dendreon was capacity-constrained.  (*See* Bishop Decl.

9    ¶ 32; Hagen Decl. ¶¶ 14-19, Ex. A.)  Indeed, there was more demand for Provenge in

10   these areas than Dendreon was generally able to meet in 2010, and Dendreon ended the

11   year with approximately 470 patients waiting to be treated with Provenge.  (Bishop Decl.

12   ¶¶ 41, 44.)  The only geographic area that had excess capacity was the area surrounding

13   Dendreon's New Jersey manufacturing facility.  (*See id.* ¶ 32.)  Thus, according to

14   Defendants, the only added sites that might have affected Dendreon's 2010 revenue were

15   those located within that geographic area.  (Resp. at 16.)  Plaintiffs' Exhibit 39A,

16   however, shows only a handful of new sites within that region.  (*See* Ta Decl. Ex. 39A.)

17   Furthermore, the exhibit shows that these sites generated only about 25 infusions.  (*See*

18   *id.*)  Assuming each of these infusions generated incremental revenue to Denreon, the

19   revenue generated would amount to only about $800,000.00, which represents only 2%

20   of Dendreon's 2010 revenue rather than the 8% asserted by Plaintiffs.

21        Defendants have drawn reasonable inferences from the evidence that the court

22   must credit in ruling on Plaintiff's motion.  *See Scott*, 550 U.S. at 378.  The court

ORDER- 18

1   concludes that the impact of the newly added sites on Dendreon's financial statements is

2   a triable issue of fact.  If the newly added sites did not materially impact Dendreon's

3   bottom line, then arguably the sites would not be material to investors either.  Thus, the

4   court concludes that Defendants have raised a genuine issue of fact as to the element of

5   materiality.  Particularly in light of the Ninth Circuit's admonition that materiality should

6   ordinarily be left to the trier of fact, *see Phan*, 500 F.3d at 908, the court declines to grant

7   partial summary judgment on that issue.

8          The court concludes that Defendants have raised triable issues of fact with respect

9   to the elements of falsity, scienter, and materiality on Plaintiffs' federal securities fraud

10  claim related to the number of newly added infusion sites in 2010.  Accordingly, the

11  court denies this portion of Plaintiffs' motion for partial summary judgment.

12  **C. Capacity Constraints**

13         Plaintiffs argue that Defendants knowingly misled investors with statements

14  indicating (1) Dendreon was "supply constrained" or had "capacity constraints,"[9] and (2)

15  _____

16         [9] (*See* Ta Decl. Ex. 9 at 14 (during the August 3, 2010, second quarter earnings
    conference call, Mr. Bishop stated that only in early 2011, after additional capacity was

17  approved, would Dendreon "be able to offer . . . existing infusers additional capacity"); *id.* Ex.
    54 at DNDN-WA 0004033 (during the September 15, 2010, presentation at the Baird & Co.

18  2010 Health Care Conference, Mr. Bishop stated:  "we are supply constrained"); *id.* Ex. 10 at 2,
    11-12 (during the November 3, 2010 third quarter earnings conference call, Mr. Gold stated:

19  "clearly the demand out there is exceeding our ability to supply the market," Dendreon is "in a
    capacity constraint environment," and Dendreon is experiencing a "supply constraint" which

20  would be "resolved once additional capacity comes online" in early 2011); *id.* Ex. 11 at 2 (during
    the January 7, 2011, conference call, Mr. Gold stated that sales for Provenge remained low

21  because Dendreon is "in a capacity constrained environment"); *id.* Ex. 11 at 7 (during the
    January 7, 2011, conference call, Mr. Bishop stated that Dendreon would "get rid of the supply

22  constraint" in 2011); *id.* Ex. 55 at 0095176 (during the January 10, 2011, JP Morgan Healthcare
    Conference, Mr. Gold stated that Dendreon was "currently near maximum monthly capacity");

1   that Dendreon was operating at its maximum monthly capacity of $9-$10 million (which

2   was the equivalent of approximately 306 infusions) until the expansion of the New Jersey

3   manufacturing facility in March 2011.[10]  (*See* Mot. at 5-13.)

4          Plaintiffs marshal information from Defendants' document production to show

5   that Defendants knew the foregoing statements were false at the time Defendants made

6   them.  For example, Plaintiffs refer to Dendreon's "Capacity Reports," and the

7   accompanying emails which indicate that the reports were circulated to Defendants.  (*See,*

8   *e.g.*, Ta Decl. Ex. 35 at DNDN-WA 0117151, Ex. 36 at DNDN-WA 1111815, Ex. 37 at

9   DNDN-WA 0145399, Ex. 38 at DNDN-WA 0114253.)  Plaintiffs argue that the

10   information in these reports and other documents confirms that Dendreon had an average

11   monthly capacity of 368 infusions and that Defendants knew Dendreon did not operate at

12   capacity from July 2010 through January 2011.  (*See* Mot. at 6-7; *see also* Ta Decl. Ex.

13   14 (attaching email from Varun Nanda to Mr. Bishop stating that Dendreon's capacity

14   from August through December 2010 is 1839 infusions (which averages to 368

15   _____

16   *id.* Ex. 56 at 7 (during the April 7, 2011, presentation to the Leerink Swam Cancer Roundtable
Conference, Mr. Schiffman stated that "we look at what we saw in the launch with just the first
50 sites, we've been completely sold out in capacity"); *id.* Ex. 57 at 6 (during the May 10, 2011,

17   presentation to Bank of America Merrill Lynch Health Care Conference, Mr. Schiffman stated
that during the last year "[w]e had a very limited amount of capacity.  We signed on 50 sites that

18   were all clinical trial sites and we limited them to one or two patients purely because of our
capacity.").)

19   

20   [10] (*See* Ta Decl. Ex. 10 at 2 (during the November 3, 2010, third quarter earnings
conference call, Mr. Gold stated:  "Revenue for October was approximately $9.5 million . . . .
Our October revenue performance is close to our average maximum capacity of approximately

21   $9 million to $10 million per month."); *id.* Ex. 12 at 10 (during the March 1, 2011, fourth quarter
conference call, Mr. Gold stated that "we are still in a capacity constraining environment and our

22   peak capacity is $9 million to $10 million a month and that's what you should expect in terms of
revenue for Q1").)

ORDER- 20

1    infusions/month) and that "96% of capacity needs to be scheduled for us to achieve [2010

2    revenue] goal [of $53 million]").)

3        In addition, Plaintiffs point to what appears to be a September 14, 2010, Power

4    Point presentation to Dendreon's Board of Directors.  (Mot. at 7 (citing Ta Decl. Ex. 40

5    at DNDN-WA 0005591).)  The referenced slide indicates that if Dendreon achieved a

6    projected 355 infusions in October 2010, Dendreon would be at just 85% of capacity

7    (which was 428 infusions for October 2010).  (*See* Ta Decl. Ex. 40 at DNDN-WA

8    0005591; *see also id.* Ex. 35 at DNDN-WA 1111814.)  Plaintiffs assert, without citation

9    to the record, that Mr. Bishop gave the September 14, 2010, presentation to the Board

10   and that Dr. Gold and Mr. Schiffman attended.[11]  (Mot. at 7.)

11       Plaintiffs also highlight poor demand in the geographical area surrounding

12   Dendreon's New Jersey manufacturing facility.  The facility's capacity to manufacture

13   Provenge was divided into three time "slots" during the manufacturing day:  Slots 1, 2,

14   and 3.  (Ta Decl. Ex. 4 at 3, 21; Ex. 1 at 20:8-14.)  Slot 1 was the morning time slot, and

15   Slots 2 and 3 were time slots later in the day.  (*Id.* Ex. 1 at 20:8-14.)  Because cells

16   obtained from patients need to be processed immediately upon arrival at the facility, Slot

17   1 could only be used to process cells from patients located within driving distance of the

18

19       [11] Plaintiffs also point to an email from Mr. Schiffman to Dendreon's Vice President,

20   Corporate Communications and Investor Relations which included Mr. Schiffman's comments
     on a draft script for Dendreon's November 3, 2010, earnings conference call.  (."  (Ta Decl. Ex.
     16.)  In his comments, Mr. Schiffman states, "I would not say full capacity this quarter as we are

21   below."  (*Id.* at DNDN-WA 0094070.)  The court notes, however, that this evidence would
     appear to indicate Mr. Schiffman's attention to providing correct, rather than incorrect,

22   information to investors.

ORDER- 21

1   facility or the "local" market.  (*Id.* Ex. 1 at 22:2-11, 23:1-12.)  Cells from patients outside

2   the local market that were transported by air to the facility were processed later in the day

3   during Slots 2 and 3.  (*See id.*)  Dendreon allocated at least 40-45% of its capacity to the

4   local market served by Slot 1.  (*Id.* Ex. 41 at DNDN-WA 0005310; Ex. 1 at 24:1-2 (In his

5   statement to the SEC, Mr. Bishop stated:  "[L]ocal accounted for . . . about 40 percent of

6   that manufacturing capacity.").)  However, Dendreon was not filling all of its capacity in

7   Slot 1.  (*See* Ex. 1 at 35:8-13; Ex. 2 at 28:6-10, 110:8.)  Accordingly to the December 7,

8   2010, Board minutes, only 6% to 61% of the total Slot 1 capacity was scheduled between

9   May 2010 and December 2010.  (*Id.* Ex. 41 at DNDN-WA 0005329.)  Further, idle

10  capacity in Slot 1 could not be used to process cells that arrived by air later in the day;

11  those cells could only be processed in Slots 2 or 3.  (*See id.* Ex. 6 at 12.)  Therefore,

12  excess demand in the areas of the country served by Slots 2 and 3 could not be shifted

13  into idle capacity in Slot 1.

14          Plaintiffs also assert that they are entitled to partial summary judgment on the

15  issue of materiality.  To demonstrate the materiality of information concerning

16  Dendreon's capacity, Plaintiffs point to the questions concerning capacity asked by

17  analysts and investors,[12] and the research reports issued by analysts referring to

18  Dendreon's capacity situation.[13]

19

20  _____

21          [12] (*See* Ta Decl. Ex. 59 at 5; Ex. 9 at 14, Ex. 12 at 10.)

22          [13] (*See* Ta Decl. Ex. 44 at DNDN-WA 0011834, Ex. 45 at DNDN-WA 0011869, Ex. 48 at DNDN-WA 0012571.)

1    Based on the testimony in their declarations, Defendants paint a different picture

2 concerning Dendreon's capacity constraints. (*See* Resp. at 9-14.) Although Plaintiffs

3 contend that the Dendreon's monthly capacity was the equivalent of $13 million,

4 Defendants contend that the correct number was actually $9-$10 million, and that

5 Defendants consistently provided accurate information to the market about Dendreon's

6 capacity and its use of that capacity. (*See id.*) Defendants contend that the evidence in

7 fact demonstrates that Dendreon was capacity-constrained during the relevant period, and

8 at best the documents relied upon by Plaintiffs create factual issues for the jury. (*See id.*)

9    Defendants contend that with 12 workstations on line, Dendreon had the

10 maximum theoretical capacity to produce 432 infusions in an average month, but that this

11 figure is just the starting point for determining actual capacity. (*See* Hagen Decl. ¶ 10

12 (stating that Dendreon had a maximum theoretical capacity of 144 infusions per shift

13 with 12 workstations and that there were 3 production shifts or "slots" per day).)

14 Dendreon, however, committed to the Food and Drug Administration ("FDA") that it

15 would leave a percentage of capacity unscheduled to accommodate late-arriving cells or

16 account for other potential complications in the manufacturing process that might

17 otherwise require a gravely ill patient to repeat the invasive apheresis process.[14] (*Id.* ¶¶

18 5-8; Schiffman Decl. ¶¶ 4-5; Bishop Decl. ¶¶ 23-24; Wechkin Decl. Ex. 2 at 50:16-23,

19

--------

20    [14] Dendreon acquired patients' cells through a process called leukapheresis, which was
performed at blood centers, hospitals, or other medical centers across the United States. (Hagen
21 Decl. ¶ 5.) The cells were then transported via air and/or road to a manufacturing facility, and
until July 2011, the only such manufacturing facility was in New Jersey. (*Id.*) Dendreon was
21 required to process a patient's cells within 18 hours of apheresis. (*Id.*) Thus, a patient's cell
22 often had to be processed immediately after arrival. (*See id.*)

52:10-22, Ex. 3 at 30:25-31:5.)  Leaving a portion of capacity unscheduled was also

consistent with sound manufacturing principles.  (Hagen Decl. ¶ 8; Schiffman Decl. ¶ 5.)

During the initial part of the launch, Dendreon committed to keeping 25 % of its

maximum theoretical capacity, or three out of 12 workstations, unscheduled or in reserve.

(Hagen Decl. ¶ 7; Schiffman Decl. ¶ 6.)  Keeping these stations in reserve reduced

Dendreon's maximum theoretical capacity from 432 infusions per month to a scheduled

capacity of 324 infusions per month.  (Hagen Decl. ¶¶ 7, 10.)  Defendants testify that

scheduled capacity was further reduced by at least 10% to account for patient

cancellations, failures in the apheresis process, and possible failure in the manufacturing

process.  (Hagen Decl. ¶¶ 11-12; Schiffman Decl. ¶¶ 6-7, 11; Bishop Decl. ¶ 28.)

Accordingly, Dendreon's scheduled capacity of 324 infusions per month was further

reduced to its actual capacity of 288 infusions per month, which when multiplied by the

$31,000.00 price of an infusion, yields a monthly revenue figure of $8.9 million.  (Hagen

Decl. ¶ 12; *see* Resp. at 10.)

Beginning in the fall of 2010, Dendreon began leaving idle only two, rather than

three, of the original 12 workstations.[15]  (*See* Hagen Decl. ¶ 7.)  The company had

learned that cancellations created unscheduled idleness that reduced the amount of

necessary scheduled idleness to ensure optimal production and patient welfare.  (Hagen

Decl. ¶ 7; Schiffman Decl. ¶ 8; *see also* Wechkin Decl. Ex. 1 at 414:5-16.)  In general,

---

[15] In some cases, Dendreon left only one of the original 12 workstations idle, if doing so
was supported by the data.  (Hagen Decl. ¶ 7.)

1   therefore, Dendreon began using 10, rather than only nine, of its available 12

2   workstations.  (Schiffman Decl. ¶ 8.)  With 10 workstations in production, the maximum

3   theoretical capacity of 432 dropped to a scheduled capacity figure of 360 and an actual

4   capacity figure of 324.  (*See* Hagen Decl. ¶¶ 10, 12.)  If the actual capacity figure of 324

5   is multiplied by the $31,000.00 price of an infusion, the result is a monthly revenue figure

6   of $10.4 million.[16]

7          When Defendants spoke of Dendreon's capacity to produce infusions during the

8   pre-March 2011 period, Defendants were not referring to maximum theoretical capacity,

9   but to Dendreon's actual capacity as described above.  (*See* Schiffman Decl. ¶ 12; Gold

10  Decl. ¶25.)  Defendants testify that Dendreon's actual capacity, rather than Dendreon's

11  maximum theoretical capacity, was the relevant or material figure for analysts and

12  investors who were interested in Dendreon's revenue performance.  (*See* Schiffman Decl.

13  ¶ 12.)  Indeed, Defendants submit reports from market analysts indicating their

14  understanding that Dendreon was "running at 70% to 80% capacity at its current facility

15  with 12 hoods [stations]," and that "the reason for leaving sufficient capacity open or

16  available at all times is that there has to be open hoods available for patient samples that

17  arrive late from across the U.S. and must be processed quickly (within 18 hours from

18  _____

19

20  [16] Mr. Schiffman testifies that, contrary to Plaintiffs' suggestions, Dendreon did not schedule infusions for all 12 workstations for the pre-expansion period; nor did it schedule in excess of the maximum theoretical 12-workstation capacity for that period.  (Schiffman Decl. ¶

21  9.)  Mr. Schiffman testifies that when Defendants spoke of scheduling into Dendreon's "excess" or "reserve" capacity, they were referring to an excess above the original nine-workstation production limit—not to an excess above the 12-workstation limit.  (*Id.* ¶¶ 9-12; Wechkin Decl.

22  Ex. 2 at 52:8-22, 70:15-71:11.)

leukopheresis)." (*Id.* Ex. A at DNDN-WA 1062544.)  Thus, Defendants argue that their testimony (and the testimony of Ms. Hagen) is consistent with an average manufacturing capacity of $9-$10 million in infusions per month in the pre-expansion period—just as they said in public statements to investors.  (*See id.*)

Defendants also assert that the existence of excess capacity in Slot 1 does not change the fact that Dendreon was capacity constrained across the country.  (Gold Decl. ¶ 24.)  Defendants acknowledge that in 2010 and the first quarter of 2011, Dendreon had unused capacity in Slot 1.  (Hagen Decl. ¶ 14; Schiffman Decl. ¶ 13; Bishop Decl. ¶ 32.)  Further, Mr. Schiffman testifies that he adequately disclosed this weakness in Slot 1 to investors.  (Wechkin Decl. Ex. 2 at 113:12-114:22.)  Nevertheless, during this same period, demand for Provenge in the parts of the country served by Slots 2 and 3 exceeded Dendreon's capacity to produce it.  (Bishop Decl. ¶ 32; Hagen Decl. ¶¶ 14-19, Ex. A.) However, due to the manufacturing constraints described above, the excess capacity in Slot 1 was not interchangeable with Slots 2 and 3.  (Gold Decl. ¶ 24.)  In other words, Dendreon could not use its excess capacity in Slot 1 to serve patients living farther from the New Jersey facility.  (*Id.*)  The time for the Slot 1 shift had expired by the time the cells from more distant patients arrived at the facility; and Dendreon could not process these cells in Slot 1 the next day because by that the time the cells would no longer be viable.  (Hagen Decl. ¶ 14; Schiffman Decl. ¶ 12; Gold Decl. ¶ 13.)  Thus, because Dendreon had patients that it had no capacity to treat, Defendants assert that Dendreon was capacity-constrained in the majority of the country despite excess capacity in Slot 1. (*See* Wechkin Decl. Ex. 2 at 82:7-19; 86:16-87:25.)

1    Defendants also argue that events following the FDA's approval of new

2  workstations in March 2011 provide further support for their position that Dendreon was

3  capacity-constrained in the preceding period.  (*See* Resp. at 13.)  Defendants point out

4  that once Dendreon could utilize some of its new capacity its revenue immediately shot

5  up, reaching approximately twice the monthly revenue in the pre-approval period ($15

6  million in April 2011 and approximately $20 million in June 2011).  (Bishop Decl. ¶ 55,

7  Ex. D at slide 4.)  Defendants posit that this increase in scheduled infusions after

8  Dendreon's expansion confirms Dendreon's capacity constraint in the previous period.

9  (Hagen Decl. ¶ 18; Schiffman Decl. ¶ 15.)

10    Plaintiffs nevertheless insist that because capacity was "not fungible . . . there is

11  no genuine issue of fact that the excess capacity in Slot 1 meant excess capacity for

12  Dendreon as a whole."  (Mot. at 23.)  Defendants, however, draw different inferences

13  from this same evidence.  They argue that "[i]t is precisely because capacity was not

14  interchangeable that excess capacity in Slot 1 did *not* amount to excess capacity for the

15  company as a whole."  (Resp. at 13.)  Weakness in Slot 1 did not change the fact that

16  patients living in more distant parts of the country served by Slot 2 and 3 could not be

17  served because those Slots 2 and 3 were full.  (*Id.*)  On Plaintiffs' motion for partial

18  summary judgment, the evidence must be viewed in the light most favorable to

19  Defendants and all evidentiary inferences drawn in their favor.  *See Scott*, 550 U.S. at

20  378.  Accordingly, Defendants are entitled to argue these favorable evidentiary inferences

21

22

1    to the jury.  The court denies Plaintiffs' motion for partial summary judgment concerning

2    Dendreon's capacity constraints with respect to falsity, materiality, and scienter.[17]

3         **D.  The 2011 Revenue Guidance**

4         During Dendreon's November 3, 2010, third quarter conference call, Defendants

5    told investors that they expected Dendreon's "2011 revenue to be approximately $350

6    million to $400 million."  (Ta Decl. Ex. 10 at 2.)  Plaintiffs contend that Mr. Bishop

7    played a central role in creating the 2011 revenue guidance and that it was based on a

8    financial model derived from two key metrics:  (1) the number of accounts, and (2) the

9    number of patients treated per account per month.  (*See* Mot. at 14 (citing Ta Decl. Ex.

10   41); *see also* Ta Decl. Ex. 3 at 282:18-25 ("[W]e talked about two key metrics and that

11   was the number of accounts and the number of patients we were treating per account per

12   month and if we were successful in hitting both of those metrics, you would hit the

13   guidance.").)  Plaintiffs also point to Defendants' statements to investors emphasizing

14   these two metrics and indicating that if Dendreon hit these metrics, it would also hit its

15   revenue guidance.  (Mot. at 15 (citing Ta Decl. Ex. 3 at 282:18-25, Ex. 12 at 4, Ex. 58 at

16   ───────────────────

17        [17] Plaintiffs assert that Defendants did not dispute either scienter or materiality; and thus,
     at a minimum, Plaintiffs are entitled to partial summary judgment with respect to these two
18   elements of this claim.  (Reply (Dkt. # 145).)  However, as described above, Mr. Schiffman
     testified that it was not Dendreon's maximum theoretical capacity that analysts found to be
19   relevant or material but rather Dendreon's actual capacity.  (*See* Schiffman Decl. ¶ 12, Ex. A.)
     Thus, Defendants did provide evidence raising a genuine issue of material fact with respect to
20   materiality. Further, the court finds that the same evidence discussed above that creates a genuine
     issue of material fact with regard to falsity also creates a genuine issue of material fact with
21   respect to the element of scienter.  In any event, as noted above, the court is not required to enter
     a partial summary judgment order under Rule 56(g).  *See Verizon*, 761 F.3d at 428 n.15; *see also*
22   *supra* n.4.  Here, the evidence related to the elements of falsity, scienter, and materiality is so
     intertwined that the court is not disposed to rule separately on these issues.

1    11-12).)  Plaintiffs move for partial summary judgment with respect to the elements of

2    falsity, scienter, and materiality on their federal securities claim related to Dendreon's

3    revenue guidance.

4          Specifically, Plaintiffs move for partial summary judgment with respect to the

5    falsity of three statements, made between April and June 2011, relating to Dendreon's

6    performance to date as compared to Dendreon's revenue guidance.  First, during an April

7    7, 2011, investor presentation, Mr. Schiffman stated that Dendreon was "tracking" certain

8    "goals and metrics" relevant to Dendreon's "$350 million to $400 million" revenue

9    guidance, and "to hit those numbers, what we're tracking and monitoring is bringing

10   accounts onboard," and that "'[w]hat we're looking for is essentially, on average, one to

11   two accounts, and one or two patients a month per account.  And we're hitting our

12   guidance."  (Ta Decl. Ex. 57 at 5.)  Second, during Dendreon's May 2, 2011, earnings

13   call, Mr. Bishop stated that "[w]e exited Q1 with approximately 135 active accounts,"

14   and "[w]e are well placed to meet or exceed our target of 225 active accounts by the end

15   of Q2."  (*Id.* Ex. 13 at 3.)  Third, during a June 7, 2011, investor presentation, Mr.

16   Schiffman stated that "[t]he early metrics are in line that it seems like we're hitting what

17   we need to achieve it [the 2011 revenue guidance] . . . [it] thus far seems to be going

18   well," and "[s]o as we look at the guidance, I think we look at it several different ways.

19   But in the end, the critical metrics for us to hit our guidance and I think what we're

20   sharing – and thus far if we looked at the data we've released I think we are on track – its

21   getting accounts signed up."  (*Id.* Ex. 58 at 11-12.)

22

1    Plaintiffs assert that the foregoing statements were false because at the time they

2    were made, Defendants knew based on various internal reports that Dendreon was behind

3    on both of the metrics contained in the revenue model.  (Mot. at 16-17 (citing Ta Decl.

4    Ex. 28 at DNDN-WS 55620, Ex. 29 at DNDN-WA 0000696-97, Ex. 42 at DNDN-WA

5    0005794, Ex. 30 at DNDN-WA 0033643, Ex. 43 at DNDN-WA 0005983, DNDN-WA

6    0005986, Ex. 34 at DNDN-WA 0111358, Ex. 33 at DNDN-WA 0075596, 0075589, Ex.

7    31 at DNDN-WA at 0140648-49).)  Further, Plaintiffs point to Defendants' statements to

8    the SEC indicating that they were updated regularly on these two metrics.  (*See* Mot. at

9    17.)  For example, Mr. Bishop stated that Defendants studied the metrics in weekly

10   meetings.  (Ta Decl. Ex. 1 at 392:8-15.)

11    Plaintiffs also assert that Defendants admitted to the SEC that they knew

12   Dendreon was off-track with respect to both metrics in the model.  (Mot. at 17.)  This

13   might be true with respect to the number of infusions per account.  (*See id.* Ex. 3 at

14   181:1-6 (Mr. Schiffman:  "The number of infusions per account was running below what

15   we wanted to see and that was absolutely the focus of growing.").)  Indeed, Mr.

16   Schiffman stated that Dendreon was behind on the infusions-per-account metric "the

17   majority of the time."[18]  (*Id.* Ex. 3 at 284:18-21.)  However, contrary to Plaintiffs'

18   assertions, there is conflicting testimony regarding the number of accounts.  Although

19   Mr. Schiffman acknowledges in his statement to the SEC that, at the end of the first

20

21    _____

      [18] However, Mr. Schiffman also stated Dendreon was "hitting and exceeding frequently

22   on the number of accounts."  (Ta Decl. Ex. 3 at 284:15-16.)  Thus, "in total [Dendreon was]
     exceeding on one of the metrics and under on the other metric."  (*Id.* at 284:22-23.)

1    quarter of 2011, Dendreon was 7% under its internal goal for active accounts, he states

2    that Dendreon ended up exceeding the goal in the second quarter.  (*Id.* Ex. 3 at

3    229:19-230:3.)

4          Finally, Plaintiffs assert that they are entitled to partial summary judgment on the

5    issue of materiality.  Plaintiffs base this argument on the number of questions that

6    investors asked about these metrics and the research reports and notes that discussed the

7    metrics.  (Mot. at 19-20 (citing Ta Decl. Ex. 49 at DNDN-WA 0012608, Ex. 51 at

8    DNDN-WA 0133912, Ex. 52 at DNDN-WA 0076999-77000).)

9          Once again, Defendants draw different inferences and paint a different picture

10   based on virtually the same series of events.  Defendants acknowledge that employees or

11   officers in Dendreon's commercial organization attempted to measure Dendreon's

12   current and future performance against its revenue forecast by referring to metrics

13   "similar to the two components" in cited by Plaintiffs in the revenue model described

14   above.  (Resp. at 19; *see also* Ta Decl. Ex. 3 at 182:6-8 ("Q:  Why would you assume

15   Hans [Bishop] would be the one who provides the metrics [during the March 1st earnings

16   call]?  Q:  Because these are commercial metrics.").)  Defendants also admit that "the

17   metrics could be useful" and that "Dendreon began in March 2011 to refer to certain

18   versions of those metrics in its public communications."  (Resp. at 19.)  Defendants,

19   however, expressly deny that the metrics constituted the only approach to determining

20   Dendreon's performance relative to its revenue guidance or that Dendreon's revenue

21   guidance was originally based on these metrics at all.  (Resp. at 19.)  Instead, Mr. Bishop

22   testifies that Dendreon's revenue guidance was originally based on epidemiological data

1   provided by third-party pharmaceutical forecasting experts, together with surveys and

2   other data and assumptions relating to expected market penetration in 2011 and beyond.

3   (Bishop Decl. ¶¶ 47-49.)

4          Defendants testify that the best way to determine whether Dendreon was on track

5   to meet its revenue guidance was to compare actual revenue for a given period to the

6   predicted revenue for that period.  (Shiffman Decl. ¶ 19.)  In charts plotting actual

7   projected performance for the first four months of 2011, the "revenue" and "forecast"

8   lines are very similar.  (*See, e.g.* Gold Decl. ¶ 16, Ex. A at slide 5 (plotting actual

9   performance against a 2011 revenue goal of $375 million, the midpoint of the guidance

10  range).)  Indeed, Defendants point out that Dendreon's revenue through April 2011 was

11  at 99% of the projected sales increase underlying the guidance, and revenue tallied to

12  date at the time of the company's June 21, 2011, board meeting was still at 96% of

13  forecast.  (*Id.* ¶ 16, Ex. B.)  If projected to the end of the year, performance at either level

14  would have come within the guidance range of $350 million to $400 million.  (Resp. at

15  20.)  Further, Defendants have testified consistently that until the June 2011 revenue and

16  July 2011 bookings data were available, Dendreon's actual performance to-date was very

17  close to that predicted in the forecast underlying the guidance.  (Wechkin Decl. Ex. 1 at

18  386:13-19 (Mr. Gold:  "I really don't think that came into play until the end of June, early

19  July when we realized we were falling off the curve at that point, and then we really

20  needed to take a deep look and say, okay, what's going on, where is the launch going?

21  Because up until that point we were tracking pretty closely against the curve.");

22  412:17-413:2, 519:6-21, Ex. 3 at 281:24-283:14; 424:9-425:11).)

1    Defendants also argue that, contrary to Plaintiffs' assertions, there were multiple

2    ways that Dendreon could meet its revenue guidance.  For example, Mr. Schiffman

3    testifies that although Dendreon may have been behind on the infusions per account

4    metric, it was ahead on the number of sites or accounts metric.  (Schiffman Decl. ¶ 31; Ta

5    Decl. Ex. 3 at 284:15-16.)  Thus, although Dendreon may have been behind on one of the

6    metrics upon which Plaintiffs rely—infusions or prescriptions per account, Defendants

7    point to evidence that it was ahead on the other—the number of sites or accounts.[19]  (*See*

8    Ta. Decl. Ex. 3 at 284:22-23.)  Further, Defendants point to evidence that Dendreon

9    ended 2011 with 590 infusing sites when it had planned for only about 450-500.

10   (Shiffman Decl. ¶ 31.)  Therefore, although prescriptions or infusions per site were lower

11   than expected, Mr. Schiffman testifies that this did not mean that Dendreon was no longer

12   on track to meet its revenue forecast.  (*Id.*)  He testifies that a temporary decrease in

13   average infusion per account was an expected result of Dendreon's rapid addition of

14   accounts as new account could take months to begin generating infusions, and that as of

15   April 2011, Dendreon was on track to meet its revenue guidance.  (*Id.*)  Indeed, Plaintiffs

16   acknowledge that the revenue model they rely upon took this fact into account.  (*See* Mot.

17   at 14-15 (citing Ta Decl. Ex. 1 at 456:5-13).)

18   Thus, based on the foregoing, Mr. Schiffman testifies that his statements on April

19   7, 2011, that "what we're looking for is essentially, on average, one to two accounts, and

20

21   [19] In his June 7, 2011, investor presentation, Mr. Schiffman stated that it was the number
     of accounts that was the "critical metric" for hitting Dendreon's revenue guidance.  (*See*
22   Schiffman Decl. ¶ 32 ("But in the end, the critical metrics for us to hit our guidance . . . it's
     getting accounts signed up.").)

ORDER- 33

1    one or two patients a month per account," and "we're hitting our guidance," and on June

2    7, 2011, that "[t]he early metrics are in line that it seems like we're hitting what need to

3    achieve it" were not false at the time they were made.  (*See* Shiffman Decl. ¶¶ 29-34.)

4           As indicated above, Plaintiffs also challenge Mr. Bishop's May 2, 2011, statement

5    that Dendreon ended the second quarter of 2011 with 135 sites and was "well placed to

6    meet or exceed our target of 225 active accounts by the end of [the second quarter]."

7    (Mot. at 18; Bishop Decl. ¶ 46.)  Plaintiffs do not contend that either of these figures is

8    inaccurate.  (*See* Mot. at 19.)  Indeed, Dendreon ended the second quarter with 265 sites.

9    (Bishop Decl. ¶ 53.)  Instead, Plaintiffs assert that this statement was misleading because

10   the publicly announced goal of 225 sites was inconsistent with an internal goal of 310

11   sites.  (*See* Mot. at 18-19.)  First, Mr. Bishop testifies that he is uncertain that the two

12   figures even referred to the same metric.  (*See* Bishop Decl. ¶ 52 (citing Ta Decl. Ex. 1 at

13   446-47).)  As Defendants note, however, an inconsistency between an internal and an

14   externally announced goal does not show that Mr. Bishop's discussion of Dendreon's

15   progress toward the external goal was false or misleading; nor does it show that

16   Dendreon's revenue goal would have been out of reach if Dendreon hit the external goal

17   of 225 sites (as opposed to 310 sites) by the end of the second quarter of 2011.  Indeed,

18   Mr. Schiffman testified before the SEC that Dendreon did not need to hit 310 sites to

19   make its revenue guidance.  (Wechkin Decl. Ex. 2 at 288:20 ("We didn't need 310 to hit

20   the guidance.").)

21          Based on the foregoing, the court denies Plaintiffs' motion for partial summary

22   judgment with respect to the falsity of Defendants' statements above.  At best, Plaintiffs

1    have raised issues of fact that require trial to the jury.  The same evidence that raises

2    triable issues of fact with respect to falsity also raises genuine issues of material fact with

3    respect to scienter.  Accordingly, the court denies Plaintiffs' motion with respect to this

4    element as well.

5          Defendants also oppose partial summary judgment on the materiality of the

6    metrics or model underlying Dendreon's revenue guidance.  (Resp. at 23-24.)

7    Defendants argue that it was not the underlying metrics or model that investors found

8    material, but rather "the larger concern" of whether Dendreon was on track with respect

9    to the revenue guidance itself, and Defendants argue that Dendreon was indeed on track

10   at the time they made the challenged statements.  (*Id.*)  Defendants, however, cite no

11   evidence in support of their argument.  (*See id.*)  Plaintiffs respond that Defendants'

12   "conclusory argument, unsupported by reference to any evidence, is not sufficient to

13   defeat summary judgment" on the issue of materiality.  (Reply at 9, n.9.)

14         Defendants, however, are entitled to draw different evidentiary inferences from the

15   same evidence that Plaintiffs have presented to the court.  Assuming those inferences are

16   reasonable, the court must credit them on summary judgment.  *See Scott*, 550 U.S. at 378.

17   Indeed, the Supreme Court has cautioned that "[t]he determination [of materiality]

18   requires delicate assessments of the inferences a 'reasonable shareholder' would draw

19   from a given set of facts and the significance of those inferences to him, and these

20   assessments are peculiarly ones for the trier of fact."  *TSC Indus., Inc. v. Northway, Inc*.,

21   426 U.S. 438, 450 (2001) (quoting *Johns Hopkins Univ. v. Hutton*, 422 F.2d 1124, 1129

22   (4th Cir. 1970)) (footnote omitted); *see also Phan*, 500 F.3d at 908 ("Materiality typically

1   cannot be determined as a matter of summary judgment because it depends on

2   determining a hypothetical investor's reaction to the alleged misstatement.").  Thus,

3   Defendants are entitled to draw and argue different reasonable inferences from the

4   documents or reports Plaintiffs cite regarding the information that a reasonable investor

5   would find material and argue those different inferences to the jury.

6       The research reports and notes cited by Plaintiffs nearly always reference the

7   metrics or model at issue in relation to Dendreon's revenue or sales projections.  (*See,*

8   *e.g.*, Ta Decl. Ex. 51 at DNDN-WA 0133912 ("Only 1-2 patients per account are

9   required to achieve DNDN's 4Q sales projections assuming the company achieves its

10  account goals."), Ex. 49 at DNDN-WA 0012608 ("We're leaving our 2011 Provenge

11  estimate untouched ($396M). . . . For context, consider that management is guiding for

12  500 centers to be up and running as we exit 2011.  Using the 2011 capacity midpoint of

13  1-2 pts/center/mth suggest entering 2012 on a monthly run rate of $69.8M

14  (500x1.5x$93k)."), Ex. 52 at DNDN-WA 0076999-0077000 ("Per Dr. Gold . . . target

15  tally of 225 [infusing centers] by Q2 end. . . . Reiterate guidance calls for an average of 1-

16  2 patients treated per month per center per 12 workstations. . . . [W]e model for $367M in

17  Provenge sales for 2011, in line with guidance of $350-400M.").)  Defendants are

18  entitled, based on this evidence, to argue that the real concern for investors was not the

19  particular underlying metrics but the revenue guidance itself.  This is a reasonable

20  inference based on the evidence before the court.  Thus, the court denies Plaintiffs'

21

22

ORDER- 36

1  motion for partial summary judgment with respect to the issue of materiality concerning

2  the metrics or model underlying Dendreon's revenue guidance.[20]

3                          **IV.    CONCLUSION**

4        Based on the foregoing, the court DENIES Plaintiffs' motion for partial summary

5  judgment as described in detail above (Dkt. ## 129, 133).

6        Dated this 9th day of November, 2015.

7

8  _____

9  JAMES L. ROBART
   United States District Judge

10

11

12

13

14

15

16

17

18

19  _____

20      [20] In any event, for the same reasons discussed in relation to Plaintiffs' motion for partial
    summary judgment concerning Dendreon's capacity constraints, the court declines to issue
21  separate rulings concerning the three elements (falsity, scienter, and materiality) that Plaintiffs
    raise regarding their claim based on Dendreon's revenue guidance.  Here, the evidence related to
22  the elements of falsity, scienter, and materiality is so intertwined that the court is not disposed to
    rule separately on them.  *See supra* n.17 (citing *Verizon*, 761 F.3d at 428 n.15).

ORDER- 37